Walter Haessig                                                    April 25, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3  AMY WEXLER and KENNETH A.        )
    WEXLER,                          )
 4                                   )
           Plaintiffs,               )
 5                                   ) CIVIL ACTION
    V.                               )
 6                                   ) NO.:  21 CV 2543
    CHUBB NATIONAL INSURANCE         )
 7  COMPANY and BELFOR USA GROUP     )
    INC.,                            )
 8                                   )
           Defendants,               )
 9                                   )
    And                              )
10                                   )
    CHUBB NATIONAL INSURANCE         )
11  COMPANY,                         )
                                     )
12  Counterclaim Plaintiff,          )
                                     )
13  V.                               )
                                     )
14  AMY WEXLER and KENNETH A.        )
    WEXLER,                          )
15                                   )
    Counterclaim Defendants.         )
16

17          ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF

18                     WALTER HAESSIG

19                     APRIL 25, 2023

20                       VOLUME 1
            -----------------------------------
21

22      ORAL AND VIDEOTAPED 30(B)(6) DEPOSITION OF WALTER HAESSIG,

23  produced as a witness at the instance of the PLAINTIFF, and

24  duly sworn, was taken in the above-styled and numbered cause on

25  Tuesday, April 25, 2023, from 9:31 a.m. to 2:39 p.m., via Zoom,
```



Walter Haessig

April 25, 2023
Pages 2 to 5

---

**Page 2**

1  before Wendy Schreiber, CSR No. 9383, in and for the State of
2  Texas, reported by machine shorthand, from Rockwall, Texas,
3  pursuant to the Federal Rules of Civil Procedure and the
4  provisions stated on the record or attached hereto.
5
6  Job No. 966787
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1                    INDEX
2  WALTER HAESSIG                        PAGE
3  Examination by Mr. Lamden                7
4  Examination by Mr. Offenbach            152
5  Reporter's Certificate                  156
6
7                   EXHIBITS
8  NO.          DESCRIPTION              PAGE
9  Exhibit 1    Notice of Deposition       15
10 Exhibit 4    Chubb National Insurance Company's    69
11             First Supplemental Responses to
12             Plaintiff's First Set of Request
13             to Produce Documents
14 Exhibit 6    E-Mail dated 4/22/19 to Paradis from   139
15             Haessig
16 Exhibit 7    General Adjuster (GA) Best Practices    84
17             Guidelines
18
19         REQUESTED DOCUMENTS/INFORMATION
20                   NONE
21 //
22 //
23 //
24 //
25 //

---

**Page 3**

1               APPEARANCES
2  FOR THE PLAINTIFFS:
3     SETH D. LAMDEN, ESQ.  (Attending Remotely)
      BLANK ROME LLP
4     444 W. Lake Street, Suite 1650
      Chicago, Illinois 60606
5     Phone: (312) 776-2600
      slamden@blankrome.com
6
7  ATTORNEYS FOR DEFENDANT CHUBB NATIONAL INSURANCE COMPANY:
8     DANIEL J. OFFENBACH, ESQ.  (Attending Remotely)
      LEAHY EISENBERG & FRAENKEL, LTD.
9     33 W. Monroe Street, Suite 1100
      Chicago, Illinois 60603
10    Phone: (312) 368-4554
      Fax: (312) 368-4562
11    Djo@lefltd.com
12
   ATTORNEY FOR DEFENDANT BELFOR USA GROUP, INC.:
13
      MICHAEL S. ERRERA, ESQ.  (Attending Remotely)
14    FORAN GLENNON PALANDECH PONZI & RUDLOFF, P.C.
      222 N. LaSalle Street, Suite 1400
15    Chicago, Illinois 60601
      Phone: (312) 863-5000
16    Fax: (312) 863-5099
      Merrera@fgppr.com
17
18
   Video Operator - James Taylor  (Attending Remotely)
19
20
21
22
23
24
25

---

**Page 5**

1               CERTIFIED QUESTIONS
2  NO.                             PAGE/LINE
3  1.  Mr. Haessig, have you been involved --      12/15
4      were you sued in Wind River Management
       Corporation?
5  2.  Would that be the same if I asked you       12/23
       whether you were sued in your individual
6      capacity in Pemberton versus Chubb Lloyd's
       Insurance Company?
7
   3.  What about if I asked you if you were sued    13/2
8      personally in Brache, B-R-A-C-H-E, vs. Chubb
       Lloyd's Insurance Company?
9
   4.  What made you confused as to whether you     24/16
10     were going to testify about topic No. 14?
11 5.  What do you mean by administering the policy?  37/19
12 6.  Do you know whether Chubb is subject to      65/14
       any regulations in Illinois that dictate
13     what types of documents must be kept in
       an insured's claim file?
14
   7.  Do you know whether there was any subrogation  94/12
15     activity in the Wexlers' claim?
16 8.  If the Wexlers provided Chubb with a damage   127/19
       estimate that was higher than Chubb's damage
17     estimate, should Chubb's adjuster have had a
       conversation with his or her supervisor to
18     determine whether reinspection was necessary?
19
20
21
22
23
24
25



Walter Haessig

April 25, 2023
Pages 6 to 9

Page 6

1        VIDEO OPERATOR:  We are now on the record.
2  This begins media No. 1 in the deposition of Walter Haessig in
3  the matter of Amy Wexler, et al., versus Chubb National
4  Insurance Company, et al., in the United States District Court,
5  Northern District of Illinois, Eastern Division,
6  No. 21 CV 2543.
7        Today is April 25th, 2023, and the time is 9:31
8  a.m. Central.  This deposition is being taken remotely at the
9  request of plaintiff.  The videographer is James Taylor and the
10  court reporter is Wendy Schreiber of Magna Legal Services.
11        Will Counsel please state their appearances and
12  whom they represent.
13        MR. LAMDEN:  Good morning.  This is Seth Lamden
14  with Blank Rome, LLP on behalf of the plaintiffs, Amy and
15  Kenneth Wexler.  I'd just like to note for the record that this
16  is being taken remotely at the request of the defendant Chubb,
17  not at the request of plaintiff.
18        VIDEO OPERATOR:  Thank you.
19        MR. ERRERA:  Michael Errera on behalf of
20  defendant Chubb National Insurance Company.
21        MR. OFFENBACH:  Dan Offenbach on behalf of
22  BELFOR U.S.A., Group, Inc.
23        VIDEO OPERATOR:  Will the court reporter please
24  swear in the witness.
25        THE REPORTER:  My name is Wendy Schreiber, Texas

Page 7

1  CSR 9383, and I am reporting the deposition remotely from
2  Burleson, Texas and the witness is located in Rockwall, Texas.
3        Sir, could I get you to raise your right hand,
4  please?
5        In the deposition about to begin, do you swear
6  to tell the truth, the whole truth, nothing but the truth so
7  help you God?
8        THE WITNESS:  Yes.
9
10        WALTER HAESSIG,
11  having been first duly sworn, testified as follows:
12
13        THE REPORTER:  Thank you.
14        You may begin.
15        EXAMINATION
16    Q.  (BY MR. LAMDEN)  Good morning, Mr. Haessig.  As I
17  mentioned, I'm Seth Lamden and I represent the plaintiffs in
18  this matter.
19        Could you please state your full name and spell
20  your name for the transcript?
21    A.  Hey, good morning, Seth.  Yeah, Walter Haessig.
22  Haessig spelled H-A-E-S-S-I-G.
23    Q.  And what is the city and state of your current
24  residence?
25    A.  Rockwall, Texas.

Page 8

1    Q.  Are you currently employed?
2    A.  Yes, sir.
3    Q.  Who is your employer?
4    A.  Ace -- Ace American also referred to as Chubb.
5    Q.  So your paychecks come from Ace American?
6    A.  Yeah.  Seth, I don't look at a paycheck every day or
7  every week for that matter but, yeah, Ace.
8    Q.  Okay, I'm just trying to figure out.  There's a lot
9  of companies here.  We've got I understand the brand name
10  Chubb; is that right?
11    A.  Yeah, that's correct.
12    Q.  And then Federal Insurance Company is the company
13  that wrote the policy in this -- in this matter?
14    A.  Was it -- is it Federal or is it Chubb National?
15    Q.  It may be Chubb National.  I guess that's the party
16  here.  So if I were to use "Chubb" to refer to the issuing
17  party, the insurer in this case and your employer collectively,
18  would that be all right?
19    A.  I would be agreeable to that, yes, sir.
20    Q.  Okay.  If that causes confusion or if your answer
21  changes, just let me know.  I'm not trying to trip you up.  I'm
22  just trying to avoid using a whole bunch of different names
23  here and creating conflict there.
24        Are you associated with a physical office of
25  Chubb?

Page 9

1    A.  No, I'm -- I work from home exclusively.
2    Q.  Okay.  And what's your current title?
3    A.  AVP Claim Manager.
4    Q.  AVP Claim Manager.  And how long have you had that
5  title?
6    A.  Approximately four years.
7    Q.  Do you have any other employers?
8    A.  No, sir.
9    Q.  Are you employed by a company or affiliated with a
10  company called Complex Loss Consultants, LLC?
11    A.  Yes, I started an LLC that hasn't gone anywhere.
12    Q.  Okay.  And what's that -- does that company have a
13  mission or can you tell me a little bit about that company?
14    A.  Yeah, sure.  Other than spending the $300 with the
15  State of Texas to create an LLC there is nothing else with the
16  company.  The thought process behind it, Seth, was in the event
17  that I ever started a consulting firm I like the name but --
18  but other than that, there's -- there's not been any activity
19  or business done under that LLC.
20    Q.  Okay.  Fair enough.  So there's no connection between
21  Chubb and Complex Loss Consultants?
22    A.  That is correct, yes.
23    Q.  Okay.  That's all I was getting at.
24        So can you tell me if you've been deposed in the
25  past?



Walter Haessig

April 25, 2023
Pages 10 to 13

Page 10

1    A.   Yes, sir.

2    Q.   How many times?

3    A.   Approximately eight, nine times, something close to

4  that.  Maybe ten but that seems like it would be high.

5    Q.   Do you remember the last time you testified -- or

6  that you were deposed?

7    A.   Sure.  About six weeks ago, maybe eight weeks ago.

8    Q.   What kind of case was that?

9    A.   Personal lines first-party property claim.

10   Q.   Can you tell me about what the insured was alleging

11  in that case?

12   A.   To -- to some extent, sure.  Mike, if you have any

13  objections of course.

14        But it's a California wildfire claim, a dispute

15  over the extent of damages.

16   Q.   Does that involve a Chubb Masterpiece insurance

17  policy?

18   A.   I believe it does, yes.

19   Q.   Do you know -- can you recall if any of the other

20  times you've been deposed it involved a Chubb Masterpiece

21  policy?

22   A.   Seth, as I sit here today I can't remember the

23  details.  There -- some of them may have been, yes.

24   Q.   Did they ever involve properties that were located in

25  Illinois?

Page 11

1    A.   I don't believe so.

2    Q.   Have you ever been involved in a dispute or claim

3  involving a property located in Illinois?

4    A.   I'll have to ask you to define "disputed."

5    Q.   A claim where Chubb or one of the insuring companies

6  issued payment without any objection from the insured.

7    A.   So undisputed?

8    Q.   Have you been involved in any disputed claims?

9  Sorry, I though you asked me to define "undisputed."  So

10  disputed where the insurer questioned or challenged the amount

11  that Chubb was going to pay in connection with a claim.

12   A.   Oh, yeah.  Hey, I'm not -- I'm not trying to be

13  difficult here.  We handle a lot of claims across a variety of

14  states.  Have I had one where someone didn't -- may have

15  disagreed with a payment?  I -- I don't know.  I can tell you

16  that I cannot think of a claim or a matter in Illinois which

17  would have resulted in litigation or my deposition.

18   Q.   Have you ever been a party to litigation?

19   A.   Pardon?

20   Q.   Have you ever been a party to a lawsuit, you

21  personally?

22   A.   Oh, personally?  No.

23   Q.   You weren't sued in Wind River Management Corporate

24  v. Federal Insurance Company?

25   A.   I don't recall the details of -- of Wind River

Page 12

1  Management but let me -- let me -- let me explain a little bit

2  more.

3        MR. ERRERA:  Well, hold on.  Let me I guess

4  object.  I certainly don't have a problem, Seth, you know, if

5  you want background on prior deps and things like that so he

6  can understand the process but to me this is kind of getting

7  more into a fact deposition rather than a 30(b)(6) deposition,

8  you know, unless this is to one of the topics.

9        MR. LAMDEN:  Michael, I'm not going to argue

10  scope on the record but I'm not going to entertain any scope

11  objections today.  They're improper in the Northern District.

12  I'm going to repeat the question --

13        MR. ERRERA:  Well, then I'm going to have to

14  instruct him --

15   Q.   (BY MR. LAMDEN)  Mr. Haessig, have you been involved

16  -- were you sued in Wind River Management Corporation?

17        MR. ERRERA:  I will have to -- I'm going to have

18  to instruct him not to answer.  It's beyond the scope of the

19  topics that he's been designated upon.

20   Q.   (BY MR. LAMDEN)  Mr. Haessig, are you going to follow

21  your counsel's instructions?

22   A.   I will follow counsel's instructions.

23   Q.   Would that be the same if I asked you whether you

24  were sued in your individual capacity in Pemberton versus Chubb

25  Lloyd's Insurance Company?

Page 13

1        MR. ERRERA:  Same.

2    Q.   (BY MR. LAMDEN)  What about if I asked you if you

3  were sued personally in Brache, B-R-A-C-H-E, vs. Chubb Lloyd's

4  Insurance Company?

5        MR. ERRERA:  Same.

6        THE WITNESS:  Okay.

7    Q.   (BY MR. LAMDEN)  So you won't answer any of those

8  topics?  All right.

9        I'm going to go through some ground rules.  For

10  today you understand that you are under oath and you were sworn

11  to tell the truth?

12   A.   I do.

13   Q.   You understand that your testimony today has the same

14  force and effect as if given in a court of law and the penalty

15  of perjury laws apply?

16   A.   I do.

17   Q.   You understand all my questions today will be typed

18  up into a transcript.  You will have the opportunity to make

19  changes to your testimony but if you do, I will be able to

20  comment on the fact you changed your testimony at trial?

21   A.   I understand there will be a transcript and

22  opportunity to review and make corrections.

23   Q.   Okay.  So the court reporter can accurately take down

24  all my questions, all your answers today, I just ask that you

25  let me finish my questions before you respond.  Do you agree



Walter Haessig

April 25, 2023
Pages 14 to 17

Page 14

1 that if you don't understand any of my questions you'll ask me
2 to restate it or for clarification?
3    A.   Yes, sir.
4    Q.   Objections are for the record.  Today your counsel
5 will be making them.  Unless your counsel instructs you not to
6 answer you're to answer.  The judge will decide later whether
7 questions answered will be allowed in future proceedings.
8         Do you agree not to look at anything while we
9 are on the record?
10    A.   Yes.
11         MR. ERRERA:  Well, you mean other than exhibits?
12         MR. LAMDEN:  Of course.
13         MR. ERRERA:  Go ahead, you can answer.
14         THE WITNESS:  Yes, I agree.
15    Q.   (BY MR. LAMDEN)  So you agree not to communicate with
16 anyone else while we're on the record?
17    A.   I do agree with the exception of Mike, of course.
18    Q.   Can you explain what you mean by that?
19    A.   Yeah.  Should -- should Mike have an objection or
20 there's some dialogue around the question that -- you know,
21 there might be some dialogue with Mike here while the -- while
22 we're -- just like we just had.
23    Q.   But you're talking about while we're on the record,
24 correct?
25    A.   Yes.

Page 15

1    Q.   Okay.  So you're not going to be checking e-mails or
2 texts during this deposition?
3    A.   That is correct.
4    Q.   Is your phone off and your e-mail app closed?
5    A.   My e-mail is.  I can turn my phone off if you'd like.
6    Q.   That's fine.  I'm just asking that you don't check it
7 during our deposition.
8    A.   I agree.
9    Q.   Can you confirm that there's no one else in the room
10 with you?
11    A.   No one else is in the room.
12    Q.   Will you let me know if someone enters?
13    A.   I will.  In fact, you'll probably see them right
14 behind my shoulder here but I hope that doesn't happen.
15    Q.   Do you know of any reason that you can't give
16 truthful and accurate testimony today?
17    A.   I'm not aware of any reason why I would not be able
18 to provide truthful -- truthful and accurate testimony.
19    Q.   You're not on any medications or under the influence
20 of alcohol that might impair your ability to give answers?
21    A.   No, sir.
22    Q.   You've been designated as Chubb's corporate GM for
23 the topics today; is that right?
24    A.   That is my understanding.
25         (Exhibit 1 was marked for identification.)

Page 16

1    Q.   (BY MR. LAMDEN)  Okay.  Mr. Haessig, I'm going to put
2 on the screen what I've already marked as Exhibit 1.  Are you
3 able to see the document marked Exhibit 1 on your screen?
4    A.   Yes, sir.
5    Q.   This is Plaintiffs' Amy and Kenneth Wexler's Notice
6 of Deposition of Defendant Federal Insurance Company.  Have you
7 seen this before?
8    A.   I have seen this before.
9    Q.   Do you recall the first time that you saw it?
10    A.   I believe that I probably saw it within the last
11 several weeks.
12    Q.   Did you review it in connection with your prep for
13 this deposition?
14    A.   Yes, sir.
15    Q.   Okay.  Were you involved in drafting Chubb's
16 responses to this Notice of Deposition?
17    A.   This -- this document I believe has more pages.  Can
18 we -- can you provide the additional details because I think
19 there's a total of ten pages.
20    Q.   That's correct.  I'm just going to flip to the first
21 page.  This is our notice.  I'm just asking if you were
22 involved in providing written responses to it.
23    A.   Next page, please.  Okay.  If you could continue.
24 Thank you.  All right, thank you.  Next, please.  Next, please.
25 Okay.

Page 17

1    Q.   Same question.  Were you involved in preparing
2 Chubb's responses to this notice?
3    A.   Seth, I don't remember if I was directly involved.  I
4 don't remember being -- what's the last page called?  -- the --
5 the execution page?  I don't -- I don't believe that I provided
6 the signature on this document.
7    Q.   Well, this is my document.  This is a document that
8 the plaintiffs served on your client.  It's the reason that
9 you're here today.  But you are appearing pursuant to this
10 Notice of Deposition, correct?
11    A.   Correct, yes.
12    Q.   You're appearing here in your capacity -- I just want
13 to make clear -- as Chubb's designee on certain topics in this
14 notice, correct?
15    A.   Certain topics, that is correct.
16    Q.   Okay.  I'm turning to the first page of Exhibit 1.
17 It states No. 2 on the bottom.  My understanding is that you
18 are not here to testify on topics 1, 2 or 3 and that your
19 employer, Chubb, has designated Bob Paradis to testify on those
20 topics.  Is that correct?
21    A.   I don't have the list in front of me but let me look.
22 I'm sure that we provided the topics that I was going to
23 provide testimony on but...
24    Q.   So do you -- do you not know which topics you've been
25 designated to provide testimony on?



Walter Haessig

April 25, 2023
Pages 18 to 21

Page 18

1    A.  Seth, let me be clear.  I understand what topics.  I
2  don't know what numbers they are so I need a moment to look at
3  the numbers.  That's not how I -- how I remember the -- the
4  information.
5    Q.  We can -- we can --
6    A.  I'm sorry -- let me finish.  So as far as 1, 2 and 3,
7  yeah, I believe that we responded with Bob being the designee
8  on those topics.
9    Q.  Topic No. 4 states, "Chubb's setting of loss reserves
10  for the CLAIM, including any adjustments to such loss reserves
11  made or considered at any time."
12       Do you see that?
13    A.  I do.
14    Q.  Have you been designated to testify on behalf of
15  Chubb today about topic No. 4?
16    A.  I believe that that's Bob that's designated on that
17  topic.
18    Q.  Move on to topic No. 5.  It says, "Chubb's standards
19  for handling, investigating, and adjusting homeowners'
20  residential water damage insurance claims in Illinois from 2018
21  to the present, including with respect to the CLAIM, whether
22  pursuant to any claims or adjustment manuals or other sources
23  of standards or practices."
24       Do you see that?
25    A.  I do.

Page 19

1    Q.  Have you been designated by Chubb to testify on its
2  behalf today in connection with topic No. 5?
3    A.  I have.
4    Q.  And are you prepared to testify about all the
5  information known or reasonably known to Chubb about topic No.
6  5?
7    A.  I am.
8    Q.  Move on to topic No. 6.  It states, "Chubb's training
9  of CHUBB claims personnel who are responsible for handling,
10  investigating, and adjusting homeowners' residential water
11  damage property insurance claims regarding the investigation,
12  repair, and replacement of residential property damaged by
13  water, mitigation of water damage, and the remediation of mold
14  damage, whether pursuant to any claims or adjustment manuals or
15  other sources of standards or practices."
16       Did I get that right?
17    A.  Yes, sir.
18    Q.  Now, have you been designated by Chubb to testify on
19  its behalf with regard to topic No. 6?
20    A.  I have.
21    Q.  And are you prepared to give testimony today
22  regarding all of the information known or recently known to
23  Chubb regarding topic No. 6?
24    A.  That is correct.
25    Q.  Move on to topic No. 7.  It states, "Chubb's

Page 20

1  understanding of any Illinois statutes and regulations
2  applicable to the handling, and adjustment of the CLAIM,
3  including the maintenance of any files relating to the CLAIM."
4       Did I get that correct?
5    A.  Yes, sir.
6    Q.  Have you been designated to testify on behalf of
7  Chubb today about topic No. 7?
8    A.  I have not.
9       MR. ERRERA:  Object to form.
10    Q.  (BY MR. LAMDEN)  You have not been designated to
11  testify regarding topic No. 7?
12    A.  That is correct.
13    Q.  So you will not be providing testimony today
14  regarding topic No. 7?
15    A.  That is accurate.
16    Q.  Move on to topic No. 8.  It states, "Chubb's
17  standards for selecting DOCUMENTS for inclusion in a claims
18  file (of the kind that CHUBB identified as such in discovery in
19  this ACTION) for a homeowners' property claim."
20       Do you see topic No. 8?
21    A.  I do.
22    Q.  Have you been designated to testify on behalf of
23  Chubb today about topic No. 8?
24    A.  I have.
25    Q.  Have you prepared to testify about all the

Page 21

1  information known or reasonably known to Chubb today about
2  topic No. 8?
3    A.  Yes, sir.
4    Q.  Move on to topic No. 9.  It states, "Chubb's
5  contentions regarding whether its actions and conduct in
6  handling the CLAIM comply with its duties of good faith and
7  fair dealing under applicable law, and all bases, analyses, and
8  reasons in support thereof."
9       Do you see that?
10    A.  I do.
11    Q.  Have you been designated to testify on behalf of
12  Chubb today about topic No. 9?
13    A.  Yes, sir.
14    Q.  And are you prepared to testify about all the
15  information known or reasonably known to Chubb about topic No.
16  9?
17    A.  Yes.
18    Q.  Let's move on to topic No. 10.  It states, "Chubb's
19  searches for and productions of DOCUMENTS (including any
20  failure or declination to search for and produce DOCUMENTS)
21  related to the CLAIM in this ACTION."
22       Do you see that?
23    A.  I do.
24    Q.  Have you been designated to testify on behalf of
25  Chubb today about topic No. 10?



Walter Haessig

April 25, 2023
Pages 22 to 25

---

Page 22

1    A.  I have.
2    Q.  Are you prepared to testify about all the information
3 known or reasonably known to Chubb about topic No. 10?
4    A.  Yes, sir.
5    Q.  My understanding is that Bob Paradis has been
6 designated by Chubb to testify on behalf of topic -- on behalf
7 of Chubb in connection with topic No. 11.  Would I be correct
8 that you're not here today to testify on topic 11?
9    A.  You are correct.
10    Q.  Twelve is not an issue in this -- in this deposition.
11 I'm going to move on to topic 13.
12        On the following page it states, "All
13 interpretive materials (DOCUMENTS and information) in Chubb's
14 possession, custody, or control, or that are reasonably
15 available to CHUBB, that concern or could be used for, or that
16 CHUBB actually has used for, the interpretation and application
17 of any provisions of the policy implicated by the CLAIM."
18        Do you see that?
19    A.  I do.
20    Q.  Have you been designated to testify on behalf of
21 Chubb today about topic No. 13?
22    A.  I have not.
23    Q.  Topic No. 14 states, "The underwriting of the
24 POLICY."
25        Do you see that?

---

Page 23

1    A.  I do.
2    Q.  Have you been designated to testify on behalf of
3 Chubb today about topic No. 14?
4    A.  I have not.
5    Q.  Do you know whether you were ever designated by Chubb
6 to testify on behalf of -- on its behalf in connection with
7 topic No. 14?
8        MR. ERRERA:  Objection:  form.
9        Go ahead.
10        THE WITNESS:  Thank you.  Yes, I believe that
11 there was some miscommunication or some confusion.  There was
12 an e-mail that I'm aware of that had me at one point designated
13 for topic 14 but I am not -- not here to give testimony on
14 topic 14.
15    Q.  (BY MR. LAMDEN)  Can you tell me who sent you that
16 e-mail?
17    A.  I -- I think it's actually an e-mail that -- that I
18 wrote to Mike initially and then review of that e-mail
19 recognized, "Hey, wait a second, Mike.  I think I wrote you in
20 error.  I'm not to be giving testimony on topic 14."
21    Q.  When did you write that e-mail?
22        MR. ERRERA:  Go ahead.  Just speak to a date and
23 that's it, if you know.
24        THE WITNESS:  Yeah.  So, Seth, I don't -- I
25 don't know the specific date.  I could give you an

---

Page 24

1 approximation.  You know, sometime in the last couple weeks.
2        MR. LAMDEN:  Mike, it sounds like you're making
3 a privilege objection but your witness has already started
4 talking about the contents of the -- of the e-mail.
5        MR. ERRERA:  You know, Seth, he's given you his
6 answer.
7        MR. LAMDEN:  That's fair.  And his answer also
8 involved his communication.
9    Q.  Mr. Haessig, can you tell me --
10        MR. ERRERA:  No, he's not going -- I'm directing
11 him not to answer the question.
12    Q.  (BY MR. LAMDEN)  Mr. Haessig, what about the
13 confusion -- what made you confused about what you were going
14 to testify about?
15        That's not related to a communication.
16        What made you confused as to whether you were
17 going to testify about topic No. 14?
18        MR. ERRERA:  Same objection; same direction.
19    Q.  (BY MR. LAMDEN)  Mr. Haessig, is it your testimony
20 that you -- strike that.
21        You're not prepared to testify about topic No.
22 14 today?
23        MR. ERRERA:  Asked and answered.
24        Go ahead.
25        THE WITNESS:  That is correct.

---

Page 25

1    Q.  (BY MR. LAMDEN)  I'm going to move on to topic No.
2 15.  It states, "The drafting history of the Masterpiece policy
3 forms used or marketed by CHUBB in Illinois from October 2013
4 through December 2017."
5        Do you see that?
6    A.  Yes, sir.
7    Q.  Mr. Haessig, have you been designated to testify on
8 behalf of Chubb today about topic No. 15?
9        MR. ERRERA:  Objection:  form.
10        THE WITNESS:  I have not.
11        MR. ERRERA:  Foundation.
12        Go ahead.
13        THE WITNESS:  I have not.
14    Q.  (BY MR. LAMDEN)  I am moving on to topic No. 16.  It
15 states, "Chubb's marketing of the Masterpiece policy from
16 October 2015 to the present, including any characterizations of
17 the nature, terms, and conditions of dwelling coverage
18 (including any additional coverages associated with the
19 dwelling, such as rebuilding to code coverage and land
20 coverage) under the Masterpiece POLICY and any target market
21 segment or clientele."
22        Do you see that?
23    A.  I do.
24    Q.  Mr. Haessig, have you been designated by Chubb to
25 testify on its behalf in connection with topic No. 16?



Walter Haessig

April 25, 2023
Pages 26 to 29

Page 26

1        MR. ERRERA: Objection: form, foundation.
2        Go ahead.
3        THE WITNESS: I have not.
4        MR. LAMDEN: Mike, explain this objection.
5 What's your -- what's your foundation question there?
6        MR. ERRERA: You've got the notice so it's
7 already self-evident, but you can continue on.
8        MR. LAMDEN: Okay, so it's not a foundation
9 objection; you just don't like the question. I'm going to move
10 on to No. 17.
11        MR. ERRERA: No, that's not what I said but go
12 ahead.
13    Q.   (BY MR. LAMDEN) It starts off, "The facts of, and
14 CHUBB's handling of, the claims described as 'client stories'
15 on the CHUBB website and found, as of December 13, 2021
16 following urls." And there's more to it.
17        Mr. Haessig, do you see where I'm reading?
18    A.   I do.
19    Q.   And have you been designated to testify on behalf of
20 Chubb today about topic No. 17?
21        MR. ERRERA: Form and foundation.
22        Go ahead.
23        THE WITNESS: I have not.
24    Q.   (BY MR. LAMDEN) I'm going to move on to topic No.
25 18. It's on the following page. It states, "The factors

Page 27

1 considered by Chubb in deciding not to renew the POLICY for the
2 2022-2023 policy period, the identities of the persons involved
3 in CHUBB's decision not to renew the policy for the 2022-2023
4 policy period, and all DOCUMENTS generated in connection with
5 CHUBB's decision not to renew the POLICY for the 2022-2023
6 policy period."
7        Do you see where I'm reading?
8    A.   I do.
9    Q.   Mr. Haessig, have you been designated to testify on
10 behalf of Chubb today about topic No. 18?
11        MR. ERRERA: Objection: form.
12        Go ahead.
13        THE WITNESS: I have not.
14    Q.   (BY MR. LAMDEN) I'm going to move on to topic No.
15 19. It starts off, "The factors considered by Chubb in
16 subsequently deciding to renew the POLICY for the 2022-2023
17 policy period..." It continues from there.
18        Mr. Haessig, do you see where I'm reading?
19    A.   Yes, sir.
20    Q.   Have you been designated to testify on behalf of
21 Chubb today about topic No. 19?
22        MR. ERRERA: Objection: form.
23        THE WITNESS: No, sir.
24    Q.   (BY MR. LAMDEN) My understanding is that Chubb has
25 designated Bob Paradis for topics 20 and 21 and you will not

Page 28

1 be -- you are not prepared to testify on those topics today.
2 Is that correct?
3    A.   I will not be providing testimony on topics 20 and
4 21.
5    Q.   You won't be providing testimony or you have not been
6 prepared to speak on behalf of the -- of the company?
7        MR. ERRERA: Asked and answered.
8        Go ahead.
9        THE WITNESS: Topic 20 and 21 are not topics
10 that -- that I've been designated to provide testimony on.
11    Q.   (BY MR. LAMDEN) Topic 22 starts off, "The
12 contractual relationships existing at any time in 2019 between
13 Chubb and (1) Enservio, (2) BELFOR, (3) BIG, (4) Paul Davis,
14 and (5) DBI, Inc. ..." It continues from there.
15        Mr. Haessig, have you been designated to testify
16 on behalf of Chubb today regarding topic No. 22?
17    A.   Yes, sir.
18    Q.   Topic No. 23 starts off, "The substitution of Bob
19 Paradis for Jordan Beverly, Ashley Argyle, or any other
20 adjuster assigned to or contemplated for assignment to the
21 CLAIM..." It continues from there.
22        Mr. Haessig, have you been designated to testify
23 on behalf of Chubb today regarding topic No. 23?
24    A.   That is correct.
25    Q.   My understanding is that Mr. Paradis has been

Page 29

1 designated by Chubb to testify about topic No. 24 and you've
2 not been prepared on that topic; is that correct?
3    A.   You are correct in that I'm not designated on topic
4 24.
5    Q.   Topic 25 states, "CHUBB's policies in effect during
6 the policy -- strike that. -- during the period February 1,
7 2019 - June 1, 2019 regarding the use of infrared cameras in
8 investigating residential property insurance claims involving
9 water damage."
10        Mr. Haessig, do you see topic No. 25?
11    A.   Yes, sir.
12    Q.   Have you been designated to testify on behalf of
13 Chubb today about topic No. 25?
14    A.   No, sir.
15    Q.   You have not been designated for 25?
16    A.   Oh, my apologies. 25? Yes, I am designated for 25.
17    Q.   Okay. Are you prepared to testify about all the
18 information known or reasonably known to Chubb today about
19 topic No. 25?
20    A.   Topic 25, yes, sir.
21    Q.   My understanding is that you have not been designated
22 for topics 26 and 27 and those have been designated or assigned
23 to Bob Paradis; is that correct?
24    A.   It is correct that I'm not designated for 26 and 27.
25    Q.   Okay. Mr. Haessig, did you do anything to prepare



Walter Haessig

April 25, 2023
Pages 30 to 33

Page 30

1 for today's deposition?
2   A.  Yes, sir.
3   Q.  What did you do?
4   A.  So reviewed some of the claim documentation, some of
5 the productions, reviewed the items that have been -- to more
6 familiarize myself with some of the topics that I've been
7 designated on, reviewed the policy.  Those -- those -- those
8 type of actions.
9   Q.  Do you recall what documents you reviewed in the
10 claim file?  I think you referred to them as claim documents.
11   A.  Yeah, so specifically the -- the insurance policy was
12 reviewed.  Some of the general adjuster best practice
13 guidelines I reviewed.  Some of the file itself, the claim
14 file.  I had to make some phone calls to make sure I had an
15 understanding on a couple of other topics.
16   Q.  Who did you call?
17   A.  So this would have been a guy by the name of Ben
18 Kelly.
19   Q.  What's Mr. Kelly's current title?
20   A.  You know, Seth, I don't know his specific title.  I
21 know that he helps with vendor management but I don't know what
22 his -- as I sit here today, I don't know his title.
23   Q.  Is he employed by Chubb?
24   A.  That is correct.
25   Q.  Does he work in a specific department of Chubb?

Page 31

1   A.  I'm sure that he does.  Other than that it kind of
2 falls under the umbrella of vendor management I don't know what
3 the department would be.
4   Q.  What's vendor management?
5   A.  Vendor management, the -- he -- he would help
6 facilitate some of the workings related to -- I don't remember
7 the specific topic but one of the topics is the contractual
8 agreements it states with a variety of vendors I believe is
9 how you had wrote it so I needed a little clarification from
10 them on that topic.
11   Q.  What did you and Ben talk about?
12   A.  Yeah.  So I had questions that were related to
13 contracts and we talked about -- what the details, if any, of
14 those contracts might be.
15   Q.  Do you remember what specific questions you asked
16 him?
17   A.  Yeah.  Some, anyway.  I had to inquire as to if there
18 even is a contract in place or a professional service agreement
19 in place with some of these vendors.
20   Q.  Which vendors did you ask about?
21   A.  If you pull up the topic it would help me out, but as
22 I sit here right now without the topics in front of me it was
23 Enservio, I believe it was DBI, the building consultant that we
24 use, BIG was another one.  There was another one or two in
25 there.  I don't remember exactly the name.

Page 32

1   Q.  Did you talk about your deposition with anyone other
2 than Ben Kelly?
3   A.  No, sir.
4   Q.  You didn't discuss it with your counsel?
5   A.  Well, I thought that was a given but, yeah, Mike and
6 I talked, of course.
7   Q.  Do you recall when you and Mike first discussed your
8 deposition?
9   A.  Within the last couple of weeks.
10   Q.  Have you spent time with your attorneys preparing for
11 the deposition?
12   A.  Yes.
13   Q.  Did they show you any documents?
14   A.  We talked about the -- the --
15      MR. ERRERA:  Wait.  You know, he -- he doesn't
16 want -- or he -- don't talk about what you and I have talked
17 about.  Just -- could you re ask the question again?  Listen to
18 what the question was.
19   Q.  (BY MR. LAMDEN)  Yeah.  Mr. Haessig, to be clear, I'm
20 not asking you to disclose any privileged communications with
21 your counsel, Mr. Errera, or anyone with his firm but I would
22 like to know if you reviewed any documents in preparation with
23 this claim including any showed to you by your attorneys.
24   A.  Yes, sir.
25   Q.  Do you recall any of the specific documents that you

Page 33

1 reviewed?  I think you had -- strike that.  Let me go back.
2      I think you said claim documents and you
3 mentioned the policy.  Do you recall specifically any other
4 documents that you reviewed to prepare for your deposition that
5 were in the claim file?
6   A.  Not -- not specific documents, no.
7   Q.  I think you used the word "productions" earlier when
8 you said that's what you reviewed.  What did you mean by that?
9   A.  And maybe I used the wrong terminology but there was
10 some documents that were provided as part of the production and
11 I don't -- I'm sure there's some legal terminology I don't --
12 not familiar with, you know, but stuff that -- or files that --
13 documents that would have been provided in relation to the
14 litigation.
15   Q.  Do you remember specifically what any of those were?
16   A.  I can remember one specifically that I'll be happy to
17 share with you.  So as it relates to the general adjuster best
18 practices I had asked Mike to e-mail that document to me.
19   Q.  Okay.  Other than Ben Kelly and your counsel, you
20 testified, am I correct, that you didn't talk to anyone else
21 about your deposition?
22   A.  That is correct.
23   Q.  And have you disclosed to me all of the documents
24 that you remember you remember viewing in connection with your
25 deposition?



Walter Haessig

April 25, 2023
Pages 34 to 37

Page 34

1  A.  Yeah, I have.  I mean, there might be some other
2  stuff that I've reviewed documentation wise but as I sit here
3  today I can't tell you exactly what those things might be other
4  than things that, you know, generally speaking are -- would be
5  the claim file.
6      Q.  How much time did you spend reviewing documents to
7  prepare for your deposition?
8      A.  Seth, I didn't keep a tally of the hours but just an
9  approximation, probably six hours.
10     Q.  Was that spread out over several days or was that all
11  in one day?
12     A.  It was over probably two, three days, something close
13  to that.
14     Q.  Do you recall how much time you spent talking to your
15  attorneys to prepare for this deposition?
16     A.  Mike and I probably had an hour, maybe an hour and a
17  half of a -- of a call.
18     Q.  Did you talk to any in-house attorneys at Chubb in
19  preparing for your deposition?
20     A.  Yes, I did.  Thanks for bringing that to my
21  attention.  I didn't -- certainly don't mean to mislead you at
22  some points.  But, yeah, I had to contact an in-house attorney,
23  Tom Coleman, to make sure that I had an understanding of how
24  some of the documents were produced.
25     Q.  When did you talk to Tom Coleman?

Page 35

1      A.  I talked to Tom yesterday.
2      Q.  Do you remember how long you and he spoke?
3      A.  Oh, goodness, less than ten minutes.  It was not a
4  very long conversation.
5      Q.  Was Mr. Errera on the call?
6      A.  No.
7      Q.  Was that the first time you had talked to Mr. Coleman
8  about your deposition?
9      A.  Yes.
10     Q.  Was that the first time you had talked to Mr. Coleman
11  about the Wexlers' claim?
12     A.  The best I can recall, yes.
13     Q.  Other than preparing -- other than talking to
14  Mr. Coleman and Mr. Errera and reviewing the documents you
15  referenced, did you do anything else to prepare for today's
16  deposition?
17     A.  No, sir.
18     Q.  Okay.  How long have you been working at Chubb?
19     A.  I have been at Chubb for approximately 14 years.
20     Q.  Can you tell me what your position was in January
21  1st, 2019, with Chubb?
22     A.  Yes.  At that point in time I believe I was in the
23  same position that I am right now.  That would have been close
24  to the period of time that I would have taken the job to sit at
25  the desk and have the title I currently do.  One thing I didn't

Page 36

1  prepare for, Seth, was, you know, just a -- a timeline of when
2  I -- when I took a promotion so...  Yeah, I think it -- I think
3  it is where I'm at right now.
4      Q.  Have your roles and responsibilities in that position
5  changed from January 1, 2019, to today?
6      A.  Assuming that I'm in the same desk that I was at that
7  point?
8      Q.  Yes.
9      A.  Yeah, the responsibilities are -- are the same.
10     Q.  Can you tell me what those are?
11     A.  Yeah, sure.  So as the AVP or Assistant Vice
12  President of the -- a claim manager, what I do is I manage a
13  team of five or six general adjusters.  The general adjusters
14  generally are hand -- handling larger losses and we administer
15  the policy associated with those claims.
16     Q.  What's a general adjuster?
17     A.  A general adjuster is an adjuster that handles, you
18  know, claims that a company we designate to be large or
19  complex or complicated.
20     Q.  Is that a title, general adjuster?
21     A.  Yes, sir.
22     Q.  Okay.  What do you mean by a larger claim?  What's a
23  large claim or a large -- larger claim I think you may have
24  said?
25     A.  Yeah.  So there's not a specific definition of a

Page 37

1  larger claim.  Just generally speaking we would probably start
2  talking about something being larger in value, somewhere around
3  $500,000.
4      Q.  Are we talking about property-damage claims?
5      A.  Yes, sir.
6      Q.  Do your responsibilities with the company include
7  liability insurance claims as well?
8      A.  They do not, no.
9      Q.  Do -- do your responsibilities include commercial
10  property-damage claims?
11     A.  Correct, yes.
12     Q.  It is though commercial and residential property
13  damage?
14     A.  That is true.
15     Q.  Did you say administering the claim is one of your
16  responsibilities?
17     A.  I think I said administering the policy.  I may have
18  said "claim" but, yes, policy.
19     Q.  I -- I probably misspoke.  What do you mean by
20  administering the policy?
21     A.  Yeah.  So --
22         MR. ERRERA:  Let me -- let me -- Wally, hold on.
23         Seth, is there a particular topic that you're
24  looking at here that this falls under?
25         MR. LAMDEN:  No.



Walter Haessig

April 25, 2023
Pages 38 to 41

Page 38

1    MR. ERRERA: I'm sorry?
2    MR. LAMDEN: No.
3    MR. ERRERA: All right. Then I'd ask the
4  witness not to answer. Again, this isn't being taken as a fact
5  deposition. I give you a little bit of leeway to understand
6  his background and that but I think it's all intimate fact
7  issues now.
8    MR. LAMDEN: As I previously stated, I don't
9  believe scope objections are appropriate in this deposition.
10   Q. Mr. Haessig, are you going to follow your attorney's
11 advice not to answer?
12   MR. ERRERA: Well, and just to make the record
13 clear, I believe that scope objections are appropriate because
14 that's the whole point of designating someone on select topics.
15 But with that direction I would ask the witness to not answer.
16   Q. (BY MR. LAMDEN) Mr. Haessig, do you recall when you
17 first heard about the Wexlers' claim?
18   MR. ERRERA: Again, is this a particular topic
19 just so that I could understand as I'm looking at the topic
20 list which one you're pulling this from?
21   MR. LAMDEN: My former response stands. It
22 doesn't relate to a specific topic. I'm not going to keep
23 answering this question.
24   MR. ERRERA: Then I won't -- until you get to a
25 specific topic I'm going to tell him not to answer. You've got

Page 39

1  the topics. Like we did in the meet and confer I told you
2  these were specifically worded and narrowly tailored. Stick to
3  the topics.
4    MR. LAMDEN: Mike, you recognize we're going to
5  end up taking this deposition again if you keep obstructing
6  these questions, right?
7    MR. ERRERA: And you understand that you're
8  limited to the topics as you have phrased them and presented
9  them, correct? And we can go back and forth like this all day.
10 You've got the topics. Ask the topics. Inquire upon the
11 topic.
12   MR. LAMDEN: Mike, you're taking a very risky
13 approach here but that's fine, we can move on. If you want to
14 send me some authority to support your position, please do at a
15 break. Otherwise, I can send you the cases but I'm not going
16 to continue with this on the record.
17   Q. Mr. Haessig, if I ask you questions about your
18 involvement with the Wexler claim that are not specifically
19 related to a topic that you've been designated for, are you
20 going to answer my questions?
21   MR. ERRERA: I'm going to direct that he's going
22 to answer no but go ahead, Walter.
23   THE WITNESS: Seth, I'll take the advice of
24 counsel and not answer questions other than what I'm
25 designated -- what I'm designated for.

Page 40

1    Q. (BY MR. LAMDEN) Were you personally involved in the
2  process of searching for and producing documents in this
3  litigation?
4    A. Personally involved, no, sir.
5    Q. But you are prepared to talk about document
6  productions in this litigation, correct?
7    A. That is correct.
8    Q. What did Chubb do to identify responsive documents to
9  this litigation when responding to the Wexlers' request for
10 production?
11   A. Sure. Thanks for the question. So my -- my
12 understanding is there is a request to produce documents. We
13 work with the folks in a variety of departments, if you will.
14 So, for example, some of the documentation the best that I can
15 remember would have been related to underwriting, some of it,
16 of course, was the claim file. So we worked with the various
17 Operation folks to produce those documents that were requested.
18   Q. Do you know which documents -- strike that.
19   I'm going to move on for a second. Do you know
20 if Ashley Argyle was involved in connection with the Wexlers'
21 claim?
22   A. Yes, I'm aware that she was involved.
23   Q. Did Chubb review and produce Ashley Argyle's e-mails
24 and documents that are not in the claim file?
25   A. I'm sorry, Seth, can you repeat the question?

Page 41

1    Q. Did Chubb review and produce Ashley Argyle's e-mails
2  and documents that are not in the claim file?
3    A. Yeah. So when I'm talking about claim file at least
4  in my mind, and maybe it's a point we can talk about a little
5  bit, claim file I'm -- I'm talking the e-mails as well would
6  make up the broader claim file, if you will. I am aware that
7  we requested Ops and produced the e-mails that -- from Ashley.
8  I don't want there to be confusion that -- sorry, I just am
9  looking to clarify that e-mails do make up the claim file and
10 we did ask Operations to provide e-mails from Ashley, yes.
11   Q. Let me ask this. Do you know whether all of Ashley
12 Argyle's e-mails relating to the Wexler claim were contained in
13 the Wexlers' claim file?
14   A. It's my understanding that pertinent e-mails would
15 have been attached to the claim file.
16   Q. That's not my question. Do you know whether all of
17 Ashley Argyle's e-mails relating to the Wexlers' claim are
18 contained in the Chubb claim file?
19   A. Yeah, I -- I don't know that all of Ashley's e-mails
20 are in the claim file. It is my understanding that pertinent
21 e-mails are in the claim file.
22   Q. Did Chubb review whether Ashley Argyle's e-mails that
23 are not in the claim file were responsive to the Wexlers'
24 document production requests?
25   A. That is my understanding, yes, sir.



Walter Haessig

April 25, 2023
Pages 42 to 45

Page 42

1   Q.   Do you know whether all of Jordon Beverly's e-mails
2   and documents that relate to the Wexlers' claim are contained
3   in the claim file?
4   A.   Similar answer to Ashley's.  But all e-mails?  Not
5   necessarily.  Pertinent e-mails would be in the claim file.
6   Q.   Do you know whether Chubb reviewed Jordon Beverly's
7   e-mails that are not contained in the Chubb claim file to see
8   whether they relate to the Wexlers' claim?
9   A.   Just for clarification, so did we review them or did
10  we produce them?
11  Q.   Well, I'm going to ask first did you review them?
12  A.   Yeah.  I personally did not review the -- the
13  e-mails.  My understanding is that we produced the -- the
14  e-mails that -- as part of the production.  You asked -- or
15  Wexlers asked and we provided those e-mails.
16  Q.   Yeah, I should be clear, too.  I'm not asking whether
17  you reviewed them.  I understand from what you said earlier you
18  did not.  I'm asking whether Chubb did or, you know, by
19  extension Chubb's counsel.
20       But -- and I just want to make sure I wrap this
21  up correctly.  So what is -- what is the answer whether Chubb
22  reviewed Jordon Beverly's e-mails relating to the Wexler claim
23  that are not contained in the claim file?
24  A.   Yeah, so I'm -- I don't know that there are e-mails
25  that are not contained in the claim file.  I don't know if we

Page 43

1   reviewed -- to the extent there are e-mails not in the claim
2   file if Chubb reviewed those e-mails to the extent they got
3   them.
4   Q.   Did Chubb ask Jordon Beverly to provide his e-mails
5   that were not in the claim file?
6   A.   Yeah, again, the question is e-mails that aren't in
7   the claim file.  I don't know that there are e-mails that are
8   not in the claim file.  We did request I'm going to call them
9   the IT department which might not be completely accurate but
10  for the purpose of this answer to produce those e-mails.
11  Q.   Do you know whether Tim Blake was involved in any way
12  with the Wexlers' claim?
13  A.   Tim -- as I sit here today, Seth, I can't tell you
14  for certain if Tim was involved.  I wouldn't be surprised to
15  find out that he had some involvement at some point over the
16  years of this claim.
17  Q.   Do you know whether Chubb reviewed Tim Blake's
18  e-mails and documents to determine whether any relates to the
19  Wexler claim?
20  A.   Specific to Tim's e-mails?  I -- I don't recall a
21  document that would have specifically called out Mr. Blake's.
22  I do recall the request and the production for -- for Ashley
23  and -- and Jordon.
24  Q.   I think you mentioned a document.  I'm just asking
25  whether Chubb reviewed Tim Blake's e-mails that are not in the

Page 44

1   claim file to determine whether any are related to the Wexlers'
2   claim?
3   A.   Seth, I -- I don't know.
4   Q.   Do you know whether Chubb reviewed Tina Bryant's
5   e-mails and documents to determine whether any were related to
6   the Wexler claim?
7   A.   Yeah, I don't -- I don't remember reviewing the
8   requests for that individual.
9   Q.   Right.  What I'm asking is whether Chubb reviewed
10  Tina Bryant's e-mails that are not in the claim file to
11  determine whether any are related to the Wexler claim?
12  A.   Yeah, a similar answer.  Hey, I'm not trying to be
13  difficult.  The -- the question has the premise that there's
14  e-mails not in the claim file.  I'm not certain that is
15  accurate.  That specific individual I don't remember reviewing
16  that production.  To the extent it was requested we -- we
17  should have provided the documents but again as I sit here
18  today, I can't tell you for certain that we reviewed them.
19  Q.   And I understand you said you -- you don't know
20  whether there are Tina Bryant e-mails that are not in the claim
21  file and that's fair.  I'm not trying to trip you up either.
22  Do you know whether Chubb asked Tina Bryant whether she had any
23  e-mails relating to the Wexlers' claim that are not in the
24  claim file?
25  A.   I don't know.

Page 45

1   Q.   Did Chubb ask Lacey Chastain whether she had any
2   e-mails relating to the Wexler claim that were not in the claim
3   file?
4   A.   Yeah, I -- I can't answer that question in that we
5   requested the IT folks to do a search and would have provided
6   those documents or those e-mails.
7   Q.   And by "IT folks" who are you referring to?
8   A.   Yeah.  Again, kind of similar to the answer on a
9   prior question.  I'm not an IT guy just to be real -- real
10  honest with you so the workings of how -- how computers work
11  and how -- how things are stored, that level or that granule
12  detail, I'm going to refer to those folks as -- as the IT
13  department which might not be completely accurate.  But for the
14  purposes of answering the question, the IT folks would have
15  done the search and provided the document or documents or
16  e-mails.
17  Q.   Do you know what -- the parameters Chubb gave to the
18  IT team for these searches?
19  A.   In part I can remember the parameters.  I don't
20  remember every parameter, no, sir.
21  Q.   Did Chubb specify specific document custodians --
22  for example, Tina Bryant or Lacey Chastain -- that they wanted
23  the IT group to search for their e-mails?
24  A.   Yes, sir.
25  Q.   If I wanted to find a list of those e-mails, what



Walter Haessig

April 25, 2023
Pages 46 to 49

Page 46

1 would I do?

2     A.   To be real specific on the answer, I don't know

3 the -- the detailed processes or work flow for that but I would

4 request that the IT people produce the documents that are

5 within the parameters provided.

6     Q.   Do you know the date range that the IT team used to

7 search for e-mails related to the Wexler claim?

8     A.   Yeah, Seth, as I sit here right now I can't remember

9 the -- the dates.  I can testify that there -- there was a date

10 range.

11     Q.   Do you recall where you learned the information that

12 you're testifying to now about IT searches for e-mails?

13     A.   Yeah, for -- in talking to Tom Coleman who I

14 mentioned earlier -- because I needed some clarification myself

15 to provide testimony on the topic -- that's where the

16 information would have come from.

17     Q.   Do you know what -- what search terms were used by

18 the IT team to identify e-mails that might relate to the

19 Wexlers' claim?

20     A.   Seth, I can answer in part.  It might not be fully as

21 I sit here today -- again, I can't remember all of the

22 parameters -- but it would have been by first and last name,

23 claim number, policy number.  I believe I saw address as well.

24     Q.   When you say "first and last names," you mean of the

25 insured or the employees within Chubb?

Page 47

1     A.   Sorry, the insured.

2     Q.   The insured.  So Kenneth and Amy Wexler?

3     A.   Correct.

4     Q.   Okay.  I'm not sure that we answered the question and

5 so I apologize but do you know whether Chubb asked Lacey

6 Chastain whether she had e-mails and documents relating to the

7 Wexler claim that were not in the claim file?

8     A.   Did we specifically ask her?

9     Q.   Yes.

10     A.   That I don't -- I don't have clarity on.  We would

11 have asked the IT folks based on the parameters provided for

12 the e-mails.

13     Q.   For Lacey Chastain's e-mails relating to the Wexler

14 claim?

15     A.   Yes.

16     Q.   Do you know whether Hattie Cherry was involved at all

17 with the Wexler claim?

18     A.   The name sounds familiar, Seth, but I can't recall

19 if -- if -- if they were or were not or what level of detail

20 they may have been involved.

21     Q.   Do you know whether Chubb asked Hattie Cherry whether

22 she had any e-mails or documents relating to the Wexler claim

23 that were not in the Wexler claim file?

24     A.   Yeah, specifically for that individual I -- I don't

25 know other than that my understanding is that if it was

Page 48

1 requested as part of the documentation or the document

2 production, that we would ask for the search.

3     Q.   Would the IT team searches have picked up documents,

4 electronic documents as well as e-mails or just e-mails?

5     A.   I'm sorry, can you clarify the question?

6     Q.   I think you had testified earlier that the Chubb IT

7 team ran searches to find responsive e-mails.  Is that correct?

8     A.   That's my understanding, yes, sir.

9     Q.   Would those searches also have encompassed electronic

10 documents that were not e-mails?

11     A.   I'm not sure how electronic documents that aren't

12 e-mails might -- might be.  Do you have an example by chance?

13     Q.   Sure.  An Excel spreadsheet --

14     A.   Oh, like --

15     Q.   -- that's not been printed out.

16     A.   Like a -- like attached in an e-mail?

17     Q.   No, just an Excel spreadsheet regardless of whether

18 it's attached to an e-mail.  So saved on a local drive,

19 for example.

20     A.   Oh, yeah.  Seth, I know -- I know there's some

21 documents I'm not real clear on -- on the ins and outs of this

22 and it's not part of the topics but I'll -- I'll help where I

23 can.

24         You know, there's litigation holds.  I would

25 imagine that anybody involved would have got the litigation

Page 49

1 hold.  Whether there was a specific request from her on an

2 electronic document that is stored on her drive or not, I don't

3 know that she would have gotten that request.

4     Q.   Was there a litigation hold issued in this case?

5     A.   I believe so, but I could be -- I could be wrong.

6 I'd have to get some clarification and get back to you which is

7 unusual in deposition but, yeah.

8     Q.   Did you receive a litigation hold in connection with

9 this case?

10     A.   Specifically on Wexler?  As I sit here today, I can't

11 recall.  We get litigation holds, you know, periodically.  If

12 it pertained to Wexler specifically, I just can't remember.

13     Q.   I was asking earlier about whether the IT searches

14 picked up electronic documents such as spreadsheets.  Would

15 those searches also have picked up chat messages that were used

16 by any of the employees related to the Wexlers' claim?

17     A.   And to the best that I understand I think that it was

18 specific for e-mail communications.  I -- I -- I just don't

19 remember seeing anything that would have been related to

20 instant messages but I -- I -- at the same time I can't

21 answer -- I can't answer the question with certainty that if it

22 included IMs or not.  Sorry, Seth.

23         Hey, while you're doing that, just for timing

24 purposes I'll probably be looking for a break maybe in about 15

25 minutes-ish or something close to that.



Walter Haessig

April 25, 2023
Pages 50 to 53

Page 50

1 Q. Yeah, that's fine. If you -- I'll keep an eye on the
2 clock but if I don't I assume you will so just let me know and
3 we can -- we can break.
4 A. Sure.
5 Q. Do you know whether Chubb asked Corey Everett whether
6 he had any e-mails or electronic documents that were not in the
7 claim file that related to the Wexlers' claim?
8 A. You know, the best that I can recall, Corey was --
9 Corey's e-mails were included. Again, similar to the prior
10 answer, not to imply that there's e-mails -- pertinent e-mails
11 that are not in the claim file but -- but, yeah.
12 Q. What do you mean when you say they were included?
13 A. So -- so your -- your questions pertaining to this
14 topic at least seem to me -- again, I'm not trying to be
15 difficult -- but on the idea that there's e-mails out there
16 that are not in the claim file. I just want to be clear I
17 don't know that there are e-mails that aren't in the claim file
18 but to the extent that IT was requested within the parameters
19 we talked about a moment ago, then those e-mails were requested
20 from the IT folks as part of production.
21 Q. Can you tell me what the criteria are for when an
22 e-mail must be placed into a claim file?
23 A. Yeah. So you've heard me say "pertinent e-mails" a
24 few times. So I'll give an example of an e-mail that I
25 wouldn't expect to necessarily find in the claim file that I

Page 51

1 wouldn't deem to be a pertinent e-mail and that would be, you
2 know, let's -- for example -- and I don't know that this to be
3 the case -- but Bob may have sent an e-mail to the Wexlers
4 arranging a time to meet at the house. Some dialogue back and
5 forth that is not pertinent or not significant to the claim
6 file, some of those type of back-and-forth communications might
7 not be in the claim file obviously would be picked up in the
8 e-mail production with him.
9 Q. And that's exactly the kind of e-mails I'm getting at
10 here which is I understand what you're saying. It sounds like
11 you don't know whether all of these employees I'm talking
12 about, all of their e-mails were contained in the claim file
13 which is why I'm asking whether Chubb asked Corey Everett
14 why -- whether he had any e-mails or documents relating to the
15 Wexler claim that were not in the claim file?
16 A. Yeah, so was there a specific request to Corey? I
17 don't recall seeing that -- that request of him. It is my
18 understanding that we had requested the IT folks to produce the
19 e-mails.
20 Q. And I know that you haven't seen it but I'm asking
21 about what Chubb did here which is one of the topics, as to
22 whether they reviewed and produced documents relating to these
23 folks I'm going through.
24 A. Sure.
25 Q. And you don't know. What about your e-mails? Were

Page 52

1 you asked whether you had any e-mails relating to the Wexlers'
2 claim that were not contained in the Chubb claim file?
3 A. Yeah, I was not -- I was not asked about e-mails that
4 were not in the claim file.
5 Q. Were you asked whether you had any electronic
6 documents that related to the Wexlers' claim that were not in
7 the claim file?
8 A. I don't remember being asked that.
9 Q. Do you know whether you have e-mails that relate to
10 the Wexlers' claim that were not in the claim file and not
11 produced in this matter?
12 A. Not that I'm aware of.
13 Q. So you don't have any e-mails relating to the
14 Wexlers' claim that are not in the claim file?
15 MR. ERRERA: Asked and answered.
16 Go ahead.
17 THE WITNESS: Yes. You know, not that I'm aware
18 of.
19 Q. (BY MR. LAMDEN) Okay. I just want to be clear.
20 When you say not that you're aware of, you're saying that
21 you're not aware of having any e-mails or not aware of having
22 been asked whether you have e-mails?
23 MR. ERRERA: Form.
24 Go ahead. And asked and answered. Go ahead.
25 THE WITNESS: Yeah, so have -- have I -- have I

Page 53

1 been requested to provide e-mails personally? No, I have not.
2 Are there e-mails related to -- to Wexler? Seth, I couldn't
3 tell you that I haven't been copied on e-mails that -- that
4 have been related to the Wexler matter. I don't -- I think
5 that answers the question.
6 Q. (BY MR. LAMDEN) Other than copy -- so you don't
7 recall sending any e-mails relating to the Wexlers' claim other
8 than those that are in the claim file?
9 A. Yeah, that would be accurate. And, hey, I'm not --
10 again, I'm not looking to be difficult. The claim file is like
11 four years old. It's got quite a bit of history on it and a
12 lot of time has gone on. I just can't remember the level of
13 detail so what I'm trying to say is could there possibly be an
14 e-mail out there that as I sit here now I can't remember?
15 Yeah, there's that possibility. Can I think of anything that
16 would have -- would have been into that classification? I
17 can't remember any.
18 Q. Okay. And I -- I need to be clear and your counsel
19 lectured me on this earlier. This isn't your personal
20 deposition so I'm really just asking about Chubb's knowledge
21 and Chubb's conduct in this case. In fairness I was asking
22 about your own e-mails and I understand that you're saying you
23 don't recall anything there and that's fair.
24 What about Caitlin Herman? Did Chubb ask
25 Caitlin Herman whether she had any e-mails relating to the



Walter Haessig

April 25, 2023
Pages 54 to 57

Page 54

1 Wexlers' claim that were not in the claim file?
2    A.  Yeah, I don't know.
3    Q.  Did Chubb ask Caitlin Herman whether she had any
4 electronic documents that related to the Wexlers' claim that
5 were not in the claim file?
6    A.  I don't know.
7    Q.  Do you know whether Caitlin Herman's e-mails and
8 electronic documents, if any, that are not in the claim file
9 have been produced in this matter?
10    A.  I don't recall.
11    Q.  Do you know whether Latonya Johnson was involved in
12 any way with the Wexlers' claim?
13    A.  Seth, I think I may have seen her name in the file
14 but I -- without reviewing the claim file I don't -- I don't
15 recall.  I don't recall what the extent of her involvement was,
16 if any.
17    Q.  Do you know whether Chubb asked Latonya Johnson
18 whether she had any e-mails or electronic documents relating to
19 the Wexlers' claim that were not in the claim file?
20    A.  Yeah, again, I don't know that we requested
21 specifically of her.  I believe that that was done through IT.
22    Q.  Do you know whether Chubb asked Michael Koos whether
23 he had any e-mails or electronic documents relating to the
24 Wexlers' claim that are not contained in the Wexler claim file?
25    A.  Yeah, again, same -- same -- same answer.  I don't

Page 55

1 know if Mike specifically was addressed -- asked.
2    Q.  Do you know specifically whether Michael Koos had any
3 e-mails or electronic documents relating to the Wexler claim
4 that were not in the Wexler claim file?
5    A.  Again, the -- the IT parameters would have been -- IT
6 would have been asked about those parameters we talked about
7 earlier.  I don't know that Mike has anything that's not in the
8 claim file.
9    Q.  What about Donald Lee?  Do you know whether Donald
10 Lee was asked whether he has any e-mails or documents relating
11 to the Wexlers' claim that are not in the claim file?
12    A.  I don't know.
13    Q.  Do you know whether -- do you know whether Tina
14 Larson was asked whether she has any e-mails or electronic
15 documents that are not in the claim file?
16        MR. ERRERA:  You can answer.  Sorry.
17        THE WITNESS:  Yeah, I don't -- I don't know.
18    Q.  (BY MR. LAMDEN)  What about Bob Paradis?  Do you know
19 whether he was asked whether he had any e-mails or electronic
20 documents relating to the Wexlers' claim that are not in the
21 claim file?
22    A.  I'm aware that the IT parameters that he with talked
23 about were run for Bob.  I don't know if Bob was asked if he
24 has documents outside of what would be e-mails.
25    Q.  Does Chubb -- does Bob Paradis have any e-mails or

Page 56

1 electronic documents relating to Wexlers' claims that are not
2 within the Chubb claim file?
3    A.  Not that we're aware of.
4    Q.  But he hasn't been asked?
5    A.  Yeah, I don't know that he has specifically been
6 asked.
7    Q.  What about Elva Columbo?  Does she have any -- strike
8 that.
9        Was she -- was Elva Columbo ever asked whether
10 she has any e-mails or documents relating to the Wexler claim
11 that are not in the claim file?
12    A.  I don't know.
13    Q.  Do you know whether she has any such documents or
14 e-mails?
15    A.  I do not.
16    Q.  Do you know whether Steven Pelosi was ever asked if
17 he had any e-mails or documents that are not in the -- that
18 relate to the Wexler claim that are not in the Wexler claim
19 file?
20    A.  I do not.
21    Q.  Do you know whether he has any e-mails or electronic
22 documents that are not in the claim file?
23    A.  Not -- not that I'm aware of.
24    Q.  What about Baer Phillibar?  Do you know whether he --
25 I believe he has any e-mails and documents relating to the

Page 57

1 Wexler claim that are not in the Wexler claim file?
2    A.  I don't -- I'm not aware that Baer has any documents.
3    Q.  Do you know whether Baer was ever asked?
4    A.  I'm not sure.
5    Q.  Do you know whether Jennifer Naughton was ever asked
6 whether she has any e-mails or electric documents related to
7 the Wexlers' claim that are not in the claim file?
8    A.  I do not know.
9    Q.  Do you know whether Patricia Neiner, N-E-I-N-E-R, was
10 ever asked whether she has any electronic e-mails or documents
11 that relate to the Wexlers' claim that are not in the Wexler
12 claim file?
13    A.  I don't know.
14    Q.  Do you know whether John Serio was ever asked whether
15 he has any electronic e-mails -- strike that.  -- any e-mails
16 or documents relating to Wexlers' claim that are not in the
17 Wexler claim file?
18    A.  I do not know.
19    Q.  What about Allison Scott?
20    A.  Sorry, again, I'm not meaning to be difficult, same
21 question?  What's the question?
22    Q.  Yeah.  Sorry.  Do you know whether Allison Scott was
23 ever asked whether she had any e-mails or documents relating to
24 the Wexlers' claim that are not in the Wexler claim file?
25    A.  Yeah, I don't know.



Walter Haessig

April 25, 2023
Pages 58 to 61

Page 58

1    Q.  Do you know whether Craig Billeci was ever asked
2  whether he has any e-mails or documents related to the Wexlers'
3  claim that are not in the Wexler claim file?
4    A.  I do not know.
5    Q.  Do you know whether he has any e-mails or electronic
6  documents that are not in the claim file that relate to the
7  Wexler claim?
8    A.  I don't know.
9    Q.  Do you know whether Jonathan -- Jonathan Smith was
10  involved in any way with the Wexlers' claim?
11    A.  As -- as I sit here right now?  I don't know but I
12  would not be surprised because Jonathan manages the terr -- in
13  part that territory so I would think that Jonathan was involved
14  to some extent but I'm not certain.
15    Q.  You don't recall ever discussing the Wexler matter
16  with Jonathan Smith?
17    A.  I have not talked to Jonathan Smith about the Wexler
18  matter.
19    Q.  Do you know whether he was asked whether he has any
20  e-mails or documents relating to the Wexler claim that are not
21  in the Wexler claim file?
22    A.  I don't know.
23    Q.  Do you know if Chubb asked James Lenz whether he had
24  any e-mails or documents relating to the Wexler claim that are
25  not in the Wexler claim file?

Page 59

1    A.  I don't know.
2    Q.  Do you know whether Chubb asked Chris Tate whether he
3  has any e-mails or documents relating to the Wexler claim that
4  are not in the Wexler claim file?
5    A.  I don't know.
6    Q.  Do you know whether Chubb asked Dorthea Johnson
7  whether she had any e-mails or documents relating to the Wexler
8  claim that are not in the Wexler claim file?
9    A.  I don't know.
10    Q.  Do you know whether Chubb asked Lashonda Washington
11  whether she had any e-mails or documents relating to the Wexler
12  claim that are not in the Wexler claim file?
13    A.  I do not know.
14    Q.  Do you know whether Chubb asked Monica Turner whether
15  she had any e-mails or documents relating to the Wexler claim
16  that are not in the Wexler claim file?
17    A.  I do not know.
18    Q.  Would it be fair to say that for the names that we
19  just went through Chubb does not know whether those individuals
20  have e-mails and documents relating to the Wexler claim that
21  are not in the Wexler claim file?
22    MR. ERRERA:  Objection:  form, asked and
23  answered.
24    Go ahead.
25    THE WITNESS:  Mike is going to have the same

Page 60

1  objection.  Sorry, gentlemen.  What was the question, Seth?
2    Q.  (BY MR. LAMDEN)  Would it be fair to say as we sit
3  here that Chubb does not know whether the individuals that we
4  just discussed have any e-mails or documents relating to the
5  Wexler claim that are not in the Wexler claim file?
6    MR. ERRERA:  Same objection.
7    THE WITNESS:  It's my understanding the
8  individuals that -- that we just mentioned that we have not
9  asked if there are documents on -- outside of the IT search if
10  there's documents that -- that might be saved somewhere that --
11  that would have been outside of those parameters that were --
12  were searched.
13    Q.  (BY MR. LAMDEN)  And other than what you've described
14  as pertinent e-mails, there's no requirement that any of these
15  employees add all of their e-mails or documents relating to the
16  Wexler claim to the Wexler claim file?
17    A.  It is accurate that pertinent e-mails would be
18  included and there would be e-mails that wouldn't be pertinent
19  that would not be included in the -- in the claim file.
20    Q.  Who is your supervisor?
21    A.  I report directly to a gentleman by the name of Corey
22  Everett.
23    Q.  Would -- if Corey Everett sends an e-mail to someone
24  other than the adjuster on this file, on the Wexler file, would
25  Mr. Everett be required to put that e-mail in the claim file if

Page 61

1  it were pertinent?
2    A.  If it were pertinent, I would expect for it to be in
3  the claim file.
4    Q.  Would he be required to be put it in the claim file?
5    A.  I'm not -- I'm not clear if there is a requirement to
6  put, you know, an e-mail in a claim file.  As a general
7  practice, we put pertinent information in the claim file.
8    Q.  Do you know who Mr. Everett's boss is?
9    A.  Yes.
10    Q.  Who's that?
11    A.  Larry D'Avenia.
12    Q.  Do you know whether Larry D'Avenia had any
13  involvement with the Wexlers' claim?
14    A.  I don't know if Larry has had any involvement.
15    Q.  I think you were asking for a break.  Is now a good
16  time?
17    A.  Yeah, if it's good for you, I'd welcome a break.
18    Q.  Okay.  Why don't we do that.  Go back on in ten
19  minutes?
20    A.  Okay.
21    VIDEO OPERATOR:  Okay.  This will mark the end
22  of media No. 1.  We're going to go off the record at 10:46 a.m.
23    (Recess taken from 10:46 a.m. to 10:58 a.m.)
24    VIDEO OPERATOR:  This will mark the beginning of
25  media No. 2 in our deposition of Walter Haessig.  We're going



Walter Haessig

April 25, 2023
Pages 62 to 65

Page 62

1  back on the record. It's 10:58 a.m.

2      Q.  (BY MR. LAMDEN) Mr. Haessig, during the break did you

3  talk to anyone about your deposition?

4      A.  No, sir.

5      Q.  Did you text with anyone about your deposition?

6      A.  I did not.

7      Q.  Did you review any documents during the break?

8      A.  I did not.

9      Q.  In preparation for today's deposition did you review

10  the underwriting file for the Wexlers' policy at issue in this

11  case?

12      A.  No, sir.

13          MR. LAMDEN:  Mike, my next block of questions

14  relates to the underwriting of the policy.  It also relates to

15  the renewal of the policy.  They were going to be based on the

16  underwriting file that you guys produced Bates No. 0003 through

17  262.  I'm not interested in fighting with you on the record

18  about scope.  If I ask questions about the underwriting file,

19  are you going to instruct your witness not to answer?

20          MR. ERRERA:  Again, not to create a fight here.

21  Is there a particular topic that you think that that falls

22  under?  That's my only issue.  If it doesn't fall within the,

23  what, one, two, three, four, five -- eight I think -- eight

24  topics, then, yeah, I would tell him not to answer since it's

25  beyond the scope.

Page 63

1          MR. LAMDEN:  Well, it falls within the scope of

2  topic 14 which up until yesterday at three o'clock Mr. Haessig

3  was designated to testify on.

4          MR. ERRERA:  Correct.  I'm sorry, I didn't mean

5  to cut you off.

6          MR. LAMDEN:  It also falls within the scope of

7  Nos. 18 and 19 and you know our position is that without a

8  protective order those topics are fair game.  But, like I said,

9  I don't want to continue to fight on the record.  If I ask

10  those questions, are you going to instruct the witness not to

11  answer or may I proceed?

12          MR. ERRERA:  No, I would so instruct.

13          MR. LAMDEN:  Okay.  And you understand that we

14  are going to request that this deposition be reconvened,

15  correct?

16          MR. ERRERA:  You can certainly ask but we're

17  also now waiting for the judge to make her decisions so...

18  But, yes, you certainly can ask for anything you'd like.

19          MR. LAMDEN:  Okay.  Just to be clear then, I am

20  not going to proceed on my questions regarding the underwriting

21  file, the underwriting of the policy, the renewal of the policy

22  based on your standing objection that you will instruct the

23  witness not to answer.  Are we on the same page on that?

24          MR. ERRERA:  Yes, sir.

25          MR. LAMDEN:  Okay.

Page 64

1      Q.  Mr. Haessig, does Chubb have written guidelines

2  regarding what types of documents must be included in a claim

3  file for a residential property insurance claim?

4          MR. ERRERA:  Asked and answered.

5          Go ahead.

6          THE WITNESS:  Yeah, we don't have written

7  guidelines on what documents should be included for residential

8  water claims.

9      Q.  (BY MR. LAMDEN)  If a general adjuster wanted to know

10  what types of documents should be included in a claims file,

11  how would he or she find out?

12      A.  Yeah, so other than to provide the similar answer the

13  pertinent information is in the claim file, there -- there's

14  not a document that would say -- or a guideline that would say

15  that this should be included where that should be included.

16      Q.  You said there's nothing in writing but how would a

17  general adjuster find out what types of information would be

18  included in a claim file if he or she had questions?

19      A.  If she or he had questions, they would contact their

20  manager at -- not to stumble around here, although I am,

21  it's -- it's just a general practice that's somewhat common

22  knowledge almost that -- that pertinent information is included

23  in the claim file and that's just what these individuals have

24  always been instructed to do.

25      Q.  Instructed -- by "individuals" you mean the general

Page 65

1  adjusters?

2      A.  Correct, yeah.

3      Q.  Instructed by their supervisors?

4      A.  Yeah.  So I was a general adjuster at one time and

5  before that I was, you know, an outside rep, if you will.

6  It's -- it's something that's ingrained in -- in the -- coming

7  up through the ranks, if you will, that -- that the file is

8  appropriately documented.

9      Q.  So with regard to e-mails, for example, within Chubb,

10  either the sender or the recipients of the e-mail determine

11  whether it's a pertinent communication that must be included in

12  the claim file?

13      A.  Yeah, I think that would be fair.

14      Q.  Do you know whether Chubb is subject to any

15  regulations in Illinois that dictate what types of documents

16  must be kept in an insured's claim file?

17          MR. ERRERA:  I will object since it's a topic

18  that's already been objected to that's pending the judge's

19  decision so it's beyond the scope.  Instruct him not to answer.

20          MR. LAMDEN:  This is a question about the

21  contents of the claim file.

22      Q.  Mr. Haessig, are you going to follow your attorney's

23  instructions not to answer the question as to whether Chubb is

24  subject to any regulations in Illinois that dictate what

25  documents must be kept in a claim file?



Walter Haessig

April 25, 2023
Pages 66 to 69

Page 66

1    MR. ERRERA: And -- and in particular I'll lodge
2 my objection beyond the scope. That's specifically also topic
3 No. 7 that's pending before the Court.
4    Go ahead, Wally.
5    THE WITNESS: So, Seth, I'll follow counsel's
6 advice.
7    Q.  (BY MR. LAMDEN) Do you know how long Chubb maintains
8 records in a residential property insurance claim file?
9    A.  I don't know the specific time period the documents
10 would be maintained.
11    Q.  Does Chubb have a record-retention policy that
12 relates to the contents of claim files?
13    A.  I don't know that they do.
14    Q.  Does Chubb permit adjusters to delete documents or
15 e-mails within a claim file?
16    A.  No, sir.
17    Q.  Do you know whether Chubb has a document-retention
18 policy for documents and e-mails that are not in the claim
19 file?
20    A.  Yeah. Hey, let me hit pause to amend slightly my
21 testimony to the question before which was can -- I don't
22 remember the exact question but to the extent can the claim
23 file be changed. There is a -- there is a short window of 24
24 hours where, you know, sometimes you just put a file -- you
25 know, you put -- you put a note in the wrong file or something

Page 67

1 like that. So there's a short window that gives you an
2 opportunity to make a change. After 24 hours you cannot change
3 the claim file.
4    Q.  The next questions I'm going to ask are going to
5 relate to claim files relating to residential property
6 insurance claims. Generally with regard to those claim files
7 can you tell me what personnel within Chubb -- I'm talking
8 about by position here -- would have access to that claim file?
9    MR. ERRERA: Hold on. You know, again, we go
10 back to my original -- I'm looking here at the eight topics.
11 Does this fall under a particular topic number to help me
12 identify which topic you're now asking about?
13    MR. LAMDEN: Mike, we're not doing this. If you
14 want to object and instruct the witness to answer, do so.
15 Otherwise I'm going to insist that the witness answer my
16 questions about the claim file.
17    MR. ERRERA: Seth, you know, we should be trying
18 to work together here. So, again, I would ask just point me in
19 the direction of which of the eight topics this falls under.
20 That's all I'm asking you to do. Can you do that or no?
21    MR. LAMDEN: I'm not doing it. We're not
22 talking about the scope objections, Mike, and I'm going to stop
23 this deposition if you keep interrupting.
24    MR. ERRERA: Well, unless you can point -- can
25 the court reporter read back the question again?

Page 68

1    (Record read as requested.)
2    MR. ERRERA: I'm trying to listen to what you've
3 read as the question and comparing it to my -- the list of the
4 eight topics to see if it's within the eight topics, I'm sorry.
5 Again, Seth, if you're not willing to tell me which covered
6 topic this falls under I'm going to add -- I'm going to say
7 it's beyond the scope because I don't see it being within any
8 of these eight. I'm trying to work with you here but --
9    MR. LAMDEN: The question isn't about scope.
10 The question is are you going to let your witness answer or not
11 and if not I'm just going to move on.
12    MR. ERRERA: I'm sorry?
13    MR. LAMDEN: The question as I see it is not one
14 of scope because that's not an appropriate objection today.
15 The question is whether you're going to instruct your witness
16 not to answer. If that's the case, then I'm going to move on.
17    MR. ERRERA: Well, if you're not telling -- if
18 you're not willing to tell me how it falls within one of the
19 eight, then I'm going to say that it is beyond the scope of
20 what he's been designated to talk about as a 30(b)(6) witness.
21    MR. LAMDEN: Okay.
22    MR. ERRERA: And, again, I -- I urge you if
23 there's a particular one, please tell me. Perhaps I'm
24 misreading what's been written here for the topics and that's
25 why I'm asking you to just please direct me to which one this

Page 69

1 falls under and we can go through there. But if not you can
2 certainly move on if you wish.
3    MR. LAMDEN: Mike, I'm going to treat that as a
4 standing objection. This is going to be my standing response.
5 We are not going to be arguing scope objections on the record
6 today. You can object to form by saying, "objection: form."
7 You can instruct your witness not to answer and I will abide by
8 that. Those are the only two objections that are appropriate
9 for today.
10    MR. ERRERA: Well, no, it's not true but we
11 won't debate it on the record. You may go on.
12    MR. LAMDEN: Okay. Let's move on.
13    (Exhibit 4 was marked for identification.)
14    Q.  (BY MR. LAMDEN) Mr. Haessig, I'm going to show you a
15 document that I have previously marked as Exhibit 2. It's
16 designated or titled, excuse me, Chubb National Insurance
17 Company's First Amended Responses -- strike that. Strike all
18 that.
19    I'm going to be showing you a document that has
20 been previously marked as Exhibit 4. It's titled "Chubb
21 National Insurance Company's First Supplemental Responses to
22 Plaintiffs' First Set of Request to Produce Documents." Please
23 let me know if you can see it. Can you see some of the
24 document on your screen?
25    A.  Yes, I do see some of the document.



Walter Haessig

April 25, 2023
Pages 70 to 73

Page 70

1   Q.  Can you see all of it now, all of the first page, I
2   mean?
3   A.  Page 1 of 13, yes.
4   Q.  Okay.  Can you tell me if this is a document you've
5   ever seen before?
6   A.  Seth, do you mind scrolling to the next?
7   Q.  No, just tell me when to move on to each page.
8   A.  Next page, please.  Next, please.  Next, please.
9   Next, please.  Okay.  All right.  Thanks, Seth.
10   Q.  Can you tell me whether you've ever seen this
11   document before today?
12   A.  Yeah, so I've reviewed -- I've reviewed some
13   documents, of course.  I don't remember the -- specifically
14   reviewing this document.
15   Q.  Do you recall whether you reviewed -- I'm going to
16   turn to the first page now.  So this is titled "Chubb National
17   Insurance Company's First Supplemental Responses to Plaintiffs'
18   First Set of Requests to Produce Documents."  Do you know
19   whether you've seen any of Chubb's responses to any of the
20   Wexlers requests to produce documents in this case?
21   A.  Yeah, so a few of the responses look familiar so I'm
22   inclined to say that I -- that I read this first set of
23   requests.  There's some of the responses that just quite
24   honestly I don't remember reading the specifics of -- of that
25   request or response.

Page 71

1   Q.  Okay.  I am turning to request No. 2, page 2 of
2   Exhibit No. 4.  It states -- the request is "Chubb's entire
3   Claims File for the Insurance Claim as well as all
4   Communications relating to or referring to the Claim File."
5   The answer is, "Objection.  This request seeks documentation
6   and information that is protected by attorney-client privilege
7   and work product privileges.  Notwithstanding said objections,
8   Chubb is producing the non-privileged claim file and related
9   communications."
10        Mr. Haessig, one of the topics that you were
11   designated for is Chubb's searches for and production of
12   documents including failure or declination to search for and
13   produce documents related to the claim in this action.  Can you
14   tell me what are "related communications" as the word is used
15   in this answer?
16   A.  Let me read it one more time.  Sorry, give me a
17   moment.  Yes, I don't know what "related communications" may or
18   may not include.
19   Q.  Do you have any idea what "related communications"
20   might encompass if they're not in the claim file?
21   A.  So I can speculate which I'd rather not speculate.
22   Q.  No need to speculate.  I'm just asking for Chubb's
23   position here.  It's really not based on your own knowledge.
24   You can answer if you'd like.  I'm just not trying to put you
25   on the spot here where you need to speculate.

Page 72

1   A.  Right.  Yeah, the -- the request is for the -- the
2   claim file.  As we say in the response or the answer, we've
3   provided, you know, a little more than $14,000 -- 14 thousand
4   dollars -- 14,000 documents that would be the claim file.
5   Whether some of those 14,000 documents would be something that
6   would fall into the title of related communications and what
7   those are, I don't know.
8   Q.  It says claim file but it also asks for
9   communications relating to or referring to the claim file and I
10   was just asking you if you knew what "related communications"
11   encompassed which I think you've answered.
12        You also noticed that -- noted that Chubb has
13   produced I think you said documents but it's actually pages 1
14   through 14,279.  Do you know whether Chubb has produced any
15   documents in addition -- or a number higher than 14,279 Bates
16   numbers?
17   A.  Oh, no -- no, sir, I don't know that -- that
18   there's -- outside of what is listed on the document here, the
19   answer, I don't know if there's additional documents or
20   additional Bates numbers beyond that 14,000 number.
21   Q.  I'm going to move on from this document.
22        Are Chubb adjusters, general adjusters,
23   permitted to communicate with their insureds through messaging
24   apps?
25        MR. ERRERA:  Hold on.  Again -- and I understand

Page 73

1   you want there to be a standing objection, however, there is
2   Illinois law that says standing objections even if agreed by
3   the parties waives issues so, again, I'll go back and say I'm
4   willing to work with you.  I don't see that particular question
5   being encompassed within any of the eight topics, however, I'm
6   more than happy if you could tell me which one to look at to
7   look at that.  Otherwise I'd say it's beyond the scope of the
8   designated topics for this particular witness and direct that
9   he not be -- not answer as a result of being beyond the scope.
10        MR. LAMDEN:  So, look, I don't want to continue
11   this on the record but I need to respond to what you just said
12   about general objections.
13        I elected not to pursue some of the topics that
14   I had prepared for today including those that Chubb has
15   designated Mr. Haessig to testify on in the underwriting file,
16   and we had agreed that I wouldn't proceed subject to a standing
17   objection.  I expect that Chubb is not going to be taking the
18   position that I waived my right to take those -- ask those
19   questions, otherwise I'm going to go through them all right
20   now.  So I hope -- I'm assuming that's not what you meant
21   but --
22        MR. ERRERA:  No, there's Illinois case law that
23   says that if I don't reiterate my objection after each request
24   that a standing objection is waivable for a defendant under
25   Illinois case law.  That's what I'm saying.  So that's why I'm



Walter Haessig

April 25, 2023
Pages 74 to 77

Page 74

1 saying if you want to point me in the direction of which one of
2 the eight topics here that it falls under, I'm happy to look at
3 it and let him answer. If not, then it's beyond the scope for
4 this particular witness and isn't appropriate under 30(b)(6).
5 　　　　MR. LAMDEN: Let me be clear on a couple of
6 things. I don't want to continue to argue on the record. This
7 time is not going to count against my seven hours for deposing
8 Mr. Haessig. I'm not going to identify a topic that relates to
9 each of my questions. For purposes of this deposition I'm
10 merely going to ask Mr. Haessig are you going to answer my
11 question about whether general adjusters are permitted to
12 communicate with their insureds through messaging apps.
13 　　　　MR. ERRERA: And, again, I will say that it's
14 beyond the scope unless you want to direct me to which
15 particular topic you want to address.
16 　　　　MR. LAMDEN: All right, let's move on. We're
17 not doing this, Mike. Let's move on.
18 　　Q.　Mr. Haessig, if an adjuster does communicate with an
19 insured through a messaging app, is the general adjuster
20 required to put that -- a log of that messaging in the claim
21 file?
22 　　　　MR. ERRERA: You can go ahead. I believe that
23 falls under topic No. 8, Wally. Go ahead.
24 　　　　THE WITNESS: Thank you. Yeah, similar to
25 e-mails, Seth, pertinent information would be put into the

Page 75

1 claim file. The example that I used previously was, you know,
2 for example, arranging a time to meet or arranging a time for a
3 call. You wouldn't expect to find that type of communication
4 in the claim file. If there is some -- something that is
5 substantial, I'd -- I'd expect to find a reference to that
6 communication in the claim file.
7 　　Q.　(BY MR. LAMDEN) When -- strike that. If -- if an
8 adjuster were to communicate with an insured through a
9 messaging app, would that be -- would that adjuster be required
10 to retain logs of those communications with the insured?
11 　　A.　The -- I'll have to ask you to clarify for me what
12 the -- what do you mean by "log of communication"?
13 　　Q.　Strike that. That was probably a bad question.
14 　　　　If you and I were to communicate by I-message,
15 for example, or WhatsApp, there would be a chain of your
16 questions and my responses and what I'm asking is if you were
17 the adjuster in my hypothetical and I were the insured, would
18 you be required to retain somewhere the chain of communications
19 that we just engaged in, the back and forth?
20 　　　　MR. ERRERA: Objection: asked and answered.
21 　　　　Go ahead.
22 　　　　THE WITNESS: Yeah. So, hey, I appreciate the
23 hypothetical. It is a hypothetical but just for clarity, we
24 don't use WhatsApp. But, yeah, I understand the nature of the
25 question. Are we required? No, there's -- there's not a

Page 76

1 requirement to -- log that. It would probably look, Seth,
2 like that the adjuster would open the electronic claim file and
3 enter a note with that -- you know, with that communication
4 similarly to how you document a voice mail. Not a voice mail,
5 a voice conversation.
6 　　Q.　(BY MR. LAMDEN) How would a voice mail be logged?
7 Would that be dragged into the claim file as well?
8 　　A.　Like the recording itself?
9 　　Q.　Correct.
10 　　A.　Yes. No, that would not be in the claim file.
11 　　Q.　When you said "we don't use What'sApp," are you
12 referring to Chubb?
13 　　A.　That is correct, yes.
14 　　Q.　Are there any messaging apps that adjusters are
15 permitted to use with their insureds?
16 　　　　MR. ERRERA: Again, I --
17 　　　　MR. LAMDEN: Let's move on. Let me withdraw
18 that question.
19 　　Q.　Mr. Haessig, when Chubb was responding to the
20 Wexlers' document production request, did Chubb produce all
21 electronic -- or messages through messaging apps that the
22 adjusters used with the Wexlers?
23 　　A.　Seth, as I sit here today, I don't remember. And
24 that's not to say that there wasn't a request for messaging. I
25 don't recall seeing that request and I don't recall seeing a

Page 77

1 production that would have included any kind of text messages.
2 　　Q.　Was Mr. Paradis asked when responding to the document
3 production request whether he communicated with the Wexlers
4 through text message?
5 　　A.　I do not know.
6 　　Q.　If I were to represent to you that he did communicate
7 with the Wexlers through text messages, would those text
8 messages that Mr. Paradis had received have been part of
9 Chubb's production?
10 　　　　MR. ERRERA: Objection: form.
11 　　　　Go ahead.
12 　　　　THE WITNESS: Sorry, Seth, one more time can you
13 repeat the question or have the court reporter repeat it?
14 　　　　MR. LAMDEN: Sure. Could we have the court
15 reporter read back?
16 　　　　(Record read as requested.)
17 　　　　THE WITNESS: Thank you. As I sit here right
18 now because I haven't laid eyes on that I'm uncertain. I'd
19 like to think that if the request was made that we made the
20 production; that it was part of the production.
21 　　Q.　(BY MR. LAMDEN) Do you know whether Chubb made that
22 request to Mr. Paradis?
23 　　A.　I do not know.
24 　　Q.　We had talked earlier about e-mails and documents.
25 Do you know whether Chubb asked any employee of Chubb whether



Walter Haessig

April 25, 2023
Pages 78 to 81

Page 78

1  it had any text messages relating to the Wexlers' claim?
2      A.  I do not know.
3      Q.  Should Chubb make that request to its employees
4  asking whether they had any text messages relating to the
5  Wexlers' claim?
6      A.  I'm sorry, did -- did you ask if we could or if we
7  did?
8      Q.  If you should have.
9      A.  What we --
10          MR. ERRERA:  I think asked and answered but go
11  ahead.
12          THE WITNESS:  Yeah, I don't know, Seth, that I'm
13  the gauge of what -- what we should have done.  I think I would
14  have to get -- only because -- and I say that only because, you
15  know, I'm not an attorney so I don't -- I don't know what maybe
16  we should have done in that production or not.  So I'm going to
17  have to say I just don't know.
18      Q.  (BY MR. LAMDEN)  The reason I ask again is you've
19  been designated to testify on, quote, whether -- strike that.
20  -- "Chubb's searches for and productions of DOCUMENTS
21  (including any failure or declination to search for and produce
22  DOCUMENTS) related to the CLAIM in this ACTION."
23          So I'm asking really not for your opinion but
24  Chubb's position as to whether it should have made that request
25  in responding to the Wexlers' document production requests.  By

Page 79

1  "that request" I mean asking any Chubb employees whether they
2  had text messages relating to the Wexlers' claim.
3      A.  Yeah.  Thanks for the clarification.  Again,
4  whether -- whether we did or did not or should have I don't
5  know.  I would think that if there is a request specifically
6  about IMs to -- to Chubb I would assume that we could, if we
7  haven't, specifically look for those communications.  Again, if
8  we have them but I'm not certain that that's the case.
9      Q.  Do you know one way or the other whether the Wexlers
10  asked for instant messages -- at least IMs or texts -- to or
11  from Chubb's employees relating to the Wexlers' claim?
12      A.  Yeah, as I sit here right now without documents in
13  front of me, I don't know.  If you have something that -- that
14  might help refresh my memory, that would be helpful, of course.
15      Q.  I'll come back to that only because I don't have the
16  document request definitions in front of me so I'll come back
17  to that.  That will help.
18          I guess the same question with regard to the --
19  the e-mails.  If the Wexlers' documentation production requests
20  included e-mails not in the claim file relating to or from the
21  Wexlers' claim, should Chubb ask Chubb employees involved with
22  the Wexlers' claim whether they had such e-mails?
23      A.  Yeah, and I think that we did that through the IT
24  folks.  They would be able to capture any of those e-mails
25  for -- for any employee and it would have been part of the

Page 80

1  production.
2      Q.  So you're saying your IT team reached out and talked
3  to the individuals in connection with their e-mail searches?
4      A.  No, sir.  And the reason why I answer like that is
5  simply they don't -- they wouldn't need to request permission
6  to search those e-mails.  They -- they can search our e-mails.
7      Q.  Right.  I understand.  I was just asking if they
8  should have asked the Chubb employees involved with the Wexler
9  claim whether they had any e-mails.  Maybe they were stored
10  locally, for example.  I'm just asking whether they should --
11  whether Chubb should have made that request, not whether IT
12  should have searched for e-mails.
13      A.  Again, whether we should have or not, I -- I'm
14  unclear on.  What I do understand is that any -- any -- any
15  search with the parameters that they were given would have
16  identified those e-mails.
17      Q.  So -- and I want to move on but just to close the
18  loop, when you said there was e-mails -- earlier we talked --
19  I'm going to put it back up on the screen -- we talked about
20  request No. 2 and we talked about, excuse me, related
21  communications as Chubb used in its answer.  Are you saying
22  that all related communications, communications related to the
23  Chubb claim -- the Wexlers' claim, excuse me, would have been
24  picked up by Chubb's IT searches and so a -- asking the
25  employees whether they had e-mails would have been unnecessary?

Page 81

1          MR. ERRERA:  Objection:  asked and answered and
2  mischaracterizes previous testimony.
3          Go ahead.
4          THE WITNESS:  So as I understand it, they --
5  there wasn't anything sinister done in not asking an employee
6  about e-mails simply because they don't -- we don't need
7  permission from the employee to search and look for their
8  e-mails.  Given the parameters you can -- the IT folks can
9  identify those e-mails and -- and pull them out without the
10  need to talk to every individual and gain some sort of
11  permission.
12      Q.  (BY MR. LAMDEN)  And that's -- the IT team could not
13  do a similar search for documents, correct?
14      A.  If the document is stored on a local drive, my
15  understanding would be that they wouldn't be able to do that.
16      Q.  Can you describe for me what search would have picked
17  up documents relating to the Wexler claim if they were not
18  stored on a local drive?
19      A.  Yeah.  As I understand it, in the parameters that I
20  saw it was a search for documents that would have included
21  first and last name of the insured, claim number, policy
22  number, address.  There may have been one or two other things
23  in the parameters, I don't -- I don't recall, but those --
24  those items would have been located and produced.
25      Q.  Okay.  So it sounds like I misunderstood earlier.

