Walter Haessig   April 25, 2023
Pages 82 to 85

Page 82

1  The searches were not just for e-mails, they were for e-mails
2  and documents as well, the IT searches?
3     A.  Yeah, and the carve-out would be is if there's
4  something stored on a local drive on somebody's computer, I
5  don't -- my understanding of it is that you wouldn't be able to
6  search.  You wouldn't be able to find a document.
7     Q.  There's no document on your screen, correct?
8     A.  Just -- just the Zoom meeting here.
9     Q.  Got it.  Okay.  I'm just making sure I wasn't still
10 sharing.  I didn't want you to see anything improper or
11 anything like that.
12        So one of the topics you've been designated for
13 -- and I'm going to ask some questions about that but just to
14 frame it -- "Chubb's standards for handling, investigating and
15 adjusting homeowners' residential water damage claims in
16 Illinois from 2018 to the present including with respect to the
17 claim whether pursuant to any claims or adjustment manuals or
18 other sources, standards or practices."
19        Can you tell me what you did specifically to
20 prepare to testify on that topic?
21    A.  Specifically around that topic?
22    Q.  Yes.
23    A.  Just general knowledge that I have on -- on the --
24 the handling of our claims.  There wasn't much preparation
25 around that particular topic.

Page 83

1     Q.  Has Chubb ever prepared written standards for
2  handling homeowners' residential water-damage insurance claims?
3     A.  No, sir, which is partially why there wasn't a lot
4  necessary to prepare for.
5     Q.  Has Chubb ever prepared written standards for
6  investigating homeowners' residential water damage insurance
7  claims?
8     A.  No, sir.
9     Q.  Has Chubb ever prepared written standards for
10 adjusting homeowners' residential water damage insurance
11 claims?
12    A.  No, sir.
13    Q.  So would it be correct to stay that what's been
14 produced to us is the -- referred to as Chubb's GA Best
15 Practices Guidelines is the only document that could arguably
16 be considered a standard that relates to handling,
17 investigating or adjusting property-damage insurance claims?
18    A.  Yeah, the GA -- the GA Best Practices Guidelines
19 would be that document.  Not to be confused with the idea that
20 it would only pertain to residential water claims.
21    Q.  Okay.  Yeah, thanks for the clarification.  I'm not
22 suggesting that anything we're talking about today -- I'll go
23 through it -- is limited just to those claims but I just want
24 to know if it applies to those claims.  So if I screwed up in
25 my questions, just please correct me.  I'm not trying to pin

Page 84

1  you down to anything.  I just want to make sure I'm
2  understanding the claims that apply to the Wexlers' claim.
3        (Exhibit 7 was marked for identification.)
4     Q.  (BY MR. LAMDEN)  I'm going to put a document up on
5  the screen.  It was something I've already marked as Exhibit 7.
6  Let me know when you see the document.
7        Do you see a copy -- or the first page I should
8  say of the General Adjuster Best Practices Guidelines on your
9  screen?
10    A.  Yes, sir.
11    Q.  Okay.  These are dated August 20, 2018 this was
12 updated.  Do you know if these are the guidelines that are in
13 effect today at Chubb?
14    A.  Seth, I believe there's been a revision since 2018.
15    Q.  But these were -- do you know when that revision
16 occurred?
17    A.  Without having the document in front of me I don't
18 recall.
19    Q.  "The document" being the guidelines that are in
20 effect today?
21    A.  That is correct.
22    Q.  Okay.  Do you know whether Bob Paradis had access to
23 these guidelines while he was involved with the Wexlers' claim?
24    A.  So without testifying on Bob's behalf, I think he
25 would have had access to this document.

Page 85

1     Q.  How would a general adjuster get access to these
2  guidelines?
3     A.  I mean, I actually shared the revised guidelines with
4  my team recently by e-mail.  That would probably be the most
5  common way.  They -- they're housed somewhere naturally.
6  Without doing a little more research for you I would be hard
7  pressed to tell you where that might be.
8     Q.  Are the adjusters trained on these guidelines?
9     A.  Trained?  I don't -- I don't know that there's
10 training around the guidelines.  The guidelines are certainly
11 discussed and the guidelines are -- yeah, if you want to define
12 "training," maybe I could help you out a little bit more but --
13 or even provide some examples but "training" -- you know, I
14 don't know, we certainly document the document that -- that we
15 discuss.
16    Q.  By "discuss" who do you mean?  You said "we discuss."
17 Who do you mean by that?
18    A.  Yeah.  So the general adjusters and the -- the
19 managers.  So, for example, one of the guidelines would be
20 something around contact.  So I don't know that there's much
21 training needed around contact other than to understand what
22 the document says.  And that -- that's really my hesitation
23 around "training."  The document kind of speaks for itself.
24    Q.  Are general adjusters provided with a copy of the --
25 can I call them the guidelines?



Page 86
1    A.  I'd be okay with that.
2    Q.  Okay.  Are general adjusters provided with a copy of
3  the guidelines when they join Chubb?
4    A.  As part of the on boarding process?  You know, Seth,
5  I can't say for certain that every GA has always been provided
6  a copy of the guidelines.  Part of the on boarding process,
7  though, would be a review of the guidelines.
8    Q.  So general adjusters are at least told they exist as
9  part of their on boarding process, as far as you know?
10   A.  Yes.
11   Q.  Other than these guidelines, do adjusters -- general
12 adjusters who are working either directly or indirectly for you
13 have access to any other written standards or guidelines that
14 apply to investigating a homeowner's residential water-damage
15 insurance claims?
16   A.  No, there's not such guidelines.
17   Q.  So the guidelines, the best practices guidelines, are
18 pretty much it?
19   A.  That is correct.
20   Q.  If a general adjuster working for you wanted
21 information regarding how to investigate a homeowner's
22 residential water-damage insurance claim, do you know how the
23 adjuster could get that information within Chubb?
24   A.  You know, the question seems to indicate that there
25 would be some sort of guideline and as I previously explained,

Page 87
1  there's -- there's not a guideline.  So I think -- I think I
2  answered the question.
3    Q.  The adjuster would then come to management and ask
4  the question if there were questions about how to investigate a
5  claim?
6    A.  Yeah, I think that would be a fair statement.  In my
7  capacity as a manager, I would encourage the team to bring
8  questions to me.
9    Q.  Were you -- were you involved in drafting any version
10 of the guidelines?
11   A.  No, sir.
12   Q.  Were you asked to review drafts?
13   A.  I was not.
14   Q.  So does Chubb expect its adjusters to follow the
15 guidelines in adjusting property-damage insurance claims,
16 residential?
17   A.  Yeah.  Again, not specific to any particular kind of
18 claim, whether residential or commercial or water or fire or
19 otherwise, but the guidelines are there as -- as just as in any
20 case a guideline for the best practices.
21   Q.  Are Chubb adjusters required -- required to follow
22 these guidelines?
23   A.  Yeah.  So Chubb adjusters because they're -- they're
24 guidelines and not always requirements there would be an
25 expectation that the guidelines are followed.

Page 88
1    Q.  Looking at the page -- the first page of Exhibit 7 on
2  the screen, it says at the very bottom -- this is probably
3  going to be hard to read, I'll just read it for you --
4  actually, my question is there's a reference to "Claims
5  handlers are encouraged to reference the Regulatory MAP in the
6  Village."
7        Can you tell me what the Village is?
8    A.  Sure.  So the Village is the intranet.  You know,
9  it's kind of the -- remember how I had referenced I'm not a big
10 IT guy?  So I'll do my best but, you know, probably similarly
11 to how you start your day and you open up your computer, you
12 know, the -- you know, the company's -- not the company's
13 website as in what, you know, everybody would see that's
14 outside of the company but kind of your landing page, yeah.
15   Q.  Okay.  What's the -- what's the regulatory -- is it
16 MAP or M-A-P?
17   A.  It actually is a map.
18   Q.  Okay.  That's not an acronym, that's just a map?
19   A.  That is correct.
20   Q.  Okay.  Do you know what the Regulatory MAP is?
21   A.  I do.
22   Q.  What is it?
23   A.  So it -- it actually pulls up as a map and you would
24 click on the various states and within that it would provide
25 you some of the guidelines or regulations that would be related

Page 89
1  to -- to that state.
2    Q.  What kinds of regulations?
3    A.  So, for example, if I was to write a reservation of
4  rights letter, some states -- certainly not all states -- would
5  have some required language that would be included in the
6  reservation of rights to be included in that letter.
7    Q.  Can you give me examples of other regulations that
8  might be found in the Regulatory MAP?
9    A.  Yeah, similarly, this would be -- and I don't know
10 why but New Jersey stands out because it seems to be a little
11 bit more than some other states but, similarly, if you were to
12 draft a denial letter, there would be some language that the
13 state requires so those type of regulations.  There might be --
14 again, it's going to depend on -- on the state but there might
15 be something around what a statute of limitations might be for
16 that state.  Just generally kind of regulatory items that would
17 be specific to -- to any given jurisdiction.
18   Q.  I'm going to move on to the third page of the
19 document, Bates-numbered CHUBB_14973.  Are you able to see that
20 on the screen?
21   A.  Yes, sir.
22   Q.  Okay.  Under "Coverage" the first bullet point refers
23 to a Chubb personal insurance appraisal.  Do you know what that
24 is, a Chubb personal insurance appraisal?
25   A.  Yeah.  Hey, Seth, it's pretty small on my screen.  Do



Walter Haessig  
April 25, 2023  
Pages 90 to 93

Page 90
1 you mind making it a little larger?
2  Q. Yeah. How's that?
3  A. That's perfect.
4  Q. Okay. Tell me if you can't see or if I'm referring
5 to a section you can't see and I'll zoom in like we just did.
6  A. Yeah, fair enough. Now, I'm going to sit back a
7 little bit though.
8  Q. Do you want me to make it smaller?
9  A. No, that's fine. So the question was am I familiar
10 with a Chubb personal insurance appraisal? Yes, sir.
11  Q. What is it?
12  A. Yeah, so not -- not all risks but certainly some
13 risks Chubb appraises the home and that's the Chubb personal
14 insurance appraisal that's referenced in this document.
15  Q. How would one -- how would a general adjuster review
16 the -- or find, excuse me, the Chubb personal insurance
17 appraisal?
18  A. For the general adjuster he or she would make a
19 request of the appraisal folks. I don't -- I don't know off
20 the top of my head what that e-mail is -- that e-mail address,
21 but it's a -- it's a request to that work group requesting the
22 appraisal.
23  Q. Do you know whether a Chubb personal insurance
24 appraisal was prepared for the Wexlers?
25  A. As I sit here today, I don't know if we have an

Page 91
1 appraisal on -- on the -- on the residence.
2  Q. Do you know whether when responding to the Wexlers'
3 document production request Chubb looked to see whether there
4 was a Chubb personal insurance appraisal that had been prepared
5 for the Wexlers?
6  A. Yeah, as I sit here today, I don't know if it was
7 specifically part of the request or the production. To the
8 extent one exists and with counsel's approval if we haven't
9 provided it, I'm sure that we can get that for you.
10  Q. Would that be part of the underwriting file or the
11 claim file or something else?
12  A. You know, quite honestly, it might be both. If -- if
13 there is one that exists and the claims adjuster requested it,
14 then it's probably in the claim file. However, it -- it would
15 likely be part of the underwriting file as well.
16  Q. Did -- did Chubb produce the entire Wexler
17 underwriting file in this litigation?
18  A. I believe that that was the request. If we had some
19 objections to that, I -- as I'm sitting here right now, I'm
20 unsure of objections -- but we did give that production, as I
21 understand it.
22  Q. What do you mean when you say "give the production"?
23  A. The requested documents. The underwriting file.
24  Q. They were provided to the Wexlers, the underwriting
25 file?

Page 92
1  A. I believe so, again, without having the documents in
2 front of me. Again, I'm not -- I'm not trying to be difficult.
3 There's a lot of documents. Can I remember every last one?
4 Yeah, I -- I can't but --
5  Q. That's fair, and I'm not asking that. I'm just
6 asking if the entire underwriting file has been produced.
7    What -- what's the commercial underwriting work
8 station?
9  A. Sure. I'll be happy to share what I know about the
10 commercial underwriting work station, which doesn't apply to
11 this personal lines matter, but the commercial underwriting
12 work station is where a commercial underwriter their file would
13 be located.
14  Q. So there's no reason an adjuster in a residential
15 claim would care about that, right, a commercial underwriting
16 work station?
17  A. Yeah, I think that's an accurate statement.
18  Q. Move on to the section in the middle of the page
19 called "Cause of loss." Can you see that -- that section?
20  A. Yes, sir.
21  Q. The second bullet point says, "Identify potential
22 third party contributors and follow the EIP guidelines for
23 subrogation."
24    What are the EIP guidelines?
25  A. "EIP" stands for early -- sorry, Early Intervention

Page 93
1 Program.
2  Q. What is that?
3  A. Yeah, so it's -- it's -- as it says, it's related to
4 subrogation so in the event that there is potentially a
5 third-party contributor to the loss -- in other words, maybe
6 somebody is -- some third party is responsible or contributed
7 to the loss, meaning there could be somebody that money could
8 be recovered from if they are found to be liable or
9 responsible. The EIP guidelines is -- and really it's not --
10 it's not much -- it is a referral to subrogation and then they
11 would be responsible for putting folks on notice. To the
12 extent that it is applicable joint inspections could even be
13 retaining subrogation counsel. But, yeah, all of the EIP --
14 all of the EIP guidelines, again, there's not really much other
15 than referring it to subrogation. It's just that, a matter --
16 matters that relate to subro.
17  Q. When a matter is referred to subrogation pursuant to
18 this bullet point, does the general adjuster typically stay
19 involved with the subrogation process?
20  A. You know, maybe to some extent, Seth. They really
21 take the lead on subrogation. The adjuster may be asked to
22 provide some documentation or, you know, something that was
23 observed at the on-site meeting but, generally speaking,
24 Subrogation runs Subrogation. The adjuster is not -- not
25 really involved.



Walter Haessig April 25, 2023
Pages 94 to 97

Page 94
1  Q.  Does an adjuster typically get updates from the
2  subrogation team regarding subrogation efforts or is it --
3  other than what you've just described is it truly a separate
4  process?
5  A.  You know, it's a separate process.  The -- the file
6  notes are intertwined so there's not a separate subrogation
7  file.  So part of your question was does the claim adjuster get
8  updates.  You know, I don't know that they get updates but the
9  subrogation file being intertwined into the claim file, you
10 know, that information is there.  Is it specifically for an
11 update or, you know, to be addressed to the adjuster?  No.
12  Q.  Do you know whether there was any subrogation
13 activity in the Wexlers' claim?
14          MR. ERRERA:  Hold on.  Again, we would just
15 object that it's beyond the scope but, again, I welcome if you
16 want to direct me to a particular request so I can see if I'm
17 missing but I don't believe that falls within one of the eight.
18 So otherwise I would direct him that it's beyond the scope and
19 not answer.
20  Q.  (BY MR. LAMDEN)  Mr. Haessig, are you going to follow
21 your attorney's advice and not answer?
22  A.  I will follow counsel's advice.
23  Q.  Let's move on.  Okay, I'm turning to page 7 of the
24 guidelines.  Bear with me one second.  And by "page 7" I mean
25 the page number at the bottom of the guidelines that says 7.

Page 95
1 By document reference CHUBB_014977.  Mr. Haessig, do you see
2 page 7 of the guidelines?
3  A.  I do.
4  Q.  I'd like to start with the section that says, "Use of
5 Vendors, Consultants and Experts" at the top of the page.  Do
6 you see where I'm looking?
7  A.  Yes, sir.
8  Q.  The first bullet point says, "The GA should follow
9 the defined assignment, handling, oversight, and authority
10 protocols when hiring experts in support of our claim handling
11 responsibilities."
12         Can you tell me what is meant by "the defined
13 assignment, handling, oversight and authority protocols"?
14  A.  You know, generally I'm happy to speak to that.  You
15 know, the assignment I think is -- assignment handling is
16 somewhat simple.  I mean, I don't know that there's anything
17 more to read into that.  The file has been assigned to a
18 particular adjuster and -- and he or she is handling that --
19 that claim and has responsibilities as it relates to handling
20 the claim.  Oversight and authority protocols as it relates to
21 this narrow bullet under this subsection really would be
22 speaking to an adjuster needs authority to engage an expert
23 from a manager so he or she, the general adjuster, that is,
24 would need to request that authority to hire -- to hire that
25 expert.

Page 96
1  Q.  So where it says "protocols," those aren't written
2 protocols or -- or guidelines, correct?
3  A.  Yeah, Seth, there's -- there's not another -- another
4 document somewhere that would outline authority protocols.
5 That -- that doesn't exist.
6  Q.  So where it says "protocols," does that really mean
7 other sections of the guidelines?
8  A.  Yeah, I think that would be -- I think that would be
9 fair because -- without having the benefit of the full document
10 in front of me but I do believe that we talk somewhere else
11 about authority being needed to obtain experts.
12  Q.  Yeah, and that's fair.  I'm not trying to trip you
13 up.  We'll go through other parts of the document, too.  I was
14 just asking more generally whether there are other documents
15 that are protocols and it sounds like they're not.  It's just
16 sort of -- there's not a written document or separate written
17 document or anything like that.  I couldn't look and find a
18 handling protocol document, correct?
19  A.  That is correct.  Yeah, there's not another document
20 or another set of protocols that -- that would be outside of
21 this document.
22  Q.  Okay.  Do these -- do these -- I'm talking about the
23 oversight authority protocols.  I recognize it's not a specific
24 document.  Do they permit -- permit a general adjuster to
25 delegate any aspect of claim-handling authorities --

Page 97
1 responsibilities to an outside attorney?
2  A.  Delegating the claim-handling responsibility to an
3 outside attorney is the question?
4  Q.  Correct.
5  A.  No, that -- that would not happen.
6  Q.  Would -- would these protocols permit an outside
7 attorney to retain a building consultant on behalf of Chubb?
8  A.  Yes, we would -- and we do often -- retain a -- a
9 building consultant to assist with really identifying the scope
10 of work and the cost of repairs.
11  Q.  When you say "we," do you mean Chubb?
12  A.  Correct, yes.
13  Q.  Could an outside attorney for Chubb take over the
14 process of retaining a building consultant for Chubb?
15  A.  So, Seth, I want to -- I need a little clarification
16 to the question, if you don't mind.  You would be referring to
17 before -- before litigation, pre-lit?
18  Q.  Correct, just in the course of investigating a claim.
19  A.  Yeah, that -- that -- that wouldn't -- that wouldn't
20 happen.
21  Q.  What roles are outside attorneys permitted to play
22 pursuant to these protocols in connection with handling
23 experts?
24  A.  You know, I -- I've never been asked that -- that
25 kind of question so let me think through it.  Is -- it would be



Walter Haessig            April 25, 2023
Pages 98 to 101

Page 98

1 unusual if at an early stage of the claim when we're retaining
2 consultants or experts that we would -- that we would have, you
3 know, counsel involved. I don't know if that answers the
4 question but may -- maybe Wendy can repeat it back for me and I
5 can provide a little bit better of an answer.
6    Q. It's not an answer to my question but if you want to
7 read it back that's fine. I'm just trying to understand -- and
8 I think you've answered it -- that these are really protocols
9 that are for your general adjusters to follow in investigating
10 claims?
11    A. Yes, that is correct.
12    Q. So if -- if Chubb had outside attorneys, they would
13 be subject to these guidelines in connection with investigating
14 a claim, right?
15    A. I don't know that -- I mean, again, I know you're not
16 trying to trip me up, at least I don't think that you are, but,
17 you know, the -- Chubb and the adjusters assigned to the matter
18 would be the ones that are responsible really for investigating
19 the claim. I don't want my answer to appear or sound like
20 we're having outside counsel investigate a claim because that's
21 -- that's not what transpires. These guidelines do pertain to
22 the adjusters. They really wouldn't have anything to do
23 with -- with outside counsel or coverage counsel. These would
24 pertain to the adjuster and the investigating or handling of a
25 claim.

Page 99

1    Q. Got it. Okay. So the second bullet point that
2 starts off with -- I'm just going to read it into the record if
3 that's all right. "The GA is expected to play a significant
4 role in providing oversight, coordinating the appropriate scope
5 of loss, addressing any technical issues that arise on the
6 claim and setting expectations with the client and the assigned
7 experts."
8        What does it mean for a general adjuster -- and
9 I'm going to limit it to general adjusters on residential
10 property insurance claims. I'm going to continue that through
11 here, I'm not going to keep repeating it, but if there's a
12 difference or if my question is just confusing, let me know.
13 I'm just trying to streamline this a little bit.
14        What would it mean for a general adjuster to
15 play a significant role in coordinating the appropriate scope
16 of loss?
17    A. I think that would really be defined on what the
18 circumstances of any one claim would be how much of a -- you
19 know in quotes -- significant role. I can tell you the -- the
20 spirit of this bullet point is that a general adjuster wouldn't
21 assign an expert and -- and the expert assume the role of the
22 adjuster. So we would have an expectation that the general
23 adjuster would still play the role, if you will, of being just
24 that, the adjuster and the building consultant, or any other
25 expert, wouldn't slide into the shoes of an adjuster and -- and

Page 100

1 fill the role that he or she really should be doing and that's
2 just that being the adjuster.
3    Q. So a general adjuster can't just pawn off to a
4 building consultant the investigation of the claim?
5    A. That is correct.
6    Q. Okay. You know, it's after 12:00 here and I'm
7 guessing you probably want a break. So I don't know whether
8 should we take a break for lunch now?
9        MR. ERRERA: Yeah, that's fine.
10       MR. LAMDEN: Wally, how long do you want? What
11 time do you want to go back on? I mean, I'd like to keep
12 things moving but I want you to take as much time as you need
13 as well.
14       THE WITNESS: Yeah, Seth, you know, I'll punt it
15 to you only because you know what questions you need to get
16 through and I'm sure that none of us want to be sitting here at
17 7:00.
18       MR. LAMDEN: Fair enough. Why don't -- why
19 don't we go back on at 12:30. Is that okay with everyone?
20       MR. ERRERA: Yeah. That should be fine. I've
21 got to run out of the house quick to get a prescription from
22 Jewel but that should be -- that should be okay.
23       MR. LAMDEN: 12:35?
24       MR. ERRERA: Yeah. As soon as I come back, I'll
25 pop on the screen but, yeah, I'll --

Page 101

1       MR. LAMDEN: Let's shoot for 12:30 then.
2       MR. ERRERA: Okay.
3       VIDEO OPERATOR: This will mark the end of media
4 No. 2. We're going to go off the record at 12:06.
5      (Recess taken from 12:06 p.m. to 12:39 p.m.)
6       VIDEO OPERATOR: This will mark the beginning of
7 media No. 3 in our deposition of Walter Haessig. We're going
8 back on the record at 12:39.
9    Q. (BY MR. LAMDEN) Mr. Haessig, welcome back. During
10 the break did you talk to anyone about your deposition?
11    A. I did not but with a little asterisk. I sent Mike a
12 message asking if we could talk. He said no. I said all
13 right.
14    Q. Cool. Did you look at any documents?
15    A. No, sir.
16    Q. Okay. Let's jump back. I think when we broke we
17 were taking a look at what I've been referring to as the
18 guidelines, the best practices guidelines. Actually, why don't
19 we have the -- the court reporter read back the last question.
20 I want to make sure we jump in where we left off.
21      (Record read as requested.)
22    Q. (BY MR. LAMDEN) I want to stay on the second bullet
23 point under "Use of Vendors..."
24       MR. ERRERA: Seth, it's not on the screen.
25       MR. LAMDEN: Yeah, my apologies. Are you guys



Walter Haessig   April 25, 2023
Pages 102 to 105

Page 102

1 able to see the screen now?
2      MR. ERRERA: Yes.
3      MR. LAMDEN: Okay, good. Let's jump back in.
4   Q. Under "Use of Vendors..." the second bullet point, we
5 were talking about the significant role that a GA is expected
6 to play. It says in there, Mr. Haessig, addressing any
7 technical issues that arise on the claim. What types of
8 technical issues do you understand that to be referring to?
9   A. I'm going to see if I can think of an example of a
10 technical issue for you. Oh, Seth, I don't know if I can come
11 up with -- with an example but, you know, again, I kind of --
12 the -- the spirit of this bullet point and technical issues at
13 least -- at least in my mind on -- on behalf of Chubb would be
14 kind of along this idea. Sorry to be long winded here but,
15 for example, if we're using a building consultant and the
16 building consultant is assisting us in identifying the scope of
17 the work, we would have an expectation of our general adjusters
18 that they would review that -- that estimate and make sure that
19 it is consistent with our understanding of the damages that we
20 saw at the time of our inspection. And that could include
21 items that might not have been included in the BC's initial
22 estimate. In fact, that happens with somewhat regularity. So
23 maybe that's a good example of -- of a technical issue.
24   Q. And so with that kind of issue that you described,
25 this bullet point is just saying the general adjuster is

Page 103

1 supposed to stay involved and help work through that sort of
2 technical issue; is that right?
3   A. Yeah. He should or she should stay -- stay involved
4 with the process. Like what we had talked about before the
5 break not abandoning the issues that need to be resolved to a
6 building consultant or -- or any other expert but continue to
7 be engaged and involved to really address -- to address
8 those -- those issues whether they're technical or not, quite
9 honestly.
10   Q. Moving to the last -- last line of that, what sorts
11 of expectations is a general adjuster expected to set with the
12 client?
13   A. Yeah, still along the lines of kind of role clarity,
14 if you will, the general adjuster is still the adjuster and the
15 BC not filling the adjuster's shoes. So setting the
16 expectation of what any general expert's tasked to do as it
17 involves the claim.
18   Q. That was with the vendor but sort of expectations is
19 the general adjuster expected to set with the client?
20   A. Oh, yeah. No, that -- sorry. Let me clarify. So
21 setting the expectation with the client that the general
22 adjuster is still the adjuster that is charged with the
23 handling of that claim and then role clarity on what the
24 various experts might be tasked with doing. That would be the
25 expectation that the GA presents to the client.

Page 104

1   Q. Does -- does Chubb provide its adjusters who handle
2 residential property-damage insurance claims with any training
3 regarding the investigation of residential property damaged by
4 water?
5   A. That's a pretty broad -- a broad question. As I sit
6 here right now, I'm not aware and cannot think of any training
7 that we have provided for residential water-damage claims.
8   Q. What about commercial? Let me ask it that way. What
9 about commercial water-damage claims?
10   A. Yeah, same -- same question -- or, I'm sorry, same
11 answer. As I sit here today, I can't think of any training
12 that we've provided that would relate to the investigation of
13 commercial or personal lines water claims.
14   Q. Does -- does Chubb require its adjusters to undergo
15 any training with regard to investigating property damaged by
16 water when they're handling -- or is a prerequisite to handling
17 water-damage insurance claims?
18   A. So the question is is there a prerequisite training
19 to handle water claims?
20   Q. Yes.
21   A. No, there's not any kind of prerequisite to handle
22 water claims.
23   Q. Is there a specified level of -- of -- strike that.
24 Let me move on.
25      Does Chubb provide adjusters who handle

Page 105

1 property-damage claims involving water with any training
2 regarding the repair of property damage by water?
3   A. Again, I cannot think of training that we have
4 provided that is related to repairs of the water damage.
5   Q. Does Chubb require its adjusters to have any training
6 regarding the repair of water-damaged property?
7   A. You know, so pretty -- pretty narrow scope of a
8 question which, of course, I will answer directly for you but I
9 don't want it to -- I don't want my answer to sound like Chubb
10 doesn't provide training. That's certainly not the case. But
11 does Chubb have a training or prerequisite to handle these
12 claims -- water-damage claims or the repairs of water-damage
13 claims? No, sir.
14   Q. Let me ask it more relative. Does Chubb provide any
15 training to its general adjusters that are handling
16 property-damage water claims, training with regard to water
17 damage -- to water-damaged property?
18   A. Seth, I'd like -- I'd like for Wendy to repeat --
19 sorry, I'm asking the court reporter to repeat the question,
20 please.
21      (Record read as requested.)
22      MR. ERRERA: I think asked and answered but go
23 ahead.
24      THE WITNESS: Hey, Seth, I'm having some
25 problems with that question. Do you mind -- do you mind



Page 106

1 rephrasing it for me?
2   MR. LAMDEN:  No, not at all.
3   Q.  Chubb's general adjusters provide claim-adjustment
4 services for water-damaged insurance claims, right?
5   A.  Yes, they -- they handle claims that involve water.
6   Q.  For a general adjuster to be allowed to work on a
7 water property-damage insurance claim does Chubb require that
8 adjuster have any specific training?
9   A.  There's not any specific training required.
10   Q.  And for general adjusters who handle property --
11 insurance claims of property damaged by water does Chubb
12 provide any training to its adjusters regarding any aspects of
13 dealing with water-damaged property?
14   A.  I'm not aware of any training that we've provided
15 that would speak to the handling of water-damage claims
16 specifically.
17   Q.  Does Chubb provide its adjusters who handle
18 property-damage claims with any training regarding the
19 remediation of mold damage?
20   A.  As I sit here today, I'm not aware of any training
21 that we have provided that would be specific to the remediation
22 of mold damage.
23   Q.  Does Chubb require its adjusters who handle
24 property-damage insurance claims to undergo any training
25 regarding the remediation of mold damage?

Page 107

1   A.  There's not a requirement that I'm aware of.
2   Q.  Does Chubb provide its adjusters who handle
3 property-damage insurance claims with any training regarding
4 the mitigation of water damage?
5   A.  There's not training specifically around the
6 remediation of water damage that I'm aware of.
7   Q.  When you say "specifically," does that suggest
8 there's a more general kind of training that you're thinking
9 of?
10   A.  So thanks for the question.  Yeah, again, I'm not
11 wanting you to leave the conversation or the deposition on the
12 idea that our adjusters in some way are not qualified to handle
13 claims.  There is a lot of training that the various folks go
14 through.  You know, some of it is related to continuing
15 education classes as it relates to licensing.  Some of them
16 have various professional designations.  I am aware of training
17 that we provide as it relates to the policy and the policy
18 coverages.  But specific training that you're asking for as it
19 relates to water damage or mold damage, really, those are why
20 we -- those issues, that area of expertise would be why we get
21 the expert involved to -- to assist with the adjuster's
22 understanding of the scope and the cost of work involved with a
23 water-damage claim or any other claim.
24   Q.  Does -- does Chubb provide its adjusters who handle
25 property-damage insurance claims with any training regarding

Page 108

1 estimating the cost of replacing or repairing a property that's
2 been damaged by water?
3   A.  Again, a similar answer.  Not that I'm aware of but
4 that would be why we would rely on a building consultant expert
5 to assist in the valuation of the cost of the repairs.
6   Q.  So does Chubb require its adjusters who handle
7 property-damage insurance claims to have any training regarding
8 estimating the cost of repairing or replacing water-damaged
9 property?
10   A.  No, I'm not aware of a required training.
11   Q.  Let's move on to the third bullet point that states,
12 "GA's should use a variety of experts in the same field to
13 prevent over-reliance on any one vendor.  Vendor database
14 should be utilized."
15      Do you see where I'm referring to, Mr. Haessig?
16   A.  Yes, sir.
17   Q.  What is the vendor database?
18   A.  Yeah.  So a slight change from what it was at this
19 point in time because of a change in some software that was
20 used that is now with a different company and really there's --
21 there's two databases, if you will.  The one that I'm speaking
22 to that has a change would be at one time we used the platform
23 of Xactimate and through that platform is where vendors would
24 be assigned.  Now it's with an outfit called Symbility but for
25 practical purposes they serve the same purpose and that would

Page 109

1 be we have to have a mechanism by which information is shared
2 to assign these claims.  So, you know, what's the property
3 address?  What's the phone number?  What's the claim number?
4 Those -- those sort of things.  So that's one database.
5      The second database is around a platform called
6 T360 or TyMetrix, I think.  I could be wrong a little bit on
7 the pronunciation but T360 and that really is related to more
8 of the professional services experts so not to be confused
9 with, you know, a mitigation company but we have to have a
10 process by which payments are made and that goes through that
11 system, T360.
12   Q.  I think you made a distinction of when Xactimate was
13 the platform versus the new software.  What were the dates
14 during -- what was the last date, I should ask, when Xactimate
15 was the platform that you were using?
16   A.  Yeah, I can't give you a specific date as I'm sitting
17 here right now.
18   Q.  Year is fine.  I'm just trying to understand where it
19 fits in with the Wexlers' claim.
20   A.  So, generally speaking, yeah, some time ago in the
21 last couple of months is when the -- when the change would have
22 been from Xactimate to Symbility.
23   Q.  And what's the standard of Xactimate?  I'm not sure I
24 understand what its purpose is.  I understand that you said
25 it's for information sharing.  Is that what you said?



Walter Haessig  April 25, 2023
Pages 110 to 113

Page 110
1  A.  Well, certainly in part but not -- not exclusively.
2  Q.  What's the main purpose for using Xactimate?
3  A.  So I don't know if this would accurately define the
4  main purpose but I can expound on the purposes of Xactimate in
5  part and it's -- it certainly is an estimating platform or if
6  you remember I'm not a huge computer IT type of a guy but it is
7  a software by which you can produce estimates and a software
8  that's used quite a bit in the industry.
9  Q.  By "industry" you mean insurance industry?
10  A.  Yes, that's correct.
11  Q.  So what kind of estimates are you talking about here?
12  A.  I mean, it could be you could estimate any --
13  anything with it.  I don't know if you want to refine the
14  question to be a little bit more specific.
15  Q.  Sure.  When you use the term "estimate," I just want
16  to know what you mean.
17  A.  Sure.  Maybe the best way to answer that is with an
18  example.
19  Q.  That would be great.
20  A.  So I'm sitting in my office here today.  If -- if I
21  had, you know, a roof leak and I had damage to my ceiling,
22  someone would be able to come in and measure this room and then
23  use that software not only to house the diagram or the
24  dimensions of the room itself but then if you wanted to,
25  for example, paint the ceiling or replace the sheetrock, you

Page 111
1  could, I guess, direct the software to -- to do that and it
2  would provide an estimate for that scope of repair that you --
3  you detailed in the software.
4  Q.  Are adjusters handling residential property insurance
5  claims required to use Xactimate to come up with estimates?
6  A.  They're not required, no, sir.
7  Q.  What about -- I think you mentioned -- why does Chubb
8  care whether there's over-reliance on any one vendor which is
9  the third bullet point?
10  A.  Yeah, I see that.  I think it's pretty simple.  We
11  don't want there to be a perception that there's an
12  over-reliance of -- of any one -- of any one company so we have
13  an expectation that our experts are unbiased and we want to
14  avoid any appearance of bias by not over utilizing any one
15  individual or any one company.
16  Q.  By "appearance" you mean by the perception of your
17  clients?  Is that who -- who you're referring to?
18  A.  Well, it certainly could be.  I mean, I'll speak
19  pretty -- pretty as a matter of fact on this.  If we used DBI
20  exclusively, which we do not, you would certainly be asking me
21  questions about how can DBI be an unbiased company; that
22  exclusively DBI is used as your expert.  So that's -- that's
23  what it is.  We -- we don't -- we do not want to have an
24  over-reliance on any one expert.
25  Q.  So when you were talking about Xactimate earlier, you

Page 112
1  weren't talking about the vendor database, right, which is
2  bullet 3?  That's something different?
3  A.  So it can be or it was certainly in Xactimate and now
4  in Symbility so if you were to open the program up, there's
5  going to be a list of various experts and you are able to
6  select from one of those experts and similarly in T360 select
7  one of those experts.  So that's -- outside of that to my
8  knowledge there's not a -- a database that would be available
9  to select experts from.
10  Q.  Does Chubb maintain statistics about how frequently
11  its vendors from its database are used?
12  A.  To my knowledge, no, sir.  And in an individual
13  capacity I have seen where there's been a request for that type
14  of information.  I've not seen that type of information
15  produced.  I don't know of any kind of data by which we track
16  that or would -- would, you know, use -- use that data, if you
17  will.
18  Q.  How would a general adjuster know that an expert is
19  being over used or over relied on?
20  A.  Yeah, I don't know that -- I don't know that they
21  necessarily would and I think I can answer your question again
22  a little bit in my own capacity.  So if I see that a general
23  adjuster has used the same expert, you know, twice in a row, I
24  might call that individual on the phone and make sure that
25  there is not an over-reliance on that particular expert and --

Page 113
1  and have him be, you know, like -- I don't want you to read
2  into this like I'm telling him to use some other expert,
3  that -- that's not the case, but theoretically, "Hey, Johnny,
4  why don't -- why don't we use somebody else on this one."
5  Q.  Do you know how experts are selected to be added to
6  the vendor database that is listed in these guidelines?
7  A.  I -- I cannot answer to a granule -- granular level
8  on that topic.  There is a vetting process that I'm aware of.
9  There's a background process.  Outside of that I don't know the
10  details by which somebody would be added.
11  Q.  Let's scroll down a little bit.  The first -- second
12  sentence under "The Vendor (Expert) Utilization Process"
13  states, "Cause and Origin investigators and Enservio Classic
14  are exceptions to this rule."  The rule being "Documented
15  approval from the Supervisor is necessary when hiring an expert
16  or consultant on behalf of Chubb."
17  What's Enservio Classic?
18  A.  Yeah, Enservio -- same, for the question I've got to
19  give a little bit of explanation on Enservio.  So Enservio is a
20  vendor that Chubb utilizes to assist the client with the -- the
21  inventory of damaged personal property and then we'll be able
22  to assist in the pricing of those things.  As you can imagine,
23  when someone has a large loss or a significant loss that has, I
24  mean, at times thousands and thousands of individual items,
25  it's quite the undertaking so they help create that list.  And



Walter Haessig  
April 25, 2023  
Pages 114 to 117

Page 114

1  then based on an interview with the client about, you know,
2  just normal shopping practices, where they might buy things at,
3  we start to create what the cost to replace those things and
4  those items might be.
5          And in Enservio Classic, as I understand it,
6  they deal with more of the spec -- more of the unusual items or
7  items that might have been made by a designer or maybe a
8  designer has been involved in the selection of fabrics,
9  for example.  Those type of things.  So more specialized I
10 guess would be an easy way to say it than -- than Enservio
11 that's not classic.
12    Q.  What kind of documented approval from a supervisor
13 would be necessary when hiring an expert or consultant on
14 behalf of Chubb?
15    A.  Generally it's a file note that would say approval to
16 engage experts or something -- something close to that.
17    Q.  Would that be a file note that is prepared by the
18 supervisor?
19    A.  That is correct.
20    Q.  Would there be any requirement that that
21 documentation specify a reason for which the expert or
22 consultant is approved to be retained?
23    A.  No, sir.
24    Q.  So the file just needs to state from a supervisor
25 that the retention of an expert or consultant is approved?

Page 115

1    A.  That is accurate.
2    Q.  The third bullet point under the section that starts
3  out "The General Adjuster should:" states, "When an approved
4  expert is available, consider selecting from Chubb's library of
5  experts found in the Chubb Expert Database Facility."
6          Mr. Haessig, what's the Chubb Expert Database
7  Facility?
8    A.  So the only database that I'm aware of is the
9  database that would be in Xactimate/Symbility and/or T360.
10   Q.  So it's your understanding that the Chubb Expert
11 Database Facility is referring to either T360 or Xactimate?
12   A.  Or Symbility but, yes.
13   Q.  What was the last one?
14   A.  Symbility.  The other platform that we're on now.
15   Q.  So tell me about T360.  What sorts of vendors are
16 enrolled in the T360 system?
17   A.  All -- all sorts of experts.  The engineers, it might
18 be building consultants, it might be industrial hygienists.  It
19 could -- could include attorneys.
20   Q.  Do you know how a specific vendor is added to the --
21 the T360 database?
22   A.  Yeah, it -- at that level of decision of what's
23 required I don't know other than to say there is a background
24 check and really what it is is we want to make sure that we're
25 sending -- similarly to how I would have a background check

Page 116

1  when I came to be employed for Chubb, we want to make sure that
2  our clients are safe and we're sending out people that -- that
3  are -- that -- that maintain -- I don't know how to say it
4  Seth -- safeness, if you will.  You know, we don't want to send
5  out somebody that would be inappropriate.  I believe there's a
6  little bit of a financial background check on -- on these
7  companies as well.  And anything more than that I can't provide
8  testimony on because I don't know.
9    Q.  Do you know whether vendors are required to be
10 reapproved, vendors that are already in the database required
11 to be reapproved from time to time?
12   A.  Yeah, you know, that's a good question and I don't
13 have the answer to that question.
14   Q.  Do you know approximately how many vendors there are
15 in the T360 database?
16   A.  Other than to say a lot.  I would have -- I would be
17 guessing wildly.  I don't know.
18   Q.  The fourth bullet point states that, "If the insured
19 has not secured a reconstruction vendor, the GA should offer a
20 Chubb preferred vendor, if applicable, as potential option for
21 the client."
22          What's a Chubb preferred -- preferred vendor?
23   A.  I think maybe the best way again would be to answer
24 the question with an example.  So the -- a company like
25 Servpro, for example, comes to mind.  Servpro would be a vendor

Page 117

1  that would also serve in the role of recon -- a reconstruction
2  vendor.
3    Q.  What makes them preferred?
4    A.  Oh, yeah, I think that simply they're on the list.
5  There's not a designation that I'm aware of between a -- you
6  know, a vendor list and a preferred vendor list.  I've never
7  seen that -- that differentiating before.  It's either a Chubb
8  vendor or it's not.
9    Q.  So there's not a distinction between a Chubb
10 preferred vendor and a Chubb approved vendor?
11   A.  That is correct.
12   Q.  Do you know whether DBI is a Chubb preferred vendor?
13   A.  I believe that we have -- I know that we have a
14 Professional Service Agreement with DBI.
15   Q.  What kind of Professional Service Agreement are you
16 talking about?  Can you describe to me what that is?
17   A.  Yeah, so I don't have the document itself.  Before
18 when we were talking about who I contacted in preparation for
19 the deposition, I had mentioned a gentleman by the name of Ben
20 Kelly and this is where I needed some information from Ben so I
21 can answer the question based on the information that I was
22 provided.  I do not have that contract.  I have not read the
23 contract so I don't have the specifics of those things but
24 similarly to how I addressed the question earlier, they go
25 through a background check, they do a little financial --



Walter Haessig  April 25, 2023
Pages 118 to 121

Page 118
1  financial background check as well.  How they're selected or
2  not selected to be on the -- the list I don't know the details.
3     Q.   Do you know whether that Professional Service
4  Agreement that you had mentioned was in effect in 2019?
5     A.   I don't know.  Again, I haven't seen the document so
6  I'm unfamiliar with when it may have originated.
7     Q.   I'm now moving to page 8 of the guidelines.  The
8  Bates number in the bottom right-hand corner is CHUBB_014978.
9  Mr. Haessig, do you see page 8 on your -- on your monitor?
10    A.   I do.  Hey, Seth, I'm going to go off camera for just
11 like five seconds to close my door.  Hold on a moment.  Sorry,
12 everybody but, yes, to answer your question I do see that.
13    Q.   I'm going to zoom in a little bit so you can see
14 better.  If you need me to zoom in more, just let me know.  So
15 under the top of the page where it says, "Vendor (Expert)
16 Oversight," the second bullet point says, "The General Adjuster
17 should:  Document their rationale when an expert is needed to
18 validate a loss, establish damages, or facilitate repairs."
19         Do you see where I'm talking about?
20    A.   I do.
21    Q.   What kind of documentation is required to be included
22 in the claim file with regard to the rationale when an expert
23 is needed to validate a loss?
24    A.   Can you give me a second to read the lead-in language
25 of this?  Thank you.  So what kind of documentation is required

Page 119
1  for that rationale is the question?  Do I understand correctly?
2     Q.   Yes, that's correct.
3     A.   I think that's going to be heavily dependent on what
4  the circumstances of any particular loss might be and the
5  rationale that would lead to the needing of an expert is just
6  going to vary wildly depending on -- on what that set of -- set
7  of circumstances are.
8     Q.   Is there a type of format of documentation that is
9  required to be included in the claim file when an expert is
10 needed to validate a loss?
11    A.   You know, no.  You know, earlier we talked a little
12 bit about what kind of approval is needed and it's -- it's
13 somewhat like that.  It's -- it's pretty simple.  It's in all
14 likelihood a file note.  If the manager hadn't already
15 recognized that an expert would be needed, the general adjuster
16 would write a file note to the manager oftentimes, not -- not
17 all the time, but, you know, requesting the use of an expert
18 and a little bit of a reason of why that might be needed and
19 oftentimes it's understood why that might be needed.  So,
20 again, I'll expound a little bit with an example.  So I
21 don't -- I don't have an expectation as a manager that my team
22 is going to write an estimate that is $500,000 so I already
23 know that -- that an expert is probably going to be needed to
24 assist and facilitate that so I'll approve that expert and
25 similarly they -- if I hadn't already approved it and they're

Page 120
1  needing that approval, they might just be simply, "Hey, I'm
2  requesting the use of an expert or a building consultant."
3  And, Seth, it's just really that simple.
4     Q.   So further down it states, "The General Adjuster
5  should:  Jointly discuss the scope while working with the
6  assigned vendor who will provide their expert evaluation."
7           Can you tell me what that means where it says
8  "jointly discuss the scope"?
9     A.   Yeah, there's a collaboration with these projects of
10 the -- the scope of the loss.  I don't remember what the line
11 of questioning was before but I think my testimony had talked
12 about at times the adjuster was reviewing those estimates to
13 making sure that they are consistent with the inspection or as
14 it states in this bullet point the meetings so, again, it's --
15 it's really a collaborative effort to identify the -- the full
16 scope of work and the -- the repairs or the cost to facilitate
17 that scope of work or the repairs of that scope of work.
18    Q.   Under what circumstances would an outside attorney be
19 involved with this joint discussion of scope referred to in
20 bullet 4?
21    A.   Yeah, and I need some clarification from you.  So
22 you're talking about something that would be pre-litigation?
23    Q.   Correct.
24    A.   Is that correct?
25    Q.   Yes.

Page 121
1     A.   You know, generally speaking, it -- it would be not
2  so much scope that would drive a conversation with an attorney
3  but -- but coverage.  So would scope sometimes be involved in a
4  conversation around coverage?  Possibly.  That -- that might be
5  one example of -- and the only example really that I can think
6  of -- where we would have outside counsel involved with
7  anything related to a -- a scope and an estimate.
8     Q.   So can you give me an example of a situation where
9  scope and coverage issues are you say connected -- is that how
10 you described it?  -- such that an attorney would be involved?
11    A.   I don't remember if that's exactly how I stated it
12 but we'll let the record stand on whatever I testified to.  But
13 an example?  Yeah, sure.  So we live -- or I live in the Dallas
14 area and we experience a lot of hail in -- in the Dallas area
15 and we experience so much hail that from time to time there is
16 overlapping hail damages and we're trying to identify when a
17 particular storm may have happened that would be arguably the
18 responsible -- responsibility of Chubb but at the same time we
19 might have a list of all of these other hail storms that could
20 have potentially provide -- damaged a roof covering that are
21 outside of when we would have been on the risk.  So there could
22 possibly be a situation in this example where I would send or
23 the adjuster would send the report to counsel for some
24 assistance on delineating between covered damages or -- and
25 non-covered damages.



MAGNA LEGAL SERVICES

Page 122

1  Q. What kind of report are you talking about here?
2  A. And it could be the -- it could be that we used an
3  engineer. It could be a building consultant. It could be a
4  combination of both.
5  Q. So in the example you're describing then would it be
6  appropriate for an attorney to are you saying weigh in on the
7  building consultant's report?
8       MR. ERRERA: Objection to form.
9       THE WITNESS: Weigh in? I don't know that
10  that's the way to describe it but if we have asked for outside
11  counsel to give us an opinion as it relates to coverage, then
12  we -- you know, I would expect -- I would expect an opinion
13  from counsel as to what is covered or what is not covered.
14  Q. (BY MR. LAMDEN) We're talking though -- I mean, the
15  bullet point we're talking about is jointly discuss the scope
16  while working with the assigned vendor and what I'm asking is
17  to what extent are outside attorneys involved with setting the
18  scope of the work of an assigned vendor?
19  A. There's -- there's -- there's not. You know, an
20  outside attorney is not going to set the scope with the
21  consultant.
22  Q. Why would that be?
23  A. You know, that's -- that's the role of the adjuster.
24  I don't -- I'm struggling with the question because I -- I -- I
25  can't see -- I just simply can't see why -- why the attorney

Page 123

1  would be involved with -- with working with a building
2  consultant on what the scope would be outside of maybe a small
3  vein of an idea that we need to make sure or identify and cover
4  damages.
5  Q. All right. Moving down to bullet point five, it
6  starts off with, "Document the file with a summary of the
7  expert's report along with any ongoing or supplemental
8  discussion with the expert regarding their findings and
9  indicate if those reports impact his/her assessment of the
10  loss."
11       Mr. Haessig, do you see where I'm reading from?
12  A. Yes, sir.
13  Q. If the kind of documentation referred to in this
14  bullet point is prepared by an adjuster, should that
15  documentation be placed in the claim file?
16  A. So the bullet point talks to documenting the file so,
17  yes, there should be discussion around an expert's report
18  that's documented in the file.
19  Q. Does Chubb dictate a format for that kind of
20  documentation?
21  A. No, sir.
22  Q. Does Chubb suggest a format for that kind of
23  documentation?
24  A. No, sir.
25  Q. What would you expect to see in terms of detail if

Page 124

1  you were looking at a claim file and saw a note documenting a
2  file of the summary of the expert's report?
3  A. It's going to vary depending on what the file -- the
4  specific files are, of course. Sometimes the expert report is
5  attached to the same file note of the summary so you -- you
6  know, as a manager or anybody else that would access the file
7  would be able just to click on the report and it would open up,
8  you know, by itself. But in the dialogue of the -- of the note
9  or the discussion of the note there's prob -- you know, there's
10  going to be some mention of just that, the summary of what his
11  or her findings were. I can speak to when I was an adjuster in
12  completing a file note like this. Oftentimes after reviewing
13  the report I might copy and paste some of the pertinent
14  information out of that report and provide a synopsis in the
15  file note and, again, the entirety of the report is attached to
16  the file if anybody would care to read the report.
17  Q. I'm going to move on to page 9 of the general
18  guidelines and page 9 is Bates-numbered at the bottom
19  CHUBB_014979. Mr. Haessig, I'm scrolling down to a portion of
20  the document that's titled "Loss Validation Differences
21  Reconciliation." Do you see where -- do you see that section
22  of the document?
23  A. I do.
24  Q. So the -- this section starts off by saying, "If the
25  insured presents an estimate, supplement or a material change

Page 125

1  in the exposure that is in excess of our evaluation of the
2  loss, the GA should:" and I'd like to start off by asking you
3  a question about the first bullet point which states, "Identify
4  the items of difference in scope, material quality, pricing or
5  repair or replace techniques."
6       Upon receiving an estimate from the insured that
7  is in excess of the Chubb valuation of damages, is the adjuster
8  required to identify the items in difference in scope, material
9  quality, pricing or repair or replace techniques?
10  A. You know, I don't know that there is a requirement.
11  We are talking about guidelines. The document is clear that
12  the GA should identify items of difference in scope, material
13  quality, pricing or repair or replacement techniques so that
14  is -- that's what the document outlines.
15  Q. If such identification takes place, should that
16  appear in the claim file?
17  A. Yes, it -- it would appear in the claim file.
18  Q. Is there a level of detail that Chubb requires to
19  document the identification of differences in scope, material
20  quality, et cetera, when putting it in the claim file?
21  A. There's not a requirement.
22  Q. Is there a level of specificity or detail that Chubb
23  suggests (simultaneous speaking) --
24  A. Sorry, I didn't mean to speak over you.
25  Q. No, please go ahead.



Walter Haessig   April 25, 2023
Pages 126 to 129

Page 126
1  A.  Yeah.  No, there's -- there's not.
2  Q.  All right.  The second bullet states, "In
3  consultation with the Supervisor determine if a re-inspection
4  is required to address the differences.  If a re-inspection is
5  not deemed necessary, document the conversation in the file."
6       Can you tell me what type of consultation is
7  required between the general adjuster and the supervisor to
8  determine if reinspection is required?
9  A.  So I'm not aware of and certainly don't know of any
10 requirements of the level of specificity -- I think I got that
11 right -- for the conversation between the supervisor and the
12 general adjuster and really the spirit of this is we're trying
13 to resolve differences, right, to the extent that there are any
14 and in our opinion that's often best facilitated -- not
15 exclusively and certainly not required -- but we can make
16 strides to reconcile those differences with a reinspection.
17 And that's really what this bullet point is speaking to.  It
18 would sound something like this in layman's terms.  "Hey, we
19 have a difference.  Let's get together and talk about those
20 differences and figure out if we can make some headway towards
21 an agreement on scope and costs."
22 Q.  What criteria would Chubb consider in determining
23 whether a reinspection is necessary?
24 A.  Yeah.  Again, I don't -- there's not a required -- a
25 requirement to when it would be deemed necessary.  I think,

Page 127
1  again, it's just the -- the -- the spirit of we can figure a
2  lot more out with a reinspection than we can do that by -- by
3  reviewing documents or sitting at our desks.  You're better
4  served at times anyway, not exclusively, not required to,
5  but -- but to reinspect the property.
6  Q.  Can you give me some examples of criteria that Chubb
7  might consider when electing to reinspect a property?
8  A.  Sure.  I'll give you one example and this is
9  something that I did just within the last four or six weeks
10 myself.  And that was related to a hurricane claim in south
11 Florida from last fall and there was some questions around --
12 it's a commercial lines claim so if there's some questions
13 around the damage or the extent of damage or even the type of
14 damage to our client, the insured's, business premise then that
15 requires an inspection or a reinspection.  So it broke my heart
16 but I had to travel to south Florida when it was a cold day in
17 Dallas and got to walk around on the beach for a few minutes to
18 determine if there would be coverage for this loss.
19 Q.  If the Wexlers provided Chubb with a damage estimate
20 that was higher than Chubb's damage estimate, should Chubb's
21 adjuster have had a conversation with his or her supervisor to
22 determine whether reinspection was necessary?
23      MR. ERRERA:  Hold on.  I'm sorry, could you read
24 back the question again?
25      THE WITNESS:  Yeah.

Page 128
1       (Record read as requested.)
2       MR. ERRERA:  Yeah, I'm going to object that it's
3  beyond the scope.  I think that falls into category No. 1 that
4  Bob has been designated on about the actual handling,
5  investigating and adjustment of this specific claim so I direct
6  him not to answer because it's beyond the scope.
7       MR. LAMDEN:  Mike, I think you misunderstood my
8  question but I'm not going to argue with you.  We can do this
9  again in a different deposition.
10 Q.  Mr. Haessig, are you going to follow your attorney's
11 advice and not respond to my question?
12 A.  I will follow counsel's advice.
13 Q.  Okay.  The third bullet states, "...the GA should:
14 Discuss the identified differences with the insured's
15 contractor.  If the contractor agrees with our price, the GA
16 should pay the loss based on our Expert's estimate."
17      Do you see that?
18 A.  I do.
19 Q.  If the Wexlers had provided Chubb with an estimate,
20 supplemental material changes in excess of Chubb's evaluation
21 of the loss, should the Chubb adjuster have discussed the
22 identified differences with the insured's contractor?
23      MR. ERRERA:  Again, I think this is now getting
24 claim specific which, again, is going to be Bob's designation
25 under No. 1 along with others but, again, if you want to direct

Page 129
1  me that I'm misinterpreting the eight topics, I'll be happy to
2  look it but I think you're going into topic No. 1 that's
3  specific to this claim instead of the standard in general.
4       MR. LAMDEN:  All right.  Mike, what I asked was
5  if the Wexlers had done that, what Chubb's response should have
6  been.  I'm certainly entitled to ask questions about the
7  general guidelines we've been talking about including how they
8  would be implemented.
9       MR. ERRERA:  Again, it might be claim specific
10 where topic No. 5 it's in general so not specific to this
11 claim.  I think that if you want to talk specific about this
12 claim, then that's under topic No. 1 for Bob to handle or how
13 No. 1 is written and so I would say that's beyond the scope for
14 this particular witness' designation.
15      MR. LAMDEN:  And, Mike, as I said before, I
16 disagree with your scope objections and we will be reserving
17 all rights to reconvene this deposition.
18      MR. ERRERA:  Understood.
19 Q.  (BY MR. LAMDEN)  All right.  Mr. Haessig, one of the
20 other topics that you've been designated to testify today on
21 behalf of Chubb involves the contractual relationships existing
22 at any time in 2019 between Chubb and then a number of
23 contractors:  Enservio, BELFOR, DIG, Paul Davis and DBI, Inc.
24 There's more but I want to stop there.  I think when we were
25 talking earlier you had mentioned some sort of agreement that



Walter Haessig  
April 25, 2023  
Pages 130 to 133

Page 130
1  Chubb had in place with DBI, if I remember that right. You
2  called it a professional services contract or agreement.
3      A.   That is my understanding.  In preparation I've talked
4  to Ben Kelly and he had made mention and made me aware that
5  there is a professional service agreement in place with DBI as
6  well as Enservio.
7      Q.   Was the professional service agreement in place --
8  that you're referring to in place in January 2019?
9      A.   Again, I have not seen the document or reviewed the
10  document so I'm not familiar with the dates of when those might
11  have been effective.  To the best that I sit here today,
12  certainly on Enservio we were using Enservio at that time and I
13  would suspect that there was a service agreement in place.
14  DBI, I don't know when they may or may not have come, you know,
15  into a relationship with Chubb but to the extent that -- that
16  there was, I would suspect that that professional service
17  agreement was in place at the time.
18      Q.   But you've been designated to testify on behalf of
19  Chubb about information known or reasonably known to Chubb and,
20  you know, when I asked you first questions earlier your counsel
21  instructed you not to answer because they were questions that
22  he said that were relating to your personal capacity.  But
23  since you have been designated to talk about the -- these
24  contracts, we would expect you to be able to discuss the terms
25  of the DBI professional service agreement.  Would it -- would

Page 131
1  it be fair to say that Ben Kelly is the individual within Chubb
2  who has the most knowledge about any sort of contract that may
3  have existed in January 2019 between DBI and Chubb?
4      A.   If -- if it's Ben -- I don't know if it's Ben at that
5  point in time -- Ben would certainly have a greater level of
6  detail of the contract than I do.
7      Q.   Other than -- I think you said you weren't sure if
8  Ben Kelly had that knowledge.  Can you think of anyone within
9  Chubb who would have knowledge of whether in January 2019 there
10  was a contract in place between DBI and Chubb?
11      A.   Yeah, so the reason -- the reason why I mentioned I'm
12  not sure if it's Ben is I -- I can't remember when Ben was
13  working for Chubb or not so it's either Ben or whoever filled
14  that seat at the time.
15      Q.   Would Ben though, do you know, have access to his
16  predecessor's files?
17      A.   I would believe that he would have access to those
18  contracts.
19      Q.   I'd like to shift gears to Enservio.  Do you know
20  whether Chubb and Enservio had any contracts in place between
21  them in January 2019?
22      A.   It's my understanding there was.
23      Q.   Can you tell me about that contract?
24      A.   Yeah.  Similar to a contract with DBI, I have not
25  seen these contracts or reviewed these contracts.  I've been

Page 132
1  told that there is some background checks that would be
2  involved with these contracts, some financials that would be
3  involved with these contracts.  There is a mechanism by which,
4  you know, information would be shared or provided through these
5  contracts to pay people or to pay the various vendors and
6  anything beyond that I wouldn't be able to provide testimony
7  on.
8      Q.   What about was there a contract between Chubb and
9  BELFOR in January of 2019 with Chubb?
10      A.   Based on my conversation with Ben, yes.
11      Q.   Can you tell me about that contract?
12      A.   Yeah.  Similar -- similar answer.  I've not seen
13  these contracts.  I don't have a level of detail to be able to
14  provide on what the contract may involve.
15      Q.   Would your answer be the same with Dave -- Paul
16  Davis -- BIG and Paul Davis?
17      A.   My answer would be the same for Paul Davis.
18  Specifically when talking with Ben concerning BIG, he is not
19  familiar with BIG.
20      Q.   And when you say "the same with Paul Davis," are you
21  saying that you don't know the specific terms of a contract
22  between Chubb and Paul Davis but you think one existed in 2019?
23      A.   It is my understanding that one existed in 2019.  I
24  don't have the specifics of that contract.
25      Q.   Did BELFOR and Chubb have a contract in place that

Page 133
1  related specifically to the Wexlers?
2      A.   No, sir.
3      Q.   Did Enservio and Chubb have a contract in place that
4  related specifically to the Wexlers?
5      A.   No, sir.
6      Q.   Did Paul Davis and Chubb have a contract in place
7  that related specifically to the Wexlers?
8      A.   No, sir.
9      Q.   Did DBI and Chubb have a contract in place related
10  specifically to the Wexlers?
11      A.   No, sir.
12      Q.   Of the contracts that we discussed, where would those
13  documents be -- where would documents relating to those
14  contracts be located within Chubb?
15      A.   I'd have to refer you to Ben on where those might be
16  but as I sit here right now, I don't -- I don't know where
17  these are housed.
18      Q.   What about communications related to these contracts?
19  Would that also be an inquiry for Ben Kelly?
20      A.   I'm unclear as to if that would be Ben or to what
21  extent if there is any communication related to these
22  documents.
23      Q.   But Chubb hasn't produced any of these contracts in
24  the litigation, correct?
25      A.   I'm sorry, Seth, one more time?



Walter Haessig  
April 25, 2023  
Pages 134 to 137

Page 134

1 Q. Chubb hasn't produced any of the contracts that we've
2 been discussing in this litigation, correct?
3 A. Again, lots of documents have been produced. As I
4 sit here right now, I can't recall seeing those contracts and
5 so without reviewing the production I'm hard pressed to answer
6 the question. I don't think that those have been produced.
7 Q. Do you know whether Chubb and JSL had a contractual
8 relationship in January 2019?
9 A. It's my understanding there was a professional
10 service agreement in place then.
11 Q. And does Chubb require its vendors to enter into
12 written contracts with Chubb before performing work on a claim?
13 A. You know, I don't know. I don't know if there is or
14 is not a requirement. To the extent there is a requirement, I
15 certainly don't know what that might involve.
16 Q. Does Chubb require its vendors to agree to a work
17 scope in writing with Chubb before performing work on a claim?
18 A. No, sir.
19 Q. Does Chubb suggest to its general adjusters that they
20 obtain a written scope before having a vendor perform work on a
21 claim?
22 A. No, sir.
23 Q. Have you ever heard of a term "general performance
24 service agreement"?
25 A. I can't say that I'm familiar with that terminology.

Page 135

1 Q. And you may know it by a different -- a different
2 term but you haven't seen any -- you don't have awareness of a
3 general performance service agreement that was provided to
4 BELFOR by Chubb?
5 A. Again, I'm not familiar with the terminology so I
6 don't -- I don't know.
7 Q. So you don't know whether a general performance
8 service agreement was provided to Enservio at any time?
9 MR. ERRERA: Objection: form.
10 Go ahead.
11 THE WITNESS: Yeah, so I -- I -- what the
12 contract itself might be officially termed, you know, I don't
13 know that. I don't know that level of detail. Is there a
14 contract in place with some vendors? Yeah, certainly there
15 are. When they were -- when they originated or the execution
16 date of these contracts, I don't know. Part of your question
17 was at any time. You know, I mean, at some point some of these
18 contracts started, of course. When they started and when they
19 expired, if any of them have, I do not know.
20 Q. (BY MR. LAMDEN) And, again, I'm not trying to badger
21 you because I know you've said that you don't know the term
22 "general performance service agreement." Would I be correct to
23 say though that you have not seen or don't know the terms of a
24 general performance service agreement with GDI or JSL?
25 A. That would be correct.

Page 136

1 Q. Let's take a break here and go back on in 10 minutes.
2 Is that okay to everyone?
3 MR. ERRERA: Sure.
4 VIDEO OPERATOR: Okay. This will mark the end
5 of media No. 3.
6 MR. ERRERA: We're going to go off the record.
7 It's 1:47.
8 (Recess taken from 1:47 p.m. to 1:59 p.m.)
9 VIDEO OPERATOR: This will mark the beginning of
10 media No. 4 in the deposition of Walter Haessig. We're going
11 back on the record at 1:59 p.m.
12 Q. (BY MR. LAMDEN) Mr. Haessig, during the break did
13 you talk to anyone about your deposition?
14 A. No, sir.
15 Q. Did you review any documents during break?
16 A. No, sir.
17 Q. One of the topics that you've been designated to
18 testify about by Chubb reads, "Chubb's contentions regarding
19 whether its actions and conduct in handling the claim complied
20 with the duties of good faith and fair dealing under applicable
21 law and all bases, analyses and reasons in support thereof."
22 Are you prepared to testify on that topic?
23 MR. OFFENBACH: Seth, can you just give us the
24 number of that one?
25 MR. LAMDEN: Yeah, hold on.

Page 137

1 MR. ERRERA: I believe it's No. 9.
2 MR. LAMDEN: It's 9, yeah. Thanks.
3 MR. OFFENBACH: Thank you.
4 THE WITNESS: Yes.
5 Q. What is Chubb's view of its duty of good faith and
6 fair dealing under applicable law?
7 MR. ERRERA: Go ahead.
8 THE WITNESS: Pretty -- pretty broad statement
9 or question but, yeah, I mean, in -- in part we're going to
10 conduct administering the claim based on the merits of the
11 contract. We're going to uphold the duties that we have within
12 the insurance policy. You know, I don't know how to say it
13 otherwise. Not to conduct ourselves with conduct that would be
14 in keeping with bad faith.
15 Q. (BY MR. LAMDEN) Does Chubb have a duty to try to
16 find or maximize coverage for the insured?
17 A. Yeah, so Chubb has a duty to administer the policy.
18 Do we have a duty to maximize the claim for the insured? No,
19 that's not the duty of the insurer.
20 Q. Does Chubb have a duty to conduct an unbiased
21 investigation of the Wexlers' claim?
22 A. I would agree that we have the duty to investigate a
23 claim to determine what is covered, what is accurate, what is
24 truthful. Those things we -- we -- we would conduct ourselves
25 in -- in that manner in keeping with those there.



MAGNA LEGAL SERVICES

Page 138
1   Q.   What I asked though is whether Chubb has a duty to
2   conduct an unbiased investigation of the claim?
3   A.   Yeah, unbiased?  I would agree -- I would agree that
4   our investigation should be unbiased, yes.
5   Q.   Was your investigation of the Wexlers' claim
6   unbiased?
7   A.   In Chubb's opinion, yes, it was unbiased.
8   Q.   Did Chubb consider the supplemental information
9   provided by the Wexlers relating to the value of the claim in
10  an unbiased manner?
11  A.   In Chubb's opinion, yes, we did.
12       MR. LAMDEN:  I'm sorry, I have to go off the
13  record one second.  I'll be back in a minute.
14       VIDEO OPERATOR:  We're going to go off the
15  record at 2:03.
16       (Recess taken from 2:03 p.m. to 2:04 p.m.)
17       VIDEO OPERATOR:  We're going back on the record.
18  It's 2:04 p.m.
19  Q.   (BY MR. LAMDEN)  I'm going to switch gears for a
20  second.  Mr. Haessig, one of the topics that you were
21  designated to testify on today was the substitution of Bob
22  Paradis for Jordon Beverly, Ashley Argyle or any other
23  adjusters assigned to or contemplated for assignment to the
24  claim, including the factors, the identities of all persons
25  responsible for the substitution of Bob Paradis or Jordan

Page 139
1   Beverly or Ashley Argyle or any other adjuster assigned to or
2   contemplated for assignment to the claim.
3        Are you prepared to testify on that today?
4   A.   That is correct.
5   Q.   Mr. Haessig, let me ask this.  When was your first
6   involvement with the Wexlers' claim?  Do you remember when you
7   first heard of the Wexlers?
8   A.   Yeah.  You know, I would have to refer to the claim
9   file and then review -- although I don't know if I recognized
10  this before a few days ago.  There was a very -- there's one
11  file for me at the onset of this claim.  I can only imagine
12  that I was -- somebody was out of the office and I was filling
13  the role of the manager while -- while whomever that was was
14  out.  Outside of that one file note very early in the claim
15  my -- my involvement actually all throughout this claim has
16  been somewhat minimal.  When I first became aware would have
17  been that one file note.  After that there was certainly a long
18  stretch of time when I would not have been involved.
19  Q.   Do you remember what that file note said?
20  A.   Without the benefit of having it in front of me, no,
21  I don't remember what it said.  It was -- it was -- it was
22  short, I recall that piece of it.
23       (Exhibit 6 was marked for identification.)
24  Q.   (BY MR. LAMDEN)  All right.  I'm going to put on the
25  screen a document that's been previously marked as Exhibit No.

Page 140
1   6, Bates No. CHUBB_402823.  Mr. Haessig, do you see an exhibit
2   marked as No. 6 on your screen?
3   A.   I do.
4   Q.   Is this the file note you're referring to?
5   A.   I believe it is, yes.
6   Q.   Okay.  Do you have any recollection of why you were
7   sending an e-mail to Michael Koos in April 2019 about this
8   claim?
9   A.   So the -- the e-mail is addressed to Bob Paradis and
10  a copy to Mike Koos and it is an e-mail in which we were
11  notifying Bob that he would take over the handling of this
12  claim.
13  Q.   When you say "we," who are you referring to?
14  A.   Chubb, the organization.
15  Q.   Why was Chubb assigning Bob Paradis to this claim?
16  A.   So this claim and many others -- claims are triaged.
17  A general adjuster is a general adjuster for a reason based on
18  experience -- mostly experience and years of service, those
19  types of things.  When we identified that this matter would be
20  complex, when we identified that it was going to be a larger
21  claim, it was reassigned to Bob.
22  Q.   Do you remember when Chubb -- or do you know when
23  Chubb determined that the claim was complex?
24  A.   Oh, yes.  I don't know the specific dates.  You know,
25  probably shortly before this e-mail was written is when it was

Page 141
1   identified.
2   Q.   What do you mean by "complex"?
3   A.   Yeah, I mean, complex meaning that -- and not
4   specifically to the Wexlers necessarily -- but a complex claim
5   may have an element of dollars or high-dollar exposure.
6   Earlier I testified what a large loss might be and oftentimes
7   we would refer to that as something approaching $500,000 or
8   more.  Complex may also be elements related to coverage.  Those
9   are generally the things that we're talking about when we're
10  talking about complex.
11  Q.   Was Bob Paradis' level of responsibility for the
12  claim when he took over greater than the level of
13  responsibility that Jordon Beverly had for the claim?
14  A.   In level of responsibility, you know, I don't know.
15  I would say that -- and I don't remember exactly what Jordan's
16  title was but something to the effect of property claims
17  adjuster or outside claims adjuster where Bob is a general
18  adjuster.  A general adjuster, generally speaking, would
19  have -- they're going to have more financial authority.
20  They're accustomed to more complicated claims.  You know,
21  that's -- I've rambled.  Sorry, I can't even remember the
22  question.  Did I answer the question?
23  Q.   Yeah.  Was Jordon Beverly not qualified to handle the
24  Wexlers' claim?
25  A.   That's not the case.



Page 142
1  MR. ERRERA: Objection: form.
2  THE WITNESS: No, that's not the case. It is
3  common practice -- because a general adjuster is more familiar
4  with some of the reporting that's required a general adjuster
5  has a less volume of claims because the claims that they do
6  handle is -- are complex. All of those things are what would
7  trigger a claim to be sent to a general adjuster. It's not
8  that Jordon is not qualified or was not qualified to handle a
9  claim.
10  Q. (BY MR. LAMDEN) So what skills then did Bob Paradis
11  bring to the claim that Jordon Beverly did not have when he was
12  substituted in April of 2019?
13  MR. ERRERA: Objection to answering.
14  THE WITNESS: Again, the question itself seems
15  to infer that Jordon wasn't qualified to handle the claim and
16  that -- that's certainly not my testimony. It -- it's very
17  common that when the claim is identified as being large or
18  complicated or complex that a general adjuster would get
19  involved. That's not to take anything away from the adjuster
20  that was handling the claim before. That's just not within his
21  or her scope of job, if you will. So they're reassigned to a
22  general adjuster and that's what happened here with the Wexler
23  claim.
24  Q. (BY MR. LAMDEN) Who made the determination that the
25  claim was complex enough to warrant transferring it to a

Page 143
1  general adjuster?
2  A. Without the benefit of reviewing the claim file as I
3  sit here, you know, right now, I can't remember.
4  Q. Do you know what factors were considered in
5  determining whether the claim was complex?
6  A. Again, I feel like I've answered the question. I'll
7  allow my testimony to stand. I will add one thing though.
8  There is an element of travel that the general adjusters are
9  accustomed to doing that an adjuster that would fill the role
10  as Jordon had, they don't -- they don't really travel. They
11  stay more around the area that they live in. So there -- in
12  addition to my prior testimony there is an element of this that
13  was going to require reinspections and -- and Bob being a
14  general adjuster and part of his responsibilities is traveling
15  to complex losses was assigned.
16  Q. Do you know whether Jordon Beverly visited the
17  Wexlers' residence?
18  A. You know, Seth, without the benefit of the file in
19  front of me I don't -- I don't recall if he was -- if he made a
20  visit to the Wexlers' residence or not. If I do recall
21  correctly, Jordon lived or lives, I don't know, in Atlanta.
22  Sometime shortly after this loss of course COVID happened and
23  there wasn't so much traveling going on. I think that was
24  after Bob was assigned. There could have been a possibility
25  that Beverly would have been traveling because of -- of a cat

Page 144
1  volume or catastrophic losses in that area at the time and then
2  would have returned back home. So, anyway, long -- long
3  answer. I can't recall if Beverly was there or not.
4  Q. But you didn't speak to anyone who was responsible
5  for the substitution of Bob Paradis for Jordon Beverly in this
6  claim, right?
7  A. Not that I recall.
8  Q. You do understand that you've been designated by
9  Chubb to testify on "the factors and the identifies of all
10  persons responsible for the substitution of Bob Paradis and
11  Jordon Beverly," right?
12  A. I understand that.
13  Q. But you don't know who those persons are?
14  A. Well, in part it certainly is me given the e-mail
15  that was written here. It's -- it's really just not -- it's
16  not -- it's not complicated in that when -- when the
17  organization identifies -- and it certainly could have been me
18  at this point -- that a claim ought to be assigned to a general
19  adjuster, an e-mail like this would be produced and transferred
20  to the general adjuster.
21  Q. Would the reasons documenting the substitution of a
22  general adjuster for another adjuster be included in the claim
23  file?
24  A. No, that would be unusual.
25  Q. Would the rationale or the reasons for substituting a

Page 145
1  general adjuster for a specific adjuster be documented
2  anywhere?
3  A. Probably not. I mean, look, maybe I can help with
4  some understanding. You know, my -- more -- most of the claims
5  that -- that my team currently gets and the general -- general
6  adjuster managers, their teams get, they are reassigned claims.
7  It's -- it's a very common practice that early on in the claim
8  we're identifying what the scope of the work might be. At some
9  point it's identified that it's going to be a complex matter
10  and it gets reassigned to a general adjuster. The idea, if
11  there is such idea out there, that something sinister happened
12  because there was a reassignment from Beverly to Bob is
13  misguided. It's -- it's just -- it's that common that a claim
14  would be reassigned to a general adjuster when we've identified
15  that it's a big or a complex claim.
16  Q. In connection with the Bob Paradis substitution, when
17  you say "we," other than you you don't know who else was
18  involved?
19  A. I don't know that anybody else was involved. You
20  know, you made it a point that I've been designated as the
21  company rep which is true but at the same time I haven't
22  memorized the claim file. If there was anybody else involved,
23  the claim file will stand on its own. Other than this e-mail,
24  as I sit here right now, I can't recall that anybody else was
25  involved.



Walter HaessigApril 25, 2023
Pages 146 to 149

Page 146
1  Q.  And as far as you recall, the only two reasons for
2  which Bob was substituted was the claim was complex and larger?
3MR. ERRERA:  Objection:  form and
4  mischaracterization of prior testimony.
5Go ahead.
6THE WITNESS:  Yeah, certainly in part that is --
7  that is the reason and then there is an element of reinspection
8  and travel is going to be -- be required.
9  Q.  (BY MS. LAMDEN)  The e-mail that I'm sharing the
10  first sentence says, "Bob, thanks for agreeing to handle this
11  claim."
12Do you recall having a discussion with Bob about
13  whether he would be able to handle the claim?
14  A.  Yeah, Seth, this e-mail -- what is today?  It's three
15  days older than four years old.  Other than what I wrote on
16  that day I don't recall having any conversations with Bob.
17  Q.  Was Bob substituted in part because of the -- what
18  you have written here there is a difference in valuation of
19  damage -- I think that's a typo -- valuation of damage?  Is
20  that one of the factors?
21  A.  Yeah, unfortunately I have my fair share of typos.
22  It certainly could have been.  Not exclusively but as the claim
23  proved out, there certainly was or is a difference and would
24  have been part of the reason why Bob was involved.
25  Q.  Are you saying that is the reason or you're guessing

Page 147
1  that it may have been the reason?
2MR. ERRERA:  Objection:  form and
3  mischaracterization of prior testimony.
4Go ahead.
5THE WITNESS:  Yeah, so it is part of the reason.
6  It's not the exclusive reason.
7  Q.  (BY MR. LAMDEN)  The third line refers to -- it says,
8  "JSL has completed a proposal for approximately $90,000."  In
9  connection with the decision to transfer this claim to Bob
10  Paradis, do you recall whether you reviewed the JSL proposal?
11  A.  As I sit here today, I don't recall reviewing the JSL
12  proposal.  The document is clear that I was aware that the
13  proposal was approximately in the amount of $90,000 and the
14  insured at the time had presented some information suggesting
15  that the house might require replacement.  Certainly there is a
16  difference there that -- that needs some attention.
17  Q.  Why do you say that?
18  A.  I'm sorry, can you clarify the question?
19  Q.  You said certainly -- what did you say there's
20  something there that needs attention?
21  A.  Sorry, it may be a bad way to characterize the
22  situation in that if it was clear or certain, I might not be
23  having these conversations.  But if you have -- if you have a
24  measure where Chubb says it might be $90,000 or let's just say
25  for an example $100,000 and the policyholder is saying, wait a

Page 148
1  second, I think we have, for example, a $2 million loss, there
2  is a big delta there that needs to be addressed.
3  Q.  So Bob was -- strike that.
4So that's where a general adjuster would come in
5  when there's a significant magnitude of difference between the
6  insurance company's estimation of the claim and the insured's?
7MR. ERRERA:  Objection:  asked and answered.
8Go ahead.
9THE WITNESS:  Yeah, again, not -- not
10  exclusively.  Like that would seem to entail the only time
11  adjusters will get involved is -- is when there is a big
12  difference and that's certainly not the case.  But it certainly
13  would be and can be a driving factor or a contributing factor
14  to why it would be reassigned to a general adjuster.
15  Q.  (BY MR. LAMDEN)  Do you recall whether you selected
16  Bob Paradis to take over the claim rather than any other
17  general adjuster candidates who may have been available?
18  A.  I don't recall the -- the determining factor on why
19  we selected Bob as opposed to any other general adjuster.
20  Q.  So it wasn't that Bob brought any specialized skills
21  to the file, to the Wexler file?
22  A.  No, that's -- that's not what I'm testifying to.  I
23  don't want to insinuate that Bob is not special but I can
24  probably answer the question maybe with an example again just
25  to help understand how oftentimes a general adjuster is decided

Page 149
1  but not remembering the specifics of this particular matter.
2  Sometimes it is just -- it's proximity.  It's who's available
3  meaning, you know, somebody could be on vacation or somebody
4  may have been assigned a loss just the day before.  It might be
5  who's available in the coming weeks meaning, you know, maybe
6  somebody else is going to be on vacation two weeks from now and
7  shouldn't be assigned a claim.  Some of those things are why we
8  may have selected Bob opposed to someone else but, again, as I
9  sit here today, I -- I can't remember the details of why
10  specifically Bob was chosen opposed to any other adjuster.
11  Q.  Okay.  Did Chubb have any policies in effect in early
12  2019 regarding the use of infrared cameras in investigating
13  residential property insurance claims involving water damage?
14  A.  Seth, this is -- this is the claim I've prepared the
15  most for, and I'm joking, because, no, we don't -- we don't --
16  there's no such requirement or documentation around infrared
17  cameras.
18  Q.  I'm not talking about a requirement necessarily but
19  did Chubb have any policy of making infrared cameras available
20  to its adjusters?
21  A.  I've never -- never had a conversation, seen anything
22  around infrared cameras from Chubb.
23  Q.  Were infrared cameras or moisture meters made
24  available to -- are they made available, excuse me, to general
25  adjusters involved with water-damage claims?



Page 150

1 A. We don't provide the adjusters with infrared cameras.
2 Were they made available? I suppose in the sense that if a
3 vendor has a infrared camera it may be used but the -- the
4 adjuster certainly doesn't carry around an infrared camera.
5 Q. Does Chubb have infrared cameras or moisture meters
6 available that it could provide to a general adjuster if asked?
7 A. I'm not aware and certainly haven't made that request
8 myself. I do want to provide a little bit of a carve-out on
9 this idea in that on the appraisal side of the business, you
10 know, we had talked previously about Chubb personal appraisal
11 or some terminology close to that. I have seen that they may
12 at times have infrared cameras but the appraisal side and the
13 claims side, I mean, they -- they don't -- you've got to
14 understand the appraisal side is generally much removed from
15 when a claim actually happens. So anyway I don't want to lead
16 you down the road that we don't use infrared cameras because
17 that's not entirely correct. I know the appraisal side does.
18 The claims side does not.
19 Q. Does -- does Chubb offer infrared thermography
20 training to its general adjusters?
21 A. No, sir.
22 Q. Does it offer that kind of training to anyone?
23 A. Unless the appraisal folks are provided that
24 training, which I'm not sure that they are, but I can speak to
25 the claims side. We are not.

Page 151

1 Q. So if Chubb were providing that kind of training, it
2 probably would have been on the appraisal side?
3 A. To the extent that it would exist, that's where I
4 would think it would be found.
5 Q. Okay. I don't know that I have anything else. I'm
6 going to take a few minutes to go through my notes, maybe ten
7 minutes or so, and then we can go back on and either conclude
8 at which time your attorney will have an opportunity to ask you
9 questions if he'd like or we can just wrap it up. So if we can
10 go back on --
11       MR. OFFENBACH: Seth, I just want to let you
12 know that we will have many questions.
13       THE WITNESS: I'm sorry, Daniel, what was that?
14       MR. OFFENBACH: We will have just a few
15 questions.
16       MR. LAMDEN: Okay, fine. I didn't mean to block
17 you out. One way or the other can we go back on in ten
18 minutes?
19       VIDEO OPERATOR: Okay, we're going to go off the
20 record now at 2:26 p.m.
21       (Recess taken from 2:26 p.m. to 2:36 p.m.)
22       VIDEO OPERATOR: We're going back on the record.
23 The time is 2:36 p.m.
24       MR. LAMDEN: Mr. Haessig, thanks for your time.
25 I don't have any further questions for you.

Page 152

1       THE WITNESS: Thanks, Seth. Pleasure talking
2 with you.
3       MR. LAMDEN: Likewise.
4       MR. OFFENBACH: Here we go.
5             EXAMINATION
6 Q. (BY MR. OFFENBACH) Mr. Haessig, my name is Dan
7 Offenbach and I represent BELFOR in this matter. I have just a
8 few questions related to your testimony pertaining to the
9 professional services agreement that you testified to and I
10 want to ask you specifically about the professional services
11 agreement that you testified to was entered into between BELFOR
12 and Chubb. Okay?
13 A. Dan, fire away.
14 Q. Is it fair to say that you had no personal knowledge
15 of whether a professional services agreement even exists
16 between Chubb and BELFOR?
17 A. That is accurate.
18 Q. And the first time you came to learn about this
19 professional services agreement was yesterday when you talked
20 with Ben Kelly, correct?
21 A. That is what Ben mentioned to me, yes, sir.
22 Q. And have you had a chance to look over the Chubb
23 document production in this case?
24 A. I have not reviewed the document production in its
25 entirety.

Page 153

1 Q. Okay. To the best of your knowledge has a
2 professional services agreement entered into between BELFOR and
3 Chubb been produced in this case?
4 A. Not that I'm aware of.
5 Q. Other than a conversation that you had with Ben
6 Kelly, were you aware of any other evidence that there exists a
7 professional services agreement entered into between Chubb and
8 BELFOR in this case?
9 A. Sorry, Dan, can you repeat the question? There was a
10 ding on something.
11 Q. Other than the conversation that you had with Ben
12 Kelly, are you aware of any evidence to support your testimony
13 that there was a professional services agreement between Chubb
14 and BELFOR?
15 A. The only information that I have to provide that
16 testimony is the conversation that I had with Ben Kelly.
17 Q. And when you had that conversation with Ben Kelly,
18 was it on the telephone?
19 A. That is true.
20 Q. And did he say whether he had a -- strike that.
21       Did he mention whether he had in his possession
22 a copy of the professional services agreement?
23 A. He did not.
24 Q. That's all I have. Thank you.
25 A. Thanks, Dan.



Page 154
1       MR. ERRERA:  Any follow-ups, Seth?
2       MR. LAMDEN:  Negative.
3       MR. ERRERA:  We'll go ahead and reserve.
4       VIDEO OPERATOR:  Okay.  This will then mark the
5  end of media No. 4 and concludes today's deposition.  We're
6  going to go off the record at 2:39 p.m.
7       (Deposition concluded at 2:39 p.m.)
8       VIDEO OPERATOR:  Mr. Offenbach, do you need a
9  copy of the video today?
10      MR. OFFENBACH:  Yes, I'll take a copy and the
11 transcript.
12      VIDEO OPERATOR:  Do you need it synced with the
13 transcript or just the video and the transcript?
14      MR. OFFENBACH:  Video.
15      VIDEO OPERATOR:  Just the video?  Okay.  And,
16 Mr. Lamden, do you need a copy of the video today?
17      MR. LAMDEN:  Yes.
18      VIDEO OPERATOR:  And do you want it synced with
19 the transcript or just the video separately?
20      MR. LAMDEN:  Just the video is fine.
21      VIDEO OPERATOR:  And, Mr. Errera, you ordered
22 today so you'll get a copy.
23      MR. ERRERA:  Okay.  Can I also get an e-tran as
24 well?
25      THE REPORTER:  Yes.

Page 155
1        Reporter's Note:  According to Federal Rule
2  30(e)(1), the request for review of the deposition by the
3  witness is accomplished "on request by the deponent or a party
4  before the deposition is completed."
5            Since this was not done, signature is considered
6  waived for this transcript.
7              (E) Review by the Witness; Changes.
8  (1) Review; Statement of Changes.  On request by the deponent
9  or a party before the deposition is completed, the deponent
10 must be allowed 30 days after being notified by the officer
11 that the transcript or recording is available in which:
12 (A) to review the transcript or recording; and
13 (B) if there are changes in form or substance, to sign a
14 statement listing the changes and the reasons for making them.

Page 156
1         IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION
3
  AMY WEXLER and KENNETH A.       )
4 WEXLER,                          )
                                   )
5       Plaintiffs,                )
                                   )
6 V.                               )  CIVIL ACTION
                                   )
7 CHUBB NATIONAL INSURANCE         )  NO.: 21 CV 2543
  COMPANY and BELFOR USA GROUP     )
8 INC.,                            )
                                   )
9       Defendants,                )
                                   )
10 And                             )
                                   )
11 CHUBB NATIONAL INSURANCE        )
   COMPANY,                        )
12                                 )
   Counterclaim Plaintiff,         )
13                                 )
   V.                              )
14                                 )
   AMY WEXLER and KENNETH A.       )
15 WEXLER,                         )
                                   )
16 Counterclaim Defendants.        )
                                   )
17
18              REPORTER'S CERTIFICATION
             DEPOSITION OF WALTER HAESSIG
19                APRIL 25, 2023
20
21      I, Wendy S. Schreiber, Certified Shorthand Reporter No.
22 9383 in and for the State of Texas, hereby certify to the
23 following:
24      That the witness, WALTER HAESSIG, was duly sworn by the
25 officer and that the transcript of the oral deposition is a

Page 157
1  true record of the testimony given by the witness;
2       That reading and signing of the deposition transcript was
3  waived;
4       That the amount of time used by each party at the
5  deposition is as follows:
6       SETH D. LAMDEN, ESQ. - 03 HOURS:56 MINUTE(S)
        DANIEL J. OFFENBACH, ESQ. - 00 HOURS:02 MINUTE(S)
7       MICHAEL S. ERRERA, ESQ. - 00 HOURS:00 MINUTE(S)
8       That pursuant to information given to the
9  Deposition officer at the time said testimony was taken, the
10 following includes counsel for all parties of record:
11 FOR THE PLAINTIFFS:
12      SETH D. LAMDEN, ESQ.  (Attending Remotely)
        BLANK ROME LLP
13      444 W. Lake Street, Suite 1650
        Chicago, Illinois 60606
14      Phone:  (312) 776-2600
        slamden@blankrome.com
15
16 ATTORNEYS FOR DEFENDANT CHUBB NATIONAL INSURANCE COMPANY:
17      DANIEL J. OFFENBACH, ESQ.  (Attending Remotely)
        LEAHY EISENBERG & FRAENKEL, LTD.
18      33 W. Monroe Street, Suite 1100
        Chicago, Illinois 60603
19      Phone:  (312) 368-4554
        Fax:  (312) 368-4562
20      Djo@lefltd.com
21
   ATTORNEY FOR DEFENDANT BELFOR USA GROUP, INC.:
22
        MICHAEL S. ERRERA, ESQ.  (Attending Remotely)
23      FORAN GLENNON PALANDECH PONZI & RUDLOFF, P.C.
        222 N. LaSaller Street, Suite 1400
24      Chicago, Illinois 60601
        Phone:  (312) 863-5000
25      Fax:  (312) 863-5099
        Merrera@fgppr.com

Page 158

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 2nd day of May, 2023.

[signature]

Wendy Schreiber, Texas CSR 9383
Expiration Date: 05/30/24
MAGNA LEGAL SERVICES
Magna Registration No. 631
16414 San Pedro, Suite 900
San Antonio, Texas 78232
Job No. 966787 Phone: (866) 672-7880

