UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMY WEXLER and KENNETH WEXLER, | ) |
| Plaintiffs, | ) |
| v. | ) No. 21-cv-2543 |
| CHUBB NATIONAL INSURANCE CO., and BELFOR USA GROUP, INC., | ) Magistrate Judge Keri L. Holleb Hotaling |
| Defendants, | ) |
| and | ) |
| CHUBB NATIONAL INSURANCE CO., | ) |
| Counterclaim Plaintiff, | ) |
| v. | ) |
| AMY WEXLER and KENNETH WEXLER, | ) |
| Counterclaim Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Defendant Belfor USA Group Inc. ("Belfor") moves for partial summary judgment [Dkt. 192] pursuant to Federal Rule of Civil Procedure 56, on Count III (Fraud in the Inducement), Count IV (Illinois Consumer Fraud Act), Count V (Negligence), and Count IX (Bailment) of Plaintiffs' (Amy Wexler and Kenneth Wexler; collectively, "Plaintiffs" or "the Wexlers") Second Amended Complaint ("SAC") [Dkt. 150]. For the reasons explained below, the motion is granted.

**I.    Standard of Review**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court must construe the facts and

draw all reasonable inferences in the light most favorable to the nonmoving party. *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018). In doing so, "[t]he court need [not] consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## II. Procedural History

In January 2021, Plaintiffs filed this suit in the Circuit Court of Cook County, Illinois, and Defendants later removed the case to this Court based on diversity jurisdiction. [Dkt. 1.] The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiffs are citizens of Illinois and Defendants are citizens of Colorado, Indiana, Michigan, and New Jersey. [Dkt. 1-1.] On September 7, 2021, the parties consented to the exercise of jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt. 29.] This case was originally assigned to Magistrate Judge Heather K. McShain. It was reassigned to Magistrate Judge Holleb Hotaling as part of a routine calendar adjustment when Judge Holleb Hotaling assumed the bench on August 10, 2023. [Dkt. 119.]

On May 30, 2024, Judge Holleb Hotaling dismissed Counts VII (tortious interference with contract against Chubb) and X (civil conspiracy against Chubb and Belfor) of the SAC. [Dkts. 170, 171; *see also* Dkt. 191.]

## III. Material Facts

At all times relevant to this suit, the Wexlers owned and lived in a single-family home ("the

2

Home") in Glencoe, Illinois, a near-north suburb of Chicago. [BSOF[1], Dkt. 194 at ¶ 1.] During a thirty-six-hour period between January 29 and January 31, 2019, a catastrophic storm colloquially known as "the Polar Vortex" struck northern Illinois, and the Chicago metropolitan area experienced a temperature drop of over fifty degrees from 32°F to -20°F. [BSOF ¶ 2; SAC ¶ 24.] Due to this severe temperature fluctuation, water service pipes at the Home burst and released water on February 1, 2019, causing damage to the Wexlers' property. [BSOF ¶ 3.]

After the water damage was discovered on February 1, 2019, Amy Wexler contacted a plumber and turned off the water. [BSOF ¶ 4.] That plumber provided a recommendation for a water damage remediation firm. [BSOF ¶ 5.] Amy Wexler contacted that firm, told them she had an "urgent" water problem, and asked them to come out as soon as possible. [*Id*.] That firm's first availability was on Monday, February 4, 2019, and Amy Wexler scheduled an appointment for that date. [*Id*.] Amy Wexler does not recall the name of that remediation firm, what they would have done on Monday, February 4, or when they might have been able to start work. [BSOF ¶¶ 6-7.] The individual Amy Wexler spoke to on the phone "may have said" the reason they couldn't come out until Monday was that there were a lot of people in the Chicagoland area with similar leaks. [BSOF ¶ 7; WR ¶ 7.]

Amy Wexler subsequently communicated with Plaintiffs' insurance broker, Aon, and Plaintiffs also filed a claim with their insurer, Chubb. [BSOF ¶ 8; WR ¶ 8; SAC ¶¶ 20, 26-27.] On February 1, 2019, Amy Wexler spoke with a representative of Belfor USA Group Inc., a different water remediation company, who offered to send someone to inspect the Home the next day, February 2, 2019. [BSOF ¶ 9; SAC ¶¶ 33-34.] After that conversation, Amy Wexler cancelled her February 4th appointment with the remediation firm recommended by her plumber. [BSOF ¶ 10.]

---

[1] "BSOF" shall refer to Belfor's Statement of Material Facts. [Dkt. 194.] "WR" shall refer to the Wexlers' response to Belfor's Statement of Material Facts. [Dkt. 209 at 1-15.] "WSOF" shall refer to the Wexlers' Statement of Additional Material Facts. [Dkt. 209 at 15-22.] "BR" shall refer to Belfor's response to the Wexlers' Statement of Additional Material Facts. [Dkt. 214.]

3

A Belfor estimator named Daniel Correa (whose duties include conducting the initial inspection, providing estimates of cost and time, and arranging for the execution of work authorizations) met with Amy Wexler at her home on February 2, 2019. [BSOF ¶ 11.] Correa took moisture readings, informed Amy Wexler which rooms were affected, determined the materials that would need to be removed from the Home, and described a plan of action for the work to be done. [WSOF ¶ 10.] Correa walked through the Home with Amy Wexler and showed her an "amazing amount of damage" that she "had not noticed[,]" including damage to the kitchen ceiling, between the kitchen cabinets and countertops, to the dining room ceiling, the office closet and powder room, behind the kitchen appliances, and in the family room. [*Id.*] Correa told Amy Wexler that Belfor needed to "remove all of the drywall that is water damaged" and the floor, and he collected enough information about damage to the Home on February 2, 2019 to create a work order. [*Id.*]

Correa testified he informed Amy Wexler on February 2, 2019 that Belfor was very busy because of the Polar Vortex, and estimated he could get "boots on the ground" to begin work at the Home in two weeks. [BSOF ¶¶ 14-15, 18.] Amy Wexler testified that Correa "told [her on February 2, 2019] he was coming back on Monday [February 4, 2019]." [WSOF ¶ 11; disputed in part by BR ¶ 11.]

Regardless, Belfor failed to show up at the Home on Monday, February 4, 2019. [WSOF ¶ 15.] Plaintiffs did not contact Belfor or any other remediation firms on February 4, 2019. [BSOF ¶ 19.] On the morning of February 5, 2019, Ken Wexler called Belfor and left a message asking Correa to return his call. [WSOF ¶ 16.] On February 5, 2019, Belfor assigned a job number to the Wexler project and Correa also ordered testing company EGSL to go to the Home and conduct an asbestos test. [WSOF ¶ 17.]

On February 7, 2019, Correa returned to the Home where Amy Wexler executed a Work Authorization, which authorized Belfor "to effect repairs [at the Home] on an Emergency Basis" and

4

entitled Belfor to recover from Chubb for its work (or if Plaintiffs' insurance claim was denied, Plaintiffs would be "personally liable for all costs of services performed"). [Dkt. 214-4 (Work Authorization).] The terms of the EGSL Mold Remediation Protocol were incorporated by reference into the Work Authorization [*Id*.; *see also* Dkt. 199 (Plaintiffs' motion to for leave to file third amended complaint) at 2.] At the time Amy Wexler signed Belfor's Work Authorization on February 7, 2019, she was aware that mold can begin forming within 24-48 hours of water damage, and far in excess of 48 hours had passed since the pipes had burst in the Home. [BR ¶ 22; Dkt. 235 at 155:13-20.] Plaintiffs did not enter into any written or verbal contracts with Belfor other than the Work Authorization. [BSOF ¶ 26.] Belfor did not begin any work at Plaintiffs' home until after Amy Wexler signed the Work Authorization. [BSOF ¶ 25.]

Also on February 7, 2019, air quality and mold testing were conducted, and mold was found to be present. [BSOF ¶¶ 20, 27; WSOF ¶ 20.] The testing company subsequently provided a Mold Remediation Protocol. [*Id*.] The Wexlers were informed of the mold and moved out of the Home on Monday February 11, 2019. [BSOF ¶ 28.]

Plaintiffs hired an architect, structural engineer, and contractor to determine what repairs were needed before they could safely return to the Home. [SAC ¶ 78.] These consultants recommended the Home be demolished and rebuilt in its entirety. [*Id*.] Plaintiffs have not lived in the Home since.

**III.  Analysis**

The Work Authorization contract Amy Wexler signed on February 7, 2019, which engaged Belfor to perform services at the Home, limits Plaintiffs' rights and potential recoveries against Belfor. In an attempt to circumvent these limitations, Plaintiffs have asserted four tort-based claims, two of which seek to avoid the Work Authorization altogether (Count III Fraud in the Inducement and Count IV Illinois Consumer Fraud and Deceptive Business Practices Act(collectively the "Consumer Fraud") claims), and two of which rest on the assumption that the Work Authorization

5

did not cover all of the work Belfor performed at the Home (Count V Negligence and the Count IX Bailment). The Court addresses these claims in turn.

### A. Plaintiffs' Consumer Fraud Claims (Counts III and IV)

Illinois law applies to both consumer fraud claims at issue here. *Wexler* v. *Chubb Nat'l Ins. Co.*, No. 21-cv-2543, 2022 WL 279571, *2 (N.D. Ill. Jan. 31, 2022) ("*Wexler I*"). Under Illinois law, proving a fraud in the inducement claim requires the plaintiff to establish, *inter alia*, "a false statement of material fact" that was "acted on by the other party in reliance on its truth," resulting in damage, *Orsi* v. *Picklin*, 2012 IL App (1st) 11-0680-U ¶ 26 (Ill. App. Ct. 2012), and "like all fraud under Illinois law, must be established by clear and convincing evidence," *Amari Co.* v. *Burgess*, 955 F. Supp. 2d 868, 884 (N.D. Ill. 2013). *See also JPMorgan Chase Bank, N.A.* v. *Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 864 (7th Cir. 2013). An Illinois consumer fraud claim similarly demands a "deceptive act or practice by the defendant" and damage "proximately caused by the deception." *See, e.g.*, *Aliano* v. *Ferriss*, 988 N.E.3d 168, 176 (Ill. App. Ct. 2013).[2] Without evidence of a false statement, reasonable reliance thereon, or damage therefrom, Plaintiffs' Fraud in the Inducement and Consumer Fraud claims cannot stand.

### i. Plaintiffs Cannot Demonstrate Reasonable Reliance on Belfor's Representations (Count III – Fraudulent Inducement and Count IV - Consumer Fraud)

The Court will begin by addressing the issue of Plaintiffs' reasonable reliance on Belfor's alleged misrepresentations. Taking the facts in the light most favorable to Plaintiffs, *Costco*, 903 F.3d at 621, Correa told Amy Wexler that Belfor would begin work at the Home on Monday, February 4,

---

[2] Alternatively, a plaintiff can ground an Illinois Consumer Fraud claim on an "unfair practice," which is a practice that "offends public policy" and is "immoral, unethical, oppressive or unscrupulous." *Aliano*, 988 N.E.3d at 177. Plaintiffs have not even alleged that Belfor engaged in any such practice. Accordingly, the Court focuses on Plaintiffs' contentions regarding deceptive practice.

2019.³ But, critically, Plaintiffs' claims about the implications of any such representation/ misrepresentation hold no weight. For instance, the key discussion when the alleged misrepresentations would have been made by Belfor estimator Daniel Correa to Amy Wexler occurred on Saturday, February 2, 2019. Subsequently, no Belfor personnel arrived at the Home on February 4, 2019. Yet Amy Wexler, on behalf of Plaintiffs, signed the Work Authorization three additional days later on Thursday, February 7, 2019, at which point Plaintiffs' alleged expectations about work beginning on February 4th had obviously already not been realized. It is nonsensical for Plaintiffs to contend they were induced to sign a contract based on a purported promise ***they already knew was not met***. *See*, *e.g.*, *Loggerhead Tools*, No. 12-cv-9033, 2016 WL 5111573 at *4 (reliance analysis must consider "all of the facts of which plaintiff had actual knowledge"); *Cent. States Jt. Bd. v. Cont'l Assur. Co.*, 453 N.E.2d 932, 936 (Ill. App. Ct. 1983) ("person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived"); *JPMorgan*, 707 F.3d at 865 (plaintiff's claimed belief it had no obligation to pay notes belied by payments made on notes).

Further, Plaintiffs' overriding concern was the growth of mold, which they feared could begin within 48 hours of the water damage. Amy Wexler testified that Correa "told [her] that mold starts forming in 24 to 48 hours," which "scared the living daylights out of [her]" because she "had never heard that before," and later added "I have a million health issues as does my daughter, we got to – if

---

³ The Court finds it important to acknowledge how focused on precision Amy Wexler was during her deposition, stating over 80 times how careful she was to be exact/precise/swear to a particular fact. [Dkt. 235 (*see* word index for exact; exactly; precise; precisely; precision; swear).] Amy Wexler was asked in multiple differently worded inquiries what words Daniel Correa used to convey when Belfor would return to the Home. In *eleven* separate responses to these questions, Amy Wexler explained she simply could not recall Correa's words with precision, but that Correa's statements "gave everything so that—indication so that [she] *felt pretty sure* he was going to be there on Monday [February 4th]." [WSOF ¶ 11; *see* Dkt. 235 at 133:13-138:3.] Then, only a short time later and after a 19-minute break in the deposition where Amy Wexler was able to confer with her counsel, in a non sequitur response to a to wholly different question, Amy Wexler utters the magic words she had just mere minutes before averred she could not swear to: "[Correa] told me he was coming back on Monday [February 4]…." [Dkt. 235 at 152:9-153:2.] Amy Wexler offered no explanation or resolution for this late-made, non-responsive utterance that flatly contradicted her own prior testimony.

there is mold in there, we got to get it out of there." [BSOF ¶ 16.] But beginning work on Monday, February 4, 2019, **would not have satisfied that timeframe**. At the latest, the leaks occurred in the early morning hours of February 1, 2019. [BSOF ¶ 3.] Thus, more than 24 hours had already passed when Correa met with Amy Wexler on Saturday, February 2, 2019, and Monday was still 48 additional hours away. Accordingly, whether work began on Monday the 4th or at a later date, it was obvious, and any reasonable person would know, that **no work** would or could possibly occur prior to the 24-to-48-hour window that forms the basis of Plaintiffs' claimed worry. No reasonable person would believe Plaintiffs' arguments that when Amy Wexler "signed the Work Authorization, [she] had no idea that Belfor's delays had already caused a mold issue…" [Dkt. 219 at 3], as she was aware "that mold starts forming in 24 to 48 hours," and knew it had already been approximately 150 hours since the leak occurred when she signed the Work Authorization contract with Belfor. Moreover, Amy Wexler testified that before she signed the Work Authorization "the penny dropped for [her and she] realized…if mold starts forming in 42 to 48 hours, **then there is mold in our house**." [Dkt. 235 at 155:13-20 (emphasis added).] Plaintiffs cannot close their eyes to these undeniable detrimental facts.

Although Plaintiffs assert their "fraudulent inducement claim is not limited to a single statement regarding when Belfor would return to the home" [Dkt. 210 at 10], Plaintiffs never identify any other alleged misrepresentation(s). Plaintiffs contend that "despite knowing the dangers of water damage and Belfor's complete lack of available labor and equipment, Belfor answered its company hotline and sent someone to the home the very next day" [*Id.*]. Not a single word from any Belfor representative is identified in that statement, and thus there is no conceivable misrepresentation. *See Hoseman* v. *Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (to prevail on a claim of fraudulent inducement, a plaintiff must prove by clear and convincing evidence that there was a false **statement** of material fact). Plaintiffs also point to Correa's statements regarding the damages he observed, the

8

possibility of mold growth, Belfor's capability to "fix [the] house" and his suggested "general plan of action," and claim those constituted statements regarding Belfor's "ability to perform work." [Dkt. 10 at 10-11]. But Plaintiffs do not argue – let alone present evidence – that Belfor lacked the skills and expertise to perform the work Correa described.

Plaintiffs also have failed to establish reasonable reliance because they cannot point to a viable alternative for the work they wanted done. This is so for two reasons. First, although Plaintiffs allege they had an appointment on Monday, February 4, 2019 with another remediation firm, they cancelled it on Friday, February 1, 2019 once they learned a Belfor representative would come to the house on Saturday, February 2, 2019. [BSOF ¶ 10.] Thus, Plaintiffs abandoned the option of the other remediation firm before Belfor's alleged misrepresentations were made. Second, there is no evidence the "First Remediation Firm" was in fact a viable option. Amy Wexler could not recall the name of the firm, did not know if the meeting scheduled for Monday, February 4, 2019 was to begin work or was just a consultation like the one she had with Correa on Saturday, February 2, 2019, and did not know if or when that firm might begin work (the Court notes that everyone seems to acknowledge the obvious difference between an assessment and starting the actual remediation work). [BSOF ¶¶ 6-7.] Nor did Plaintiffs attempt to contact other remediation firms [BSOF ¶ 19] (including recontacting the "First Remediation Firm"), even when Belfor did not show up to the Home on February 4th, February 5th, or February 6th. Despite Plaintiffs insisting they "would have hired someone else" [Dkt. 210 at 6, 13] had they known Belfor would not begin work on Monday, February 4, 2019, it is telling they did not even contact another remediation company when Belfor did not begin work as Plaintiffs expected on February 4th. The Court finds, as a matter of law, that no trier of fact could find it reasonable for the Wexlers to rely on Belfor's purported misrepresentation that it could start work on the Home on Monday, February 4th when the contract between these parties was entered into *after* that date had elapsed with no work begun by Belfor. *Triumph Packaging Grp. v. Ward*, 877

9

F. Supp. 2d 629, 647 (N.D. Ill. 2012) ("whether reliance was reasonable is ordinarily a question of fact that courts may determine as a matter of law only when no trier of fact could find that it was reasonable to rely on the alleged statements…in light of the surrounding facts.") (signals and citations omitted).

Moreover, it is a misapprehension that Plaintiffs must only demonstrate "*they* would have acted differently but for Belfor's fraud" [Dkt. 219 at 4].[4] Rather, it is that a plaintiff's alternative actions could have produced a different outcome, namely that the harm would have been avoided. *See*, *DW Data, Inc.* v. *Coakley Relocation Sys.* 951 F. Supp. 2d 1037, 1046 (N.D. Ill. 2013) (dismissing Illinois consumer fraud claim where plaintiff had no evidence of "what it would have done differently" had it "known the 'truth'" because a fundamental element of fraud-based claims that is "if plaintiff had known the 'truth' at the time of any misrepresentation *it could have avoided the harm*…") (emphasis added). Here, Plaintiffs make no such showing.

Because reliance is an element of Plaintiffs' fraud claims, "without justifiable reliance there can be no fraud." *Greer v. Advanced Equities, Inc.*, 964 N.E.2d 772, 775 (Ill. App. Ct. 2012); *see also Schrager v. Bailey*, 973 N.E.2d 932, 938 (Ill. App. Ct. 2012). No question of fact remains as to whether Plaintiffs' reliance on Belfor's alleged misrepresentations could ever have been reasonable or justified – it simply was not. Thus, Belfor is granted summary judgment on Count III (Fraudulent Inducement) and Count IV (Consumer Fraud). Because Plaintiffs cannot demonstrate the essential element of reliance as part of their fraudulent inducement claim or their consumer fraud claim, the Court need not address the other elements of these two claims.

---

[4] The notion that Plaintiffs only need demonstrate they would have acted differently but for Belfor's fraud is absurd, as this would vitiate the requirement that damages flow from the misrepresentation. Put another way, even if Belfor had never answered Plaintiffs' call to the Belfor hotline, and Plaintiffs called other service providers, Plaintiffs offer no evidence to suggest repairs would have begun on the Home any sooner, or that any claimed damages could have been avoided. In fact, it is doubtful repairs could have begun sooner with *any* remediation company considering the unprecedented cold of the "Polar Vortex" which caused Plaintiffs' (and many others') pipes to burst, causing at least Belfor to become inundated with work. [Dkt. 193 at 1]. Amy Wexler even acknowledged Correa may have told her Belfor was very busy due to the storm. [BSOF ¶ 18.]

10

B.  **Plaintiffs' Negligence and Bailment Claims (Counts V and IX)**

Belfor argues Plaintiffs' negligence and bailment claims are foreclosed by the economic loss doctrine because the Work Authorization covers all work Belfor performed at the Home. The Court agrees.

Illinois law dictates "that plaintiffs cannot use a tort claim to recover purely economic losses." *Wexler I*, 2022 WL 279571, at *5 (citing *Moorman Mfg. Co.* v. *Nat'l Tank Co.*, 435 N.E.2d 443, 448-49 (Ill. 1982)); [Dkt. 50.] Accordingly, "a plaintiff seeking to recover purely economic losses[5] due to defeated expectations of a commercial transaction is generally limited to any remedies it may have under a contract and cannot recover in tort." *Id.* (quoting *Receivership Mgmt., Inc.* v. *A.J. Corso & Assocs., Inc.*, No. 19-cv-1385, 2021 WL 1222897, at *18 (N.D. Ill. Mar 31, 2021)).

Plaintiffs' Negligence and Bailment Claims sound in tort. *E.g.*, *Miller* v. *Madison County Jail*, No. 14-cv-909, 2014 WL 4652008. *2 (S.D. Ill. Sep. 18, 2014) (negligence); *D.W. Data, Inc.*, 951 F. Supp. 2d at 1048 (N.D. Ill. 2013) (bailment).[6] It is undisputed that Belfor undertook no work at Plaintiffs' home until after Amy Wexler executed the Work Authorization on February 7th.[7] [BSOF ¶ 25.] Thus, whether the economic loss doctrine bars those tort claims turns on whether the Work Authorization encompassed the work Belfor performed for Plaintiffs.

In her January 31, 2022, Order in this case, Judge McShain concluded that, because Plaintiffs

---

[5]  "Economic losses are damages for inadequate value, the cost of repairing or replacing a defective product, or resulting lost profits, excluding any claim for personal injury or damage to other property." *Wexler I*, 2022 WL 279571 at *5 (citing *Harleysville Ins. Co. v. Mohr Architecture, Inc.*, 198 N.E.3d 1038, 1052 (Ill. App. Ct. Apr. 27, 2021)).

[6]  Courts have held that breach of bailment claims can sound in tort or contract, at the plaintiff's election. *E.g., D.W. Data*, 951 F. Supp. 2d at 1048. Plaintiffs' choice here is not clear; nowhere in Count IX of the Complaint do Plaintiffs refer to breach of an agreement or breach of a duty of care. [SAC ¶¶ 174-179.] Plaintiffs do expressly acknowledge, however, that Belfor took possession of the subject property (an essential element of a bailment claim) "[i]n connection with its work at the Home." [*Id.* ¶ 175.] Accordingly, to the extent the Bailment claim sounds in tort, it fails under the economic loss doctrine because, as explained herein, the Work Authorization covers all work Belfor performed for Plaintiffs. To the extent the Bailment claim sounds in contract, it is subsumed by Plaintiffs' Breach of Contract claim (Count VI).

[7]  Apart from the Work Authorization, Plaintiffs did not enter into any additional written or verbal contracts with Belfor. [BSOF ¶ 26.]

sought to recover only economic losses and the Work Authorization covered the work performed, the economic loss doctrine barred Plaintiffs' negligence claim. [Dkt. 50], *Wexler I*, 2022 WL 279571, at *6. The Court specifically noted that, even though Plaintiffs sought recovery for "additional" damage to their property while Belfor performed its work, "'[w]hen property damage is caused by disappointed commercial expectations'–as is the case here–'the economic loss rule bars recovery in tort.'" *Id.* (quoting *In re Chicago Flood Litig.*, 680 N.E.2d 265, 276 (1997)). Plaintiffs did not challenge or seek reconsideration of this ruling or analysis, instead they sought leave to file an amended complaint with new allegations supporting the negligence claim. [Dkt. 54.] The new complaint [First Amended Complaint, Dkt. 59] did not alter the nature of the relief sought, but rather asserted allegations that the scope of the Work Authorization was limited to certain portions of Plaintiffs' home, and Belfor's actions damaged the home outside of those areas. [Dkt. 58], *Wexler* v. *Chubb Nat'l Ins. Co.*, No. 21-cv-2543, 2022 WL 888944, *4 (Mar. 25, 2022) ("*Wexler II*"). Accepting those contentions as true at the pleading stage, Judge McShain granted Plaintiffs' motion for leave to amend [Dkt. 58], as she believed the new negligence allegations could extend to areas of the home outside the scope of the Work Authorization. *Id.*

Plaintiffs later filed their Second Amended Complaint, which is now the operative pleading. In the SAC, Plaintiffs allege that:

> The scope of the Work Authorization was limited to the remediation of damage in the portions of the Home affected by the burst pipes as observed as of February 7, 2019. At the time the Work Authorization was signed, neither the Wexlers nor Belfor was aware of damage due to mold in other portions of the Home, and the limited scope of the EGSL mold testing ordered by Belfor shows that the scope of the Work Authorization was limited to the rooms damaged by the burst pipes. Portions of the Home that were not initially damaged by the burst pipes were not a subject of the Work Authorization.

[SAC ¶ 129.] Plaintiffs thus assert Belfor conducted its mold remediation efforts "in the vast majority of the Home and on the Contents of the Home without a contract." [*Id.* ¶ 130.]

12

However, the plain language of the Work Authorization states that Amy Wexler "authorize[s] and direct[s] Belfor USA Group, Inc….to provide **all labor**, equipment and materials required to properly repair the **specified real property, contents** or structure known as" 468 Lakeside Terrace, Glencoe, Illinois, which is the address of the Home. [BSOF ¶ 22 (emphasis added).] Thus, the parties agreed Belfor would provide "all labor" needed "to properly repair the specified real property" as well as its "contents," without restriction. Nothing in the Work Authorization limits its scope to areas of the home where damage was identified during Correa's initial inspection. Indeed, no such limitation would make sense, as it was certainly foreseeable that further damage or other items requiring repair and remediation could surface after work began and after walls and floors within the Home were opened up to check for water intrusion/damage.

Plaintiffs contend that at the time Amy Wexler signed the Work Authorization, she did not know mold had grown in the Home and did not know that other areas of the Home had been damaged; she did not understand the Work Authorization to constitute a carte blanche agreement to fix the entire Home without any restriction. [Dkt. 210 at 17.] The Wexlers' attempt to limit the scope of the Work Authorization is absurd, particularly in the face of Amy Wexler's testimony that she did indeed want Belfor to (immediately) fix any area of the house that had water intrusion. Specifically, when Correa told Amy Wexler that mold starts forming in 24-48 hours, she responded, in part, "fix it, then come on, fix it, hop to it…[w]hatever you have to do, do." [Dkt. 235 (Amy Wexler Deposition) at 132:15-133:7].

In fact, the General Conditions in the Work Authorization specifically address mold, stating that Belfor is exempt from all liability

> arising out of or relating to the presence, discovery, or failure to discover, remove, address, remediate or cleanup environmental or biological hazards including, but not limited to, mold…unless covered by the insured's policy of insurance, remediation is part of the scope of work and such work is directed by an Industrial Hygienists [sic] protocol and clearance testing.

13

[BSOF ¶ 24; Dkt. 214-4 (Work Authorization).] As such, Belfor either has no liability related to mold, or any liability is governed by Plaintiffs' Chubb insurance policy and the mold remediation protocol that was developed and implemented. But, critically, in either case the plain terms of the Work Authorization cover Belfor's efforts to discover, to remove, or to remediate mold (or its failure to do so). Indeed, if mold discovery, removal, and remediation were *not* covered in Belfor's "scope of work," Belfor would not be left "without a contract" as Plaintiffs contend [SAC ¶ 130], but rather the Work Authorization would expressly exempt Belfor for all liability related to mold.

Moreover, Plaintiffs themselves have admitted elsewhere in this litigation that "the specific terms of the EGSL Mold Remediation Protocol were incorporated by reference into Belfor's contract with the Wexlers, making the Mold Remediation Protocol terms material parts of the Belfor/Wexler contract" [Dkt. 214-4]. That admission is critical because the terms of the EGSL protocol explicitly direct Belfor to perform work with respect to the contents in Plaintiffs' home:

> [On first floor:] Moveable furniture, appliances, and items should be HEPA vacuumed, then sealed in polyethylene sheeting and removed from the containment prior to the start of remediation. These items should be professionally cleaned or discarded. …
>
> [On second floor:] Moveable fabric textile items should be machine washed or professionally cleaned. Upholstered items such as furniture or carpeting should be HEPA vacuumed and professionally cleaned.

[Dkt. 199-7 at 6-7]. It cannot be denied that "furniture," "appliances," "items," and "movable fabric textile items" constitute "contents" of Plaintiffs' home, or that the EGSL protocol "specifies" that Belfor's work includes such contents. The EGSL protocol resolves any alleged "disputed issues of fact" or "ambiguities" concerning the scope of the Work Authorization. Thus, the Work Authorization, via the EGSL protocol, expressly includes contents within its scope, which defeats Plaintiffs' argument against the economic loss doctrine.

Lastly, Plaintiffs contend the economic loss doctrine does not apply to a "sudden or dangerous

occurrence," and cite *Muirfield Village-Vernon Hills, LLC* v. *K. Reinke, Jr. & Co.*, 810 N.E.2d 235 (Ill. App. Ct. 2004), for the proposition that such exception applies to the mold growth here. Yet, as Plaintiffs acknowledge, *Muirfield Village* could help them only if Belfor's work fell "outside the scope of the Work Authorization" [Dkt. 210 at 19]. However, as discussed above, the Work Authorization covers all of Belfor's work, and therefore Plaintiffs cannot recover in tort for any damages, even if arising from a "sudden or dangerous occurrence." Indeed, Judge McShain previously considered this exact issue and made clear that, while *Muirfield Village* allowed a tort claim for work that was outside of the parties' contract, it barred tort claims for work covered by the contract, as that was a "classic economic loss" (even though the damage was from the purported "sudden or dangerous" mold growth). *Wexler I*, 2022 WL 279571, at *6 (citing *Muirfield Village*, 810 N.E.2d at 239, 249); [Dkt 50.]

**IV.     Conclusion**

For all the foregoing reasons, Defendant Belfor USA Group Inc.'s Motion for Partial Summary Judgment [Dkt. 192] is GRANTED. Summary judgment is hereby entered in Belfor's favor on Counts III, IV, V, and IX. Plaintiffs' breach of contract claim (Count VI) remains pending against Belfor.

All dates in Dkt. 230 remain set, including the trial set for 7/24/2025 through and including 8/1/2025. The parties are to file a joint status report on 3/3/2025 informing the Court regarding whether expert discovery was indeed completed by the 2/28/2025 deadline, and any other pertinent matters at that juncture.

**ENTERED: February 18, 2025**            _____
                                          Hon. Keri L. Holleb Hotaling,
                                          United States Magistrate Judge

15