UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMY WEXLER and KENNETH WEXLER, | ) |
| Plaintiffs, | ) |
| v. | ) No. 21-cv-2543 |
| CHUBB NATIONAL INSURANCE CO., and BELFOR USA GROUP, INC., | ) Magistrate Judge Keri L. Holleb Hotaling |
| Defendants, | ) |
| and | ) |
| CHUBB NATIONAL INSURANCE CO., | ) |
| Counterclaim Plaintiff, | ) |
| v. | ) |
| AMY WEXLER and KENNETH WEXLER, | ) |
| Counterclaim Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Defendant Chubb National Insurance Co. ("Chubb") moves for summary judgment [Dkt. 252] pursuant to Federal Rule of Civil Procedure 56, on Count I (Breach of Contract, Water Damage), Count II (Breach of Contract, Water and Mold Remediation), and Count VIII (Section 155 Relief) of Plaintiffs' (Amy Wexler and Kenneth Wexler; collectively, "Plaintiffs" or "the Wexlers") Second Amended Complaint ("SAC") [Dkt. 150]. For the reasons explained below, the motion is granted in part and denied in part.

**I.   Standard of Review**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In

determining whether there is a genuine issue of fact, the Court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018). In doing so, "[t]he court need [not] consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## II. Procedural History

In January 2021, Plaintiffs filed this suit in the Circuit Court of Cook County, Illinois, and Defendants later removed the case to this Court based on diversity jurisdiction. [Dkt. 1.] The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiffs are citizens of Illinois and Defendants are citizens of Colorado, Indiana, Michigan, and New Jersey. [Dkt. 1-1.] On September 7, 2021, the parties consented to the exercise of jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt. 29.] This case was originally assigned to Magistrate Judge McShain. It was reassigned to Magistrate Judge Holleb Hotaling as part of a routine calendar adjustment when Judge Holleb Hotaling assumed the bench on August 10, 2023. [Dkt. 119.]

On May 30, 2024, Judge Holleb Hotaling dismissed Counts VII (Tortious Interference with Contract against Chubb) and X (Civil Conspiracy against Chubb and Defendant Belfor USA Group Inc. ("Belfor")) of the SAC. [Dkts. 170, 171; *see also* Dkt. 191.] On February 18, 2025, Judge Holleb Hotaling granted summary judgment in Belfor's favor on Count III (Fraud in the Inducement), Count IV (Illinois Consumer Fraud Act), Count V (Negligence), and Count IX (Bailment) of the SAC. [Dkts.

2

240, 241.]

### III. Factual Background[1]

At all times relevant to this suit, the Wexlers owned and lived in a single-family home ("the Home") in Glencoe, Illinois, a near-north suburb of Chicago. During a thirty-six-hour period between January 29 and January 31, 2019, a catastrophic storm colloquially known as "the Polar Vortex" struck northern Illinois, and the Chicago metropolitan area experienced a temperature drop of over fifty degrees from 32°F to -20°F. [Dkt. 241.] Due to this severe temperature fluctuation, water service pipes at the Home burst and released water into the Home on February 1, 2019, causing damage to the Wexlers' property. [*Id.*]

Amy Wexler subsequently communicated with Plaintiffs' insurance broker, Aon, and Plaintiffs also filed a claim with their insurer, Chubb. [*Id.*] Also on February 1, 2019, Amy Wexler spoke with a representative of Belfor USA Group Inc., a water remediation company. [*Id.*] On February 7, 2019, Amy Wexler executed a Work Authorization, which authorized Belfor "to effect repairs [at the Home] on an Emergency Basis" and entitled Belfor to recover from Chubb for its work (or if Plaintiffs' insurance claim was denied, Plaintiffs would be "personally liable for all costs of services performed"). [Dkt. 214-4 (Work Authorization).]

On February 7, 2019, air quality and mold testing were conducted, and mold was found to be present in the Home. [Dkt. 241.] The Wexlers were informed of the mold and moved out of the Home on Monday February 11, 2019. [*Id.*] Plaintiffs have not lived in the Home since. [*Id.*]

Plaintiffs have not yet sought a building permit to perform repairs to the Home. [CSOF at

---

[1] The Court has adopted a portion of the factual background detailed here from its February 18, 2025 Memorandum Opinion and Order [Dkt. 241] granting Belfor's motion for partial summary judgment. Additionally, "CSOF" refers to Chubb's Statement of Material Facts [Dkt. 254]; "WR" refers to the Wexlers' response to Chubb's Statement of Material Facts [Dkt. 293]; "WAF" refers to the Wexlers' Statement of Additional Material Facts [Dkt. 293 at 20-23]; and "CR" refers to Chubb's response to the Wexlers' Statement of Additional Material Facts [Dkt. 302]. The Court also incorporates some facts supporting the Wexlers' contraposing motion for summary judgment against Chubb, because neither party mentioned certain facts dealing with Enservio in the briefs related to the instant motion and, thus, "WSOF" refers to the Wexlers' Statement of Material Facts [Dkt. 270 (unsealed); Dkt. 272 (sealed)].

¶ 38.] However, Plaintiffs hired an architect to prepare an assessment of what would be involved in either repairing the home as is/was or rebuilding. [WAF at ¶ 2.] The architect informed Plaintiffs that to prepare a repair or rebuild assessment, it would need the services of a contractor and structural engineer.[2] [*Id*.] Plaintiffs then paid for two structural engineers that subcontracted with the architect to prepare structural engineering drawings necessary for the repair and rebuild plans for the Home. [*Id*. at ¶ 4.] A structural evaluation was completed and then another firm was contacted to analyze the structural evaluation with an eye toward potentially preparing "Structural Repair Drawings" showing structural repairs necessary to repair the Home.[3] [*Id*.] The Wexlers had a general contractor use these drawings and specifications (which the general contractor described as "a guide of the repairs that needed to take place") to obtain bids from subcontractors and prepare a proposed construction budget based on walkthroughs of the Home with those subcontractors. [*Id*. at ¶ 6.] According to Chubb's Schedule of Payments, Chubb paid $50,000 to the Wexlers on March 26, 2019, as an "advance towards the necessary repairs." [Dkt. 255-2, Row 4.] The Schedule of Payments classified $25,000 of that amount as an "[a]dvance Payment towards architectural fees, designs, and permits." [*Id*. at Row 15.]

As to insurance coverage for Plaintiffs' loss, Plaintiffs' residence and contents were the subject of a Masterpiece Policy of Insurance issued by Chubb, bearing policy number 1146897 6-09 with an effective date range of September 1, 2018, to September 1, 2019 ("Policy"). [CSOF at ¶ 1.] The Policy contains two alternative measures of loss: reconstruction cost value ("RCV") and

---

[2] Plaintiffs subsequently fired their architect and he later testified that his design was never accepted by Plaintiffs: "we pursued several options, and [the Wexlers] just killed the project" because his design was "too contemporary." [Dkt. 278-3 at 95:8-19.]

[3] In the Fall of 2020, this firm, Goodfriend Magruder Structure, LLC ("Magruder"), presented to Plaintiffs drawings of latent defects in the Home that required repairs. [CR at ¶ 4; Dkt. 237 at 22:21-25:12.] These drawings were "an in-progress, not for construction set of drawings" that "was basically in the form of a construction document that is suitable for bidding and for permitting with the Village," rather than drawings that could be used to repair, replace or rebuild the Home. [*Id*.] Magruder had not been authorized to create "a remediation set of documents or repair documents." [*Id*.] In the Fall of 2020, Magruder was told "we'll get back to you when we decide what we're going to do." [*Id*.] Magruder confirmed that it has not heard from Plaintiffs since the Fall of 2020 and "no new work ever developed." [*Id*.]

reconstruction cost less depreciation or actual cash value ("ACV"). [*Id*. at ¶ 4.] RCV is defined in the Policy as "the lesser of the amount required at the time of loss to repair, replace or rebuild, at the same location, your house or any other permanent structure, using like design, and materials or workmanship of comparable kind and quality." [*Id*. at ¶ 5.] The Policy states "If you have a covered partial loss to your house or other permanent structure and do not begin to repair, replace or rebuild within 180 days from the date of loss or a later date if agreed to by [Chubb], we will only pay the reconstruction costs, less depreciation." [Policy, Dkt. 255-1 at 25.] The Policy also provides Extra Coverages for, among other things, "Mold Remediation Expenses," "Rebuilding to Code," and "Additional Living Expense," each covered as set forth in the Policy. [CSOF at ¶¶ 7, 10, 15, 46.]

Under the terms of the Policy, if there is a disagreement as to the "amount of loss" for a claim, either the insured or the insurer may invoke the Policy's appraisal clause, whereunder each party would select an appraiser and those two appraisers would select a third appraiser, who would "set the amount of loss" via "written agreement signed by any two of the three appraisers." [*Id*. at ¶ 2.]

As mentioned above, Chubb began making payments to Plaintiffs under the Policy as early as March 26, 2019. [Dkt. 255-2.] On May 7, 2019, Chubb claims adjuster Robert Paradis sent an email to the Wexlers stating that "[a]ll contents that can't be cleaned will be added to a total loss contents list. Chubb will hire a contents valuation company to assist with the creation of this inventory and pricing of same." [WSOF at ¶ 12.] On August 12, 2019, Chubb engaged a firm called Enservio "to evaluate the condition of [Plaintiffs' total loss list] and then create a total loss inventory for all of items deemed unsalvageable." [*Id*. at ¶ 16.] Enservio ultimately issued two "Total Loss Reports." [*Id*. at ¶ 17.] In a February 5, 2020 email, Paradis told Aon, the Wexlers' insurance broker, that "[a]s for the contents, the majority of the contents have been deemed a total loss, as they sat in a wet house for several months. To date, we have paid over $1M under their contents coverage and anticipate paying out the policy limits before we finalize this claim." [*Id*. at ¶ 18.] By February 18, 2020, Chubb knew

5

the Wexlers' "total loss inventory easily exceeds the policy limit" and the adjuster assigned to the file requested internal authority to pay Plaintiffs the "balance of contents policy limits." [WAF at ¶ 10.]

On April 23, 2020, Plaintiffs submitted a Proof of Loss to Chubb in the amount of $3,302,466.50. [*Id*. at ¶ 16.] On December 23, 2020, Chubb demanded an appraisal of Plaintiffs' insurance claim. [*Id*. at ¶ 17.] On January 25, 2021, Plaintiffs' counsel responded to Chubb's appraisal demand letter seeking clarification of the terms under which Chubb was seeking appraisal. [*Id*. at ¶ 18.] In response, on January 29, 2021, Plaintiffs filed the instant suit, which was removed to federal court on May 11, 2021. [Dkt. 1.] In October of 2021, Chubb filed a motion to compel appraisal [Dkt. 53] which Judge McShain granted on March 25, 2022 [Dkts. 57, 58]: "Plaintiffs and Chubb are ordered to participate in the appraisal process, and the appraisal award must be sufficiently itemized and segregated to enable the parties and the Court to identify the amount of loss (actual cash value and replacement cost) for all coverage categories, including the home itself, the contents of the home, additional living expenses ("ALE"), mold remediation, and rebuilding to code." [Dkt. 57.]

With respect to the Home appraisal, on March 1, 2023, the Appraisal panel entered an award (the "House Award") with regards to the "amount of loss" for the Home, ALE, mold remediation, and building to code. [CSOF at ¶ 24.] The House Award set the amount of loss for the reconstruction cost of the home at $921,472.04 (replacement cost value); depreciation at $92,236; reconstruction cost less depreciation (actual cash value) at $829,236.04; mold remediation at $36,480; code compliance at $32,350; and the period of restoration for ALE at 8 months. [*Id*.] (A separate Contents Award was issued on January 17, 2024 with regards to Plaintiffs' contents claim. [*Id*. at ¶ 32.])

Prior to the House Award, Chubb had compensated Plaintiffs and their vendors $521,319.85 for ALE for 26 months and 10 days, from January 31, 2019 until April 16, 2021. [*Id*. at ¶ 25.] This period included Plaintiffs' hotel expenses from January 31, 2019 to June 5, 2019, and a home rental from June 1, 2019 until April 16, 2021. [*Id*.] Although the Plaintiffs and Chubb debate by how much,

6

it is undisputed that the House Award was less than Plaintiffs' Proof of Loss and more than the amount paid by Chubb prior to the House Award's issuance. [*Id.* at ¶ 26; WR at ¶ 26.] Plaintiffs and Chubb also dispute how much Chubb has paid Plaintiffs on the Home claim and for ALE. *Compare* CSOF at ¶ 27, 28 *with* WR at ¶ 27, 28. Although Plaintiffs and Chubb agree Chubb has paid $10,000 towards mold remediation expenses, Plaintiffs "deny that the [$10,000] Policy limit with regards to mold remediation expenses is applicable due to waiver by Chubb." [WR at ¶ 29.] Upon receiving the House Award, Chubb issued an additional payment of $191,034.04 to Plaintiffs on March 29, 2023.[4] [CSOF at ¶ 30.]

Perhaps unsurprisingly, Plaintiffs and Chubb also disagree regarding the total amount Chubb has paid towards Plaintiffs' contents claim, either before or after the contents appraisal. [CSOF at ¶ 31, 33; WR at ¶ 31, 33.] That contents appraisal still had not taken place when Judge Holleb Hotaling took over the case. On September 26, 2023, the Court ordered the following: "per the Court's previous order entered 18 months ago [Dkt. 57], Plaintiffs and Chubb are ordered to complete the appraisal process pursuant to the appraisals clause of the parties' contract" and set a short-term date for that process to be completed. [Dkt. 122.] Plaintiffs and Chubb engaged in additional motion practice regarding the issue of damage to the contents, and on November 13, 2023, the Court held that "the appraisals are to identify the amount of loss (actual cash value and replacement cost) only, NOT damage or lack thereof." [Dkt. 137.] On January 17, 2024, the Appraisal panel entered an Award with regards to the contents claim ("Contents Award"). [CSOF at ¶ 32; Dkt. 146-1.] The Contents Award states that the replacement cost value of the contents is $1,843,422.83. [Dkt. 146-1.] Additionally, Chubb alleges it "overpaid the Contents claim by $36,879.19," which appears to stem in part from Chubb's "reclassifi[cation of some expense] payments back to indemnity payments."

---

[4] Because that check contained pre-printed "in settlement of" language upon its face, to preserve their rights, Plaintiffs insisted the check be reissued without this language. [CSOF at ¶ 30; WR at ¶ 30.] After much "back and forth" between counsel for Plaintiffs and counsel for Chubb, Chubb wired these additional funds to Plaintiffs on June 13, 2023. [*Id.*]

[Dkt. 253 at 3.]

IV. <u>Analysis</u>

Chubb moves for summary judgment on Count I (Breach of Contract, Water Damage), Count II (Breach of Contract, Water and Mold Remediation), and Count VIII (Section 155 Relief) of the SAC. Chubb argues its payment of the ACV of the House Award precludes Plaintiffs' Count I claim for breach of contract; that it does not owe Plaintiffs anything for RCV, Mold, Code, or ALE; and that it has paid its Contents Limit. [Dkt. 253 at 6-12.] The Court disagrees there is no issue of material fact related to this Count, as discussed below. Thus, the Court cannot grant Chubb summary judgment on Count I. Similarly, as addressed below, the Court cannot grant summary judgment in Chubb's favor on Count VIII of the SAC as there is a genuine issue of material fact related to whether Chubb's conduct in negotiating Plaintiffs' water loss was vexatious and unreasonable.

On the other hand, the Court agrees with Chubb that Count II of the SAC fails to state a legally viable cause of action for breach of contract based on Chubb's alleged "duty to ensure that water remediation was done properly." As discussed below, the Court dismisses Count II of the SAC.

    A. **Count I (Breach of Contract, Water Damage)**

        i. <u>**The Appraisal Clause is Not Binding**</u>

Chubb argues its payment of the ACV of the House Award precludes Plaintiffs' Count I claim for breach of contract. Plaintiffs wholeheartedly disagree.

Essentially, Chubb's argument treats the House Award's appraisal of ACV as final and binding. But, on March 25, 2022, this Court held that (i) the Policy requires the parties to engage in an appraisal before the Wexlers can move forward with their breach of contract and other claims, but (ii) the outcome of the appraisal is not binding on the parties. [Dkt. 58 at 9 *available at Wexler v. Chubb Nat'l Ins. Co.*, No. 21-cv-2543, 2022 WL 888944, at *6 (N.D. Ill. Mar. 25, 2022) ("[T]he appraisal clause simply explains the mechanics of how the appraisers will be chosen and that their

decision 'shall set the amount of the loss.' This language is not sufficient to make the appraisal binding on the parties.").] The rationale for the Court's holding was apparent: unlike the appraisal clauses in every appraisal case cited by Chubb (in 2021 and present) [*see* Dkts. 35; 253 at 7-8], the Chubb Appraisal Clause does *not* state that it is binding.

Faced with an Appraisal Clause that did not state that it was binding or that an appraisal award would be final, the Court followed existing Illinois law and held that "the insurer could not require the insured to accept the appraisers' decision as final without telling the insured that the decision would be final." [Dkt. 58 at 9 *available at Wexler*, 2022 WL 888944, at *6 (*citing DeGroot v. Farmers Mut. Hail Ins. Co. of Iowa*, 643 N.E.2d 875, 876 (Ill. App. Ct. 1994).] Judge McShain simply ruled that while the Appraisal Clause is non-binding, participation in the appraisal process was nevertheless required based on the terms of the Policy before Plaintiffs' breach of contract claim could proceed.

The fact that the appraisal process was required by the Policy and occurred pursuant to the Policy does not mean its outcome is binding or that compliance with the Appraisal Clause in these circumstances shields Chubb from Plaintiff's breach of contract claim. After operating for years under the Court's determination that the Appraisal Clause is not binding, *see SFG, Inc. v. Musk*, No. 19-cv-2198, 2021 WL 972887, at *1 (N.D. Ill. Feb. 10, 2021) (citing *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008)) ("there is a presumption against revisiting previously decided issues: 'under the law of the case doctrine, a court generally should not reopen issues decided in earlier stages of the same litigation.'"), there is no basis for the Court to reverse its position and rewrite the Appraisal Clause to include language it never contained. The Court will not interpret Plaintiffs' demand for an appraisal under the Policy as requesting an appraisal on terms not found in the policy, such as that the outcome is binding.

Thus, the Court will not grant Chubb summary judgment on this contract claim on the basis that Chubb has made payment on an amount it was not bound to pay.

### ii. A Jury Could Find Plaintiffs' Efforts as Beginning to Repair, Replace, or Rebuild

Next Chubb argues it is entitled to summary judgment on Count I of the SAC because it does not owe Plaintiffs further amounts unless Plaintiffs "begin to repair, replace or rebuild the damaged property within 180 days of the date of loss," which Chubb alleges they have not done. The Wexlers, on the other hand, have put forth ample evidence a jury could conceivably construe as "beginning to repair, replace or rebuild the damaged property."

Specifically, the Court finds it is an open issue of material fact whether the following activities constitute beginning to repair, replace or rebuild the damaged property:

- The Wexlers called an emergency plumber and sought remediation assistance from Belfor, who Plaintiffs understood was to restore/repair the Home to its pre-loss condition.

- In order to provide Chubb with a proof of loss with respect to the dwelling, the Wexlers hired an architect to prepare an assessment of what would be involved in either repairing the home as is/was or rebuilding. The architect informed Plaintiffs that to prepare a repair or rebuild assessment, it would need the services of a contractor and structural engineer. The Wexlers then paid for two structural engineers that subcontracted with the architect to prepare structural engineering drawings necessary for the repair and rebuild plans for the Home. A structural evaluation was completed and then another firm was employed to analyze the structural evaluation and prepare "Structural Repair Drawings" showing structural repairs necessary to repair the Home.

- The Wexlers had a general contractor use these drawings and specifications (which he described as "a guide of the repairs that needed to take place") to obtain bids from subcontractors and prepare a proposed construction budget based on walkthroughs of the Home with those subcontractors.

Moreover, according to Chubb's Schedule of Payments, Chubb paid $50,000 to the Wexlers on March 26, 2019 as an "advance towards the necessary repairs." Dkt. 255-2, Row 4. The Schedule of Payments also classified Chubb's payment of $50,000 for "necessary repairs" (of which $25,000 was an "Advance Payment towards architectural fees, designs, and permits.") Dkt. 255-2, Row 15. Plaintiffs argue these internal records constitute some evidence demonstrating Chubb believed its payments to retain architects and other design professionals were Reconstruction Cost payments that

10

apply against the Dwelling Limit rather than applying against an Extra Coverage and, thus, that Chubb considered these things "repair work." The Court finds this also constitutes an unresolved question of material fact.

Based on these facts, and others as articulated in Plaintiffs' response in opposition to Chubb's motion for summary judgment [Dkt. 291 at 5-12], the Court cannot grant summary judgment in Chubb's favor on this point.

### iii. Chubb is Not Entitled to Summary Judgment Regarding Its Obligations to Pay Additional Living Expense

Finally, the Court also finds an open question of fact as to the end date for which Chubb would have to pay Plaintiffs ALE or whether the ALE coverage amounts have been fully satisfied.

The ALE coverage within the Policy states it is limited to "two years from the date of loss or a later date if agreed to by us." Dkt. 255-2 at 11. Chubb agreed to extend its payments of ALE coverage past March 11, 2021, while Chubb and the Wexlers were negotiating the appropriate scope of work. SOAF-C ¶ 9.

Chubb has paid Plaintiffs an amount it contends more than satisfies the ALE potion of the House Award. Regardless, because the House Award has no binding effect, Chubb's payment of the Additional Living Expense portion of the House Award does not mean that Chubb did not breach the Policy. The Wexlers maintain that, because the House Award states that it would take eight months to perform all work on the Home, Chubb must pay ALE through November 1, 2023, eight months after the House Award was issued. This is a question of fact a jury must resolve.

### B. Count VIII (Section 155 of the Illinois Insurance Code)

In this case, the Wexlers allege Chubb delayed resolution of their insurance claim by invoking the Policy's appraisal clause. [Dkt. 150 at ¶ 85.] Plaintiffs also allege that Chubb vexatiously and unreasonably delayed settling their insurance claim by "relying on purposefully low estimates of the value of the[ir] damaged property (real and personal)." [*Id*. at ¶ 163.] Finally, Plaintiffs aver that

Chubb's contents appraiser unreasonably delayed the contents appraisal for more than a year. [Dkt. 150 at ¶ 170; *see also*, Dkt. 291 at 17 (citing Dkt. 93, Plaintiffs' motion to terminate the appraisal).]

The purpose of Section 155 of the Illinois Insurance Code, 215 ILCS sec. 5/155 is "to prevent the insurer from using its superior financial position to profit at the insured's expense." *Est. of Price v. Universal Cas. Co.*, 750 N.E.2d 739, 742-43 (Ill. App. Ct. 2001). The determination of whether an insurer's conduct is vexatious and unreasonable for purposes of Section 155 requires the Court to "consider the totality of the circumstances…including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his property." *Hultquist v. Nationwide Mut. Fire Ins. Co.*, No. 20-cv-5323, 2021 WL 12318981, at *3 (N.D. Ill. May 19, 2021) (citation omitted). An insurer who misrepresents facts, denies coverage after refusing to conduct an adequate investigation, and bases its decision upon speculation or incomplete information could be considered to have acted without reasonable cause. *Markel Am. Ins. Co. v. Dolan*, 787 F. Supp. 2d 776, 779 (N.D. Ill. 2011); *see also McGee v. State Farm Fire & Cas. Co.*, 734 N.E.2d 144, 151 (Ill. App. Ct. 2000) (awarding Section 155 damages where insurer conducted inadequate investigation and "refused to negotiate in good faith" in the appraisal process).

Here, the Court finds persuasive the reasoning and case law cited in Plaintiffs' response in opposition to Chubb's motion for summary judgment. [Dkt. 291 at 16-22.] In part, that persuasive reasoning comes from *Charter Props., Inc. v. Rockford Mut. Ins. Co.*, 119 N.E.3d 15, 23 (Ill. App. Ct. 2018), holding that a dispute about the cost of rebuilding did not foreclose a finding that an insurer breached Section 155 of the Illinois Insurance Code. As the *Charter Props* court explained:

> Defendant insists that section 155 sanctions are inappropriate because there was a *bona fide* dispute over the scope of coverage and the reasonable cost of rebuilding. The trial court disagreed. The long duration of the negotiations, and defendant's stalling tactics that plagued them, support the court's conclusion that the delay was unreasonable and vexatious. If insurance claims were commonly handled as defendant did this one, an insured would be compelled to repair the damage without knowing the extent to which

the insurer would cover the cost.

*Charter Props*, 119 N.E.3d at 23. In line with this case law, the Court can easily see how the trier of fact might resolve the open questions of fact to conclude that Chubb's conduct with regard to Plaintiffs' insurance claim constitutes "improper claims practices" (*see* 215 ILCS § 5/154.6(d)(e) and (h) listing those practices) with respect to Chubb's "*bona fide* dispute" over the scope of coverage and the reasonable cost of rebuilding the Home. As Plaintiffs point out, Chubb's 2020 claim notes show Chubb was treating the Wexlers' contents as a total loss and knew that the amount of loss exceeded the Policy's default contents limit; Chubb's February 18, 2020 files notes state that claims adjuster Robert Paradis was requesting payment authority of $158,918.40, which Chubb considered to be the "balance of contents policy limits" because the "[i]nsured's total loss inventory easily exceeds the policy limit." [WAF at ¶ 10; Dkt. 293-10 at CHUBB_025019.] Yet Chubb did not settle Plaintiffs' insurance claim pre-suit. There is also an open issue about the exact amount Chubb has paid toward Plaintiffs' contents limit, as laid out by Plaintiffs in Dkt. 291 at 20-21. But regardless of the amount paid, "payment alone does not defeat a claim for unreasonable delay under section 155," *Hultquist*, 2021 WL 12318981, at *3. And, further, the trier of fact may not accept Chubb's explanation about reclassification of some payments to Plaintiff, which may allow a finding that there was no bona fide dispute. *See Accord Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 362-65 (7th Cir. 1990) ("A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith."). Similarly, the trier of fact would have to grapple with and resolve the open questions surrounding the contents of Plaintiffs' home. Namely, that Chubb hired, paid, and controlled Enservio to prepare a "total loss" inventory, acknowledged that everything on the inventory was a total loss, and paid Plaintiffs a portion of the replacement cost of every item on the inventory, yet conversely alleged Plaintiffs breached the Policy by not preparing an inventory

13

of their own (which Plaintiffs allege was not necessary because Chubb had repeatedly told them everything on the inventory was a total loss, leading them to believe a separate inventory was unnecessary). Plaintiffs also allege that Chubb dragged out the contents appraisal for more than a year while the case was stayed without telling the Wexlers it believed the contents limit was exhausted (while also allegedly using as an exhibit, in a May 2024 deposition, a payment summary showing Chubb believed it had not paid the full contents limits)—conduct which will need to be considered to determine whether it was vexatious and unreasonable.

In sum, for the reasons more fully articulated in Plaintiffs' response in opposition to Chubb's motion for summary judgment [Dkt. 291 at 5-12], the Court will not grant summary judgment in Chubb's favor on Count VIII of the SAC.

C. **Count II (Breach of Contract for Water and Mold Remediation)**

Chubb also argues summary judgment is proper in its favor on Count II of the SAC. In Count II of the SAC, Plaintiffs allege Chubb breached a "duty to ensure that water remediation was done properly" by Belfor. [Dkt. 150, ¶ 101.]

However, nowhere in Count II, or anywhere in the SAC, do Plaintiffs identify where any such duty is owed by Chubb. [Dkt. 150.] Plaintiffs also do not identify any provision of the Policy that was allegedly breached by Chubb in support of Count II. [*Id.*] Instead, as Chubb points out, Plaintiffs appear solely to rely on Chubb's marketing materials to attempt to create this alleged duty. [*Id.* at ¶ 103.] However, Judge McShain already clearly and thoughtfully ruled that the referenced marketing materials are ***not*** relevant to Plaintiffs' claim since there is no allegation by Plaintiffs that the terms of the Policy are vague or ambiguous. [Dkt. 118, at 6-8; *see also*, the case law cited by Chubb in support of its motion for summary judgment at Dkt. 253 at 13.] Frankly, after Judge McShain's decision on this topic, the Court is surprised the parties are arguing this Count at this point in the

14

litigation.[5]

In opposition, Plaintiffs argue that "Chubb breached its payment obligations [by withholding payment to Belfor],[6] which resulted in more than the Wexlers being out of pocket for monetary damages." [Dkt. 291 at 16.] However, these contentions were not the basis of any allegation contained in Count II of the SAC. [Dkt. 150 at 28-29.] Plaintiffs' opposition fails to identify any material fact that supports Count II's actual allegation: that Chubb had and breached a "duty to ensure that water remediation was done properly" by Belfor. [Dkt. 150 at ¶ 101.] Further, Plaintiffs' opposition does not present any law or fact that satisfies their burden of proving that the Policy places some duty upon Chubb to ensure proper damage remediation.[7]

The Court will not create an extra-contractual "duty" for Chubb to have to select contractors, supervise their work, or perform repairs and remediation work. A duty cannot be created beyond the contract's terms, *Schweihs v. Chase Home Finance LLC*, 187 N.E.3d 1196, 1210-1211 (1st Dist. 2021), and these obligations are certainly not part of the Policy—the operative contract here. Because Count II of the SAC does not state a legally viable cause of action, Chubb is entitled to summary judgment on Count II.

## V. Conclusion

For all the foregoing reasons, Defendant Chubb National Insurance Co.'s motion for summary judgment [Dkt. 252] is granted in part and denied in part. Summary judgment is hereby entered in

---

[5] The Court notes that both Chubb's opening brief and Plaintiffs' response brief each contain a single paragraph devoted to this whole Count. The Court also notes that Plaintiffs did not move for summary judgment in their favor on this Count in their contrapositive motion for partial summary judgment against Chubb. [Dkt. 268.]

[6] As Chubb points out, Defendant Belfor has never asserted in this litigation that it is owed any money from Chubb.

[7] Although it has nothing to do with Chubb's duties under the Policy, the Court also acknowledges Plaintiffs' argument that the hardwood floor in the Home's kitchen was not removed because the activities of Belfor were controlled by Chubb. First, this theory that Chubb controlled the actions of Belfor was previously dismissed by the Court. [Dkts. 170, 171.] Second, in reality, Belfor's Rule 30(b)(6) corporate designee testified that work was performed when *both* Plaintiffs and Chubb agreed. [Dkt. 175:2-6.] And Plaintiffs failed to present any evidence of a situation where they provided approval for an activity but Chubb withheld its approval. Plaintiffs cannot survive summary judgment on Count II via this argument.

Chubb's favor on Count II of the Second Amended Complaint. Counts I and VIII remain pending against Chubb.

The in-person final pretrial conference in this matter remains set for July 15, 2025 at 1:00 p.m. in Courtroom 1700, 219 South Dearborn Street, Chicago, IL 60604. The trial remains set for July 24, 2025, through and including August 1, 2025.

**ENTERED: June 20, 2025**

_____
Hon. Keri L. Holleb Hotaling,
United States Magistrate Judge