UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMY WEXLER and KENNETH WEXLER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 21-cv-2543 |
| v. ) | |
| ) | Magistrate Judge Keri L. Holleb Hotaling |
| CHUBB NATIONAL INSURANCE CO., ) | |
| and BELFOR USA GROUP, INC., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| CHUBB NATIONAL INSURANCE CO., ) | |
| ) | |
| Counterclaim Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| AMY WEXLER and KENNETH WEXLER, ) | |
| ) | |
| Counterclaim Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Amy Wexler and Kenneth Wexler (collectively, "Plaintiffs" or "the Wexlers") move this Court under Federal Rules of Civil Procedure 37(c)(1) and 37(b)(2)(A) to exclude a calendar entry produced by Defendant Belfor USA Group, Inc. ("Belfor") as well as all evidence and testimony derived in any way from that document. [Dkt. 257.] For the reasons explained below, that motion is granted.

**I.   Standard of Review**

According to Fed. R. Civ. P. 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp.

3d 839, 960 (N.D. Ill. 2021) ("Untimely disclosures and discovery responses and supplements to them are generally not substantially justified or harmless…Indeed, supplements made after the close of fact discovery are by definition 'untimely.'"). Exclusion of such evidence is not discretionary; rather, "[t]he exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004); *see also*, *e.g.*, *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012), as amended (Feb. 2, 2012) ("non-disclosure was neither justified nor harmless"). Determining whether a failure to disclose had a substantial justification or is harmless is within the Court's broad discretion. And the Court "need not [even] make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). At the same time, the Seventh Circuit has supplied the following considerations for the exercise of that discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *David*, 324 F.3d at 857.

## II. Factual Background

At all times relevant to this suit, the Wexlers owned and lived in a single-family home ("the Home") in Glencoe, Illinois, a near-north suburb of Chicago. During a thirty-six-hour period between January 29 and January 31, 2019, a catastrophic storm colloquially known as "the Polar Vortex" struck northern Illinois, and the Chicago metropolitan area experienced a temperature drop of over fifty degrees from 32°F to -20°F. [Dkt. 241.] Due to this severe temperature fluctuation, water service pipes at the Home burst and released water into the Home on February 1, 2019, causing damage to the Wexlers' property. [*Id.*]

On February 1, 2019, Amy Wexler spoke with a representative of Belfor USA Group Inc., a

water remediation company, who offered to send someone to inspect the Home the next day, February 2, 2019. [*Id*.] Ultimately, several Belfor employees were involved in the remediation of the Home. Among them were Matt Endre, who was the general manager of Belfor's Northbrook, Illinois, office (the office responsible for the remediation work at the Home); Daniel Correa, who was an estimator at Belfor's Northbrook office; Bo Daniels, a Belfor project manager; and Ricardo Ford, who was "the production manager," which means he was "in charge of all the crews that get sent out to do mitigation work." [Dkt. 303-5 at 22:15-17; 46:16-18; 107:17-22; 177:15-19.] According to Belfor's Rule 30(b)(6) witness, Jeff Eyles, "under Rick Ford would be the technicians, the water technicians" who remediated the Home. [*Id*. at 108:1-6.] On the Wexler Home remediation, Daniels "was the on-site working supervisor/project manager that was overseeing the crews working on site," while Ford was "[i]n the office sending crews." [*Id*. at 177:11-19.]

To prepare for his testimony on April 28, 2023, Belfor's 30(b)(6) witness, Mr. Eyles, spoke in April 2023 with Endre, Daniels, and Ford. [*Id*. at 187:16-20.] All three were still employed by Belfor at the time that the 30(b)(6) witness spoke with them. [Dkt. 257-2.] This means that all three were employed by Belfor when this litigation commenced, when it was removed to federal court, and when discovery had begun in this Court.

Eventually Belfor placed air scrubbers into the Home to help remediate the water damage. Air scrubbers are devices that are placed into a room to remove impurities from the air. They suck air into one end, push the air through HEPA filters meant to capture impurities, and push out clean, purified air from the other end. Air scrubbers can be used in negative air pressure systems. Regarding negative air pressure systems, Belfor's 30(b)(6) witness explained, "We put that within the containment and then duct it outside usually, if there's a way to duct it outside, so you're not getting that -- the air that's in the area that we're working in putting it into the areas that we're not working in." [Dkt. 303-5 at 129:5-13.] Negative air pressure systems also create slight vacuums in a contained space such that

3

when a worker opens a containment zipper, the air inside of the contained space does not flow out into the rest of the home and carry mold and other impurities with it. [*Id*. at 129:21-30:4.] That is, according to the 30(b)(6) witness, negative air pressure prevented "[c]ross contamination." [*Id*. at 130:5-22.]

Belfor's 30(b)(6) witness reviewed invoices prepared by Belfor and submitted directly to Chubb for payment. The witness explained that these invoices were "a comprehensive itemized list of all the work that Belfor did on the home while it was engaged to remediate the mold and mitigate the water at the home." [*Id*. at 134:13-17.] The witness added, "[I]t was important for this to be comprehensive," because this was "supporting documentation from Belfor to Chubb for Chubb to pay Belfor for its work." [*Id*. at 134:18-135:1.] According to Belfor's 30(b)(6) witness, who had reviewed the invoices and spoken with Ford, Belfor first learned of airborne mold in the Home on February 8 but did not begin using air scrubbers in the Home for eleven more days, on February 19, 2019. [*Id*. at 171:1-72:4.] Because air scrubbers were needed to install a negative air pressure system, that meant that, according to Belfor's 30(b)(6) witness, no negative air pressure system was installed at least before February 19. Although asked open-ended questions about whether air scrubbers were installed before February 19 [*Id*. at 170-72], at no time did the 30(b)(6) witness say that Ford (or, anyone else) told him that air scrubbers or negative air pressure systems were delivered or installed before that date. Indeed, there is no evidence air scrubbers *were* installed and operational before that date.

The instant motion concerns a calendar entry [Dkt. 257-1 at p. 4] made by Belfor employee Ricardo Ford, which was allegedly drafted in connection with Belfor's work on the Home. Below is that (rather cryptic) calendar entry.



On December 13, 2024—nearly three years *after* fact discovery originally was scheduled to close, and more than seven months *after* fact discovery finally closed—Belfor for the first time produced to Plaintiffs the calendar entry; Belfor did not produce the calendar entry in its initial production or in any subsequent production prior to the close of fact discovery on May 4, 2024. At all times between when the Wexlers issued their October 2021 production request that could and should have covered the calendar entry, and the close of fact discovery, Ford was employed by Belfor

[Dkt 257-2], meaning that the calendar entry was in Belfor's possession, custody, and control. Moreover, even though Belfor's restoration and remediation expert, Cara Driscoll, referred to Ford's declaration in her November 4, 2024, expert report, Belfor did not produce that declaration until it produced Driscoll's expert rebuttal report. Thus, "the Wexlers had no idea until Belfor produced their [expert] rebuttal report and declaration that the declaration attached and was supported by" the calendar entry. [Dkt. 257 at 5.]

Ford's declaration is dated November 1, 2024, [Dkt. 257-1] and relies on his calendar entry. Ford stated in his declaration that "[o]n February 11, 2019, I personally delivered two air scrubbers to the [Home]," and that "[i]n reviewing my desk calendar from February 2019, it shows a note reflecting that two scrubbers were provided to the [Home] on February 11, 2019." [*Id.* at ¶¶ 4, 7.] Driscoll, meanwhile, admitted she never spoke with Ford before providing her expert opinions.[1] [Dkt. 315-5 at 11:13-14.] Instead, she testified she relied on Ford's declaration to conclude that Belfor delivered and used[2] air scrubbers at the home beginning on February 11, 2019, contrary to the testimony of Belfor's 30(b)(6) witness. [*Id.* at 40:5-17, 162:4-63:21.]

### III. Analysis

Plaintiffs argue that the calendar entry and any evidence derived from the calendar entry are of particular importance; to wit, this evidence is "critical to Belfor's opposition to summary judgment, as Belfor believes that the calendar entry and derivative evidence create a fact question concerning whether Belfor timely delivered and installed air scrubbers in the home on February 11, one of several steps that the Work Authorization and EGSL Mold Protocol required [of] Belfor." [Dkt. 257 at 6.]

---

[1] Despite Driscoll's testimony she never spoke with Ford, the Wexlers intimate there may have been conversation(s) between the two. [*See* Dkt. 301 at 2.] Belfor's response brief further muddies the issue. [*See* Dkt. 285 at 3 ("Ford himself did not know the calendar contained information relevant to this case until he consulted it in connection with an inquiry initiated at the behest of Belfor's expert, Ms. Driscoll, during the preparation of her report.").]

[2] The Court notes that Ford's declaration says nothing about *using* air scrubbers at the home on February 11, 2019 [*see* Dkt. 257-1]—this is merely an unsupported logical leap made by Driscoll.

Plaintiffs further detail how Belfor's late disclosure was neither substantially justified nor harmless. The Court agrees, as discussed below.

### A. Belfor's Non-Disclosure Was Not Substantially Justified

Belfor alleges it did not produce the calendar originally because "[u]nbeknownst to Belfor during fact discovery, Ricardo Ford maintained a desk calendar in 2019…" and that the calendar "does not constitute a formal business record." [Dkt. 287 at 2.] Belfor also offers the excuses that "[b]ecause that calendar is in hard copy, it was not identified in Belfor's electronic searches" and "because it was not specific to the project for Plaintiffs (or any other project), Belfor's hard-copy job file for Plaintiffs did not contain it." [*Id*. at 3.] And, finally, Belfor also notes that "Ricardo Ford himself did not know the calendar contained information relevant to this case until he consulted it in connection with an inquiry initiated at the behest of Belfor's expert, Ms. Driscoll, during the preparation of her report." [*Id*.]

Yet Belfor's Rule 30(b)(6) representative, Mr. Eyles, testified nearly two years before Cara Driscoll prepared her report [*compare* Dkt. 303-5 *with* Dkt. 315-5] and gave information contrary to what the calendar entry purportedly represents. A Rule 30(b)(6) deposition, such as the one Mr. Eyles sat for, is about collective corporate knowledge, not personal knowledge. The text of the rule confirms the point: the witness testifies about information "known or reasonably available to the organization." *See* Fed. R. Civ. P. 30(b)(6). Specifically, "the witness gains knowledge by preparing before the deposition, and then answers questions at deposition based on the corporate knowledge of the entity itself." *Kraft Foods Glob., Inc. v. United Egg Producers, Inc*., No. 11-cv-8808, 2023 WL 5647204, at *8 (N.D. Ill. Aug. 31, 2023). A corporate party "has a duty to make a good faith, conscientious effort to designate appropriate persons and to prepare them to testify fully and non-evasively about the subjects" identified in a Rule 30(b)(6) notice. *Seaga Mfg., Inc. v. Intermatic Mfg. Ltd.*, No. 13-cv-50041, 2013 WL 3672964, at *2 (N.D. Ill. July 12, 2013). "Rule 30(b)(6) imposes a duty

upon the named business entity to prepare its selected deponent to adequately testify not only on matters known by the deponent, *but also on subjects that the entity should reasonably know*." *Smithkline Beecham Corp. v. Apotex Corp.*, No. 98-cv-3952, 2000 WL 116082, at *8 (N.D. Ill. Jan. 24, 2000) (emphasis added). Mr. Eyles's deposition was a crucial deposition to Plaintiffs so that they could solidify Belfor's collective knowledge about the events in question. It appears to the Court that Mr. Eyles, in preparing to sit for his Rule 30(b)(6) deposition, could and should have asked Mr. Ford about anything he did in relation to the Wexler job, which was part of Belfor's collective knowledge; per Rule 30(b)(6), Belfor was required to have Ford inform the 30(b)(6) witness of all of the company's information, including that Ford allegedly independently recalled (this alleged recall is addressed *infra*) having delivered two air scrubbers on February 11. But Belfor clearly did not ensure that Ford conveyed that information to the 30(b)(6) witness.

Moreover, the Court is not persuaded that Ford had any independent memory of delivering the air scrubbers on February 11 and, thus, Ford's declaration *necessarily relies* on the calendar entry. [*See also*, Dkt. 257-1 at ¶ 7.] Plaintiff's arguments regarding Ford's alleged independent recall are wholly persuasive and adopted by the Court. [Dkt. 301 at 9-10.] Specifically, if Ford indeed had a memory in April 2023 of having delivered two air scrubbers on February 11, then Belfor's attorneys had an obligation under Rule 30(b)(6) to make sure Ford communicated this fact to its 30(b)(6) witness Eyles, and Belfor's attorneys had an obligation to otherwise inform Eyles of that fact. But Ford did not convey to Eyles in April 2023 that he recalled having delivered two air scrubbers on February 11. Eyles testified that in April 2023, two days before his deposition, he spoke with Ford in preparation for his Rule 30(b)(6) deposition. [Dkt. 303-5 at 187:10-22.] The Wexlers asked Mr. Eyles about when Belfor began using the air scrubbers at the home. Had Ford told Eyles in April 2023 that Ford had a memory of delivering two air scrubbers to the home, Ford would have told Eyles, and Eyles would have testified to that fact during his Rule 30(b)(6) deposition. But Eyles did not give any

8

testimony *even remotely suggesting* that Ford said anything about the air scrubbers having been delivered before February 19. Ford did not say so either because Ford in fact did not have that independent memory or because Belfor's attorneys knowingly violated 30(b)(6) and deliberately failed to prepare the 30(b)(6) witness for that testimony (the latter of which the Court does not believe is the case, because this testimony would clearly have been helpful to Belfor concerning whether it satisfied one of the critical terms of the EGSL Mold Remediation Protocol).

Next, the Court turns to Belfor's Hail Mary assertion that the calendar entry was not a "formal business record." The Court is not familiar with the term "formal business record." The Federal Rules of Evidence do not make any distinction based on the formality of a record, focusing instead on whether a document was created and kept in the regular course of business. *See* Fed. R. Evid. 803; Fed. R. Civ. P. 34. It is plain to the Court that Ford's paper desk calendar and the entries contained within it is a "Document" properly requested by the Wexlers during fact discovery that was in Belfor's possession, custody, or control. Specifically, the Wexlers written document request sought "[a]ll Documents memorializing all work done by BELFOR on the Home." [Dkt. 257-3 at 8.] The Wexlers defined "Documents" to "have the same meaning ascribed to that term as used in Rule 34 of the Federal Rules of Civil Procedure." [*Id.* at 2.] Rule 34 defines "Document" to include "*writings*, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—*stored in any medium from which information can be obtained* either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A) (emphasis added). The Wexlers further defined the term:

> 'Documents' includes, *without limitation, all original documents* and non-identical copies (whether different from the originals by reason of notation made on such copies or otherwise), letters or otherwise prepared correspondence, communications, computer files, emails, electronic claim notes, computer printouts, photographs, video recordings, text messages, multimedia messages, and data compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form, irrespective of whether the 'Documents' are printed,

9

> recorded, reproduced by any process, or written or produced by hand, which are *in the possession, custody, or control of BELFOR* and its attorneys, representatives or anyone acting for or on its behalf. 'Documents' also include copies (whether or not identical to the originals) when the originals are not in BELFOR's possession, custody, or control.

*Id*. at 3 (emphasis added). Nowhere did Plaintiffs ever limit their document request to "formal business records"; that language is now made up by Belfor. It is a poor justification, one that the Court does not consider substantial.

Finally, as to any of Belfor's purported justifications for its failure to turn over the calendar entry in the normal course of fact discovery, as Plaintiffs point out, "[t]hese reasons are not supported by any evidence in the record. Belfor did not attach to its Response a declaration from anyone" in support of any of its statements. [Dkt. 301 at 2.] "That is, Belfor does not provide a declaration or any other evidence that explains the searches it ran, the hard-copy review it performed, what the non-privileged conversation [if any] between Ford and Driscoll entailed that caused the calendar to be discovered, or to what extent Belfor's lawyers spoke with Ford about documents in his possession before the conversation the lawyers arranged between Ford and Driscoll." [*Id*.] These things certainly would have helped the Court in determining whether Belfor had substantial justification in withholding the calendar entry for so long, but they are not part of this record.

Considering the facts before the Court, the Court cannot conclude Belfor's failure to turn over the calendar entry sooner was substantially justified. Since "[t]he exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless" *Musser*, 356 F.3d at 758; *Tribble*, 670 F.3d at 760, the Court now turns to whether Belfor's non-disclosure was harmless.

### B. Belfor's Late Disclosure Was Not Harmless

While Belfor argues its claims "demonstrate" that its "failure to produce the calendar during fact discovery was neither willful nor in bad faith" [Dkt. 287 at 3], this is of no moment. Whether

10

Belfor acted in bad faith or willfully is irrelevant. Absence of "bad faith" is not the standard for exclusion under Rule 37(c)(1); the standard is "substantial justification" and "harmlessness." Fed. R. Civ. P. 37(c)(1). (The Court can, however, take any alleged bad faith into consideration when determining the appropriate remedy for a non-disclosure/late disclosure that is neither substantially justified not harmless. *David*, 324 F.3d at 857.)

The Wexlers have alleged the following harms stemming from the late disclosure of the calendar entry:

> The Wexlers did not have an opportunity to depose Belfor's 30(b)(6) witness about the calendar entry, where it was kept, how it was identified by Ford or another Belfor employee, what Belfor's position is concerning what the scribbling on the calendar might say, who wrote the scribbling, when was it written, and what steps Belfor took to confirm whether the scribbling was accurate or conflicted with other Belfor documents.

> Because Plaintiffs obtained the testimony of Belfor's 30(b)(6) witness in April 2023—more than 18 months before Belfor produced the calendar entry—Plaintiffs had no reason to seek Ford's deposition during fact discovery.[3] Plaintiffs allege (and the Court has no reason to doubt) that had Belfor produced the calendar entry during fact discovery, they would have deposed Ford concerning the calendar entry, whether and how he confirmed supposed delivery of the air scrubbers, and what knowledge he had about whether either scrubber ever was installed, turned on, or used in a negative air pressure system in the Wexlers' home.

> The Wexlers argue that Belfor has now been able to craft a one-sided declaration for Ford (based on his review of the calendar entry), which they would not have been able to do if had the Wexlers had the opportunity to examine him regarding the calendar entry.

> The Wexlers were unable to show the calendar entry and Ford's testimony to their expert, Steven Rush. Rush, then, would have had this information—including information from Ford on whether he disavowed any knowledge of whether the air scrubbers actually were delivered or how the air scrubbers were used (if at all)—in forming his opinions in this case. The Wexlers point out the inequality in the fact they had no access to the calendar entry during expert discovery but that Belfor was able to show the calendar entry and Ford's derivative declaration to its own expert, Cara

---

[3] Plaintiffs point out that they did serve Belfor with a notice to depose Ricardo Ford, on January 19, 2022. [Dkt. 301-3.] However, as is their right, the Wexlers chose to reorder their depositions to begin with the Belfor 30(b)(6) witness, and when the 30(b)(6) witness *with corporate knowledge* admitted Belfor did not install air scrubbers until February 19, the Wexlers chose to withdraw their deposition notice for Ford. [Dkt. 301 at 6.]

11

> Driscoll, in advance of her initial report.[4]
>
> Finally, Plaintiffs argue they have been prejudiced because until Belfor produced the Ford declaration and calendar entry, Belfor had no evidence that Belfor delivered, much less installed and used, air scrubbers at the home before February 19, 2019. To the contrary, the only evidence in the record on this point came from Belfor's 30(b)(6) witness, who admitted that Belfor did not use air scrubbers (much less install a negative air pressure system) until February 19, 2019. [Dkt. 303-5 at 170:16-172:4.] The late-produced calendar entry and Ford's derivative declaration are the only documents that Belfor can claim says otherwise, which Plaintiff feel is the crux of Belfor's case.

[Dkt. 301 at 6-7.]

Ultimately, Belfor held off providing Ford's declaration to the Wexlers until after it was too late for the Wexlers to take any discovery on it or even allow Rush to consider it in forming his own opinion. The Court considers these results harms that cannot be rectified at this late stage of the litigation.

## IV. Conclusion

As discussed herein, because the failure to timely produce Riccardo Ford's calendar entry was neither substantially justified nor harmless, the exclusion of the calendar entry and all evidence derived from it is mandatory. *Musser*, 356 F.3d at 758; *Tribble*, 670 F.3d at 760. It should have been clear to Belfor from the outset that Ford's calendar entry (and his testimony concerning the same) might be significant; "their failure to [produce the calendar entry] at the appropriate time cannot be laid at anyone else's doorstep." *Bronk v. Ineichen*, 54 F.3d 425, 432 (7th Cir. 1995). The Court cannot find that Belfor's late production of the calendar entry is either justified or harmless. Thus, the

---

[4] Plaintiffs argue that this scenario evinces Belfor's willfulness and bad faith in delaying an extra month and a half from when it discovered the calendar entry until the time Belfor finally turned it over to Plaintiffs. Specifically, Plaintiffs note that Driscoll testified she was shown the Ford Declaration and calendar entry before she completed her report. [Dkt. 315-5 at 40:5-42:4.] She explicitly included reference to Ford's Declaration in her list of considered materials in her initial report in early November 2024 [Dkt. 261-17 at 5], yet Belfor did not produce the Ford declaration or the calendar entry until December 13, 2024 [Dkt. 287-2 at 1]. In withholding the calendar entry from the Wexlers during this crucial month when the Wexlers' expert Steven Rush was drafting his rebuttal report to Driscoll, Belfor (strategically or not) kept the Ford declaration and calendar entry from Rush. As Plaintiffs point out, "[h]ad Belfor produced the Purported Calendar Entry and Ford's declaration with Driscoll's initial report, at the very least, Rush could have responded then. Belfor made sure that Rush did not have that opportunity." [Dkt. 301 at 5.]

12

Wexlers' motion [Dkt. 257] to exclude is granted. The Court must exclude the calendar entry [Dkt. 257-1 at p. 4] and all derivative evidence from it (including but not limited to Ford's declaration [Dkt. 257-1] and any portion of Cara Driscoll's report or rebuttal report relying on Ford's calendar entry or declaration).

**ENTERED: June 20, 2025**

                                              Hon. Keri L. Holleb Hotaling,
                                              United States Magistrate Judge