**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

AMY WEXLER and KENNETH WEXLER, )
)
Plaintiffs, )
) No. 21-cv-2543
v. )
) Magistrate Judge Keri L. Holleb Hotaling
BELFOR USA GROUP, INC., )
)
Defendant. )

**MEMORANDUM OPINION AND ORDER**

Defendant Belfor USA Group Inc. ("Belfor") now moves the Court, under the single-recovery rule, to reduce the damages awarded at trial to Plaintiffs (Amy Wexler and Kenneth Wexler; collectively, "Plaintiffs" or "the Wexlers") for damages to their house and contents, and for alternative living expenses, by amounts received from the Wexlers' insurer, Chubb National Insurance Company ("Chubb") (the "Motion") [Dkt. 451]. For the reasons explained below, the Motion is GRANTED.

I.     **Material Facts**

At all times relevant to this suit, the Wexlers owned and lived in a single-family home ("the Home") in Glencoe, Illinois, a near-north suburb of Chicago. [Trial Transcript ("TT") at 255:23-25.] During a thirty-six-hour period between January 29 and January 31, 2019, a catastrophic storm colloquially known as "the Polar Vortex" struck northern Illinois, and the Chicago metropolitan area experienced a temperature drop of over fifty degrees from 32°F to -20°F. [*See* Dkt. 241 at 3.] Due to this severe temperature fluctuation, water service pipes at the Home burst and released water on February 1, 2019, causing damage to the Wexlers' property. [TT at 77:6-9.]

After the water damage was discovered on February 1, 2019, Amy Wexler contacted a plumber and turned off the water. [TT at 66:14-25.] Amy Wexler subsequently communicated with Plaintiffs' insurance broker, Aon, and Plaintiffs also filed a claim with their insurer, Chubb [TT at

73:16-74:7; 260:5-9.] On February 1, 2019, Amy Wexler spoke with a representative of Belfor, a water remediation company, who offered to send someone to inspect the Home the next day, February 2, 2019. [TT at 80:11-25.]

A Belfor estimator, Daniel Correa (whose duties include conducting the initial inspection, providing estimates of cost and time, and arranging for the execution of work authorizations), met with Amy Wexler at her home on February 2, 2019. [TT at 80:24-81:9; TT at 880:3-16; Dkt. 241 at 4.] Correa took moisture readings, informed Amy Wexler which rooms were affected, determined the materials that would need to be removed from the Home, and described a plan of action for the work to be done. [TT at 890:23-892:19; TT at 903:6-24; Dkt. 241 at 4.] Correa walked through the Home with Amy Wexler and showed her damage that she had not previously noticed, including damage to the kitchen ceiling, between the kitchen cabinets and countertops, to the dining room ceiling, the office closet and powder room, behind the kitchen appliances, to her daughter's closet, and in the family room. [TT at 81:14-83:17; Dkt. 241 at 4.] Correa collected enough information about damage to the Home on February 2, 2019 to create a work order. [TT at 899:25-900:20.]

Correa testified he informed Amy Wexler during the initial inspection that Belfor was very busy because of the Polar Vortex and estimated he could get "boots on the ground" to begin work at the Home in two weeks. [TT at 893:8-895:22.] Conversely, Amy Wexler testified that Correa told her on February 2, 2019 he was coming back on Monday, February 4, 2019 [TT at 84:1-11] (when Belfor attempted to impeach her on this point, Amy Wexler admitted that it was her "understanding" Belfor would arrive on Monday, but she could not quote Correa on this point [TT at 195:15-199:3]). Regardless, Belfor failed to show up at the Home on Monday, February 4, 2019. [TT at 84:1-15; TT at 272:8-15.] Plaintiffs did not contact Belfor or any other remediation firms on February 4, 2019. [TT at 272:23-25; Dkt. 241 at 4.] On the morning of February 5, 2019, Kenneth Wexler called Belfor and left a message asking Correa to return his call. [TT at 273:1-13; Dkt. 241 at 4.] On February 5,

2

2019, Belfor assigned a job number to the Wexler project and Correa also ordered testing company EGSL to go to the Home and conduct an asbestos test. [TT at 896:17-899:9.]

On February 7, 2019, Correa returned to the Home where Amy Wexler executed a Work Authorization, which authorized Belfor "to effect repairs [at the Home] on an Emergency Basis" and entitled Belfor to recover from Chubb for its work (or if Plaintiffs' insurance claim was denied, Plaintiffs would be "personally liable for all costs of services performed"). [TT at 85:22-87:12; Trial Exhibit 22.] At the time Amy Wexler signed Belfor's Work Authorization on February 7, 2019, she was aware that mold can begin forming within 24-48 hours of water damage, and significantly more than 48 hours had passed since the pipes had burst in the Home some six days earlier. [TT at 80:11-82:14; TT at 89:4-90:12.] Belfor did not begin any work at Plaintiffs' home until after Amy Wexler signed the Work Authorization. [TT at 89:4-90:3; 880:17-24.]

Also on February 7, 2019, air quality and mold testing were conducted, and mold was found to be present. [TT at 289:19-290:7.] The testing company subsequently provided a Mold Remediation Protocol. [*See* Belfor Trial Exhibit 5, EGSL Report.] The terms of the EGSL Mold Remediation Protocol were incorporated by reference into Belfor's Work Authorization. [Trial Exhibit 22; Dkt. 241 at 5.] The Wexlers were informed of the mold and moved out of the Home on February 11, 2019. [TT at 96:19-25; TT at 294:25-295:13.] They have not lived in the Home since moving out. [TT at 297:5-9; TT at 369:17-370:1.]

Plaintiffs sued both Chubb and Belfor (with Chubb clearly being the lead Defendant), but Plaintiffs settled with Chubb on the eve of trial [*see*, *e.g.*, Dkt. 401 (Belfor's July 23, 2025 motion to compel production of the Wexler/Chubb settlement agreement)]. Thus, the only triable issue was the single breach of contract count against Belfor (Count VI of the Second Amended Complaint). [*See* Dkt. 381.] The trial took place July 24-August 4, 2025. The Confidential Settlement Agreement ("Settlement Agreement") between Chubb and the Wexlers was executed in counterparts on July 29,

3

2025 (the Wexlers) and July 31, 2025 (Chubb).[1] The Settlement Agreement relates to the parties' "disagree[ment] about the amount of coverage that Chubb owed [Plaintiffs] for the Claim" submitted "to Chubb under the Policy for covered water damage to their home and contents resulting from the Burst Pipe Incident."

As to the value of Plaintiff's Home, Chubb completed a September 2016 appraisal of the Home (excluding the land on which it sat) and determined that the cost to rebuild the Home at that time was $2,164,683. [TT at 466:2-468:1; TT at 468:7-19.] At trial, Kenneth Wexler also testified as to the value of the Home. He testified that as of September 1, 2018, the Chubb insurance policy itself put a replacement cost value of the Home (not including the land on which it sat) at $2,423,000 and the contents at another $1,211,500. [TT at 221:11-20; Trial Exhibit 1 (Chubb Masterpiece Policy, Coverage Summary Renewal at p. 1).] Kenneth Wexler also testified that in his lay person's opinion (which was based largely on a Redfin notice he received), he believed his Home, in its non-gutted state, was worth $2.5 million dollars.[2] [TT 255:17-259:2; TT at 307:5-10.]

At trial (but outside the presence of the jury), the Court was presented with Chubb's Statement of Loss, a summary that Bob Paradis, an executive general adjuster for complex property claims with

---

[1]    The Court ordered, and was provided, a copy of the Wexler/Chubb Confidential Settlement Agreement on October 30, 2025 in connection with its review of this Motion [*see* Dkt. 460]. The confidentiality of a settlement agreement is not typically an order of the court. *See, e.g., Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 297 (4th Cir. 2000). It is not here. While "trial courts have authority to protect confidential settlement agreements [upon a good cause examination], only the fact that the parties agreed to keep the settlement agreement confidential is an insufficient basis for the Court to seal a court record." *Atl. Wave Holdings, LLC v. Cyberlux Corp.*, No. 3:24-CV-00482-RBM-VET, 2024 WL 3367585, at *2 (S.D. Cal. July 10, 2024) (cleaned up; citations omitted); *see also*, *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1212 (9th Cir. 2002). Therefore, while the Court has endeavored to keep most of the terms of the Wexler/Chubb Confidential Settlement Agreement confidential (including not ordering it to be publicly filed on the docket), that was not wholly possible within the bounds of its directives in deciding this Motion; it is by necessity that the Court cites to some settlement terms here, including the amount of the settlement, as that amount is key to the Court's analysis of whether the Wexler's have received a windfall.

[2]    Kenneth Wexler based his lay opinion on real estate values on Redfin and Zillow estimates [TT at 256:20-257:15; TT at 258:22-259:2; TT at 307:5-10]. Very generally, for the Court's purposes here, Redfin and Zillow are companies that each operate websites publishing information about real estate derived using automated valuation models, including the estimated fair market value for individual homes (which, presumably, *do* include the appurtenant land, or these estimates would be otherwise useless as a real estate tool for the lay person to whom they are marketed) *See, e.g., Patel v. Zillow, Inc.*, No. 17-cv-4008, 2017 WL 3620812 (N.D. Ill. Aug. 23, 2017), aff'd, 915 F.3d 446 (7th Cir. 2019); *Compass, Inc. v. Zillow, Inc.*, No. 25-cv-05201 (JAV), 2026 WL 321084 (S.D.N.Y. Feb. 6, 2026).

Chubb, maintained in the regular course of business that reflected the amounts that Chubb had paid in connection with the Wexlers' insurance claim for the damages sought by the Wexlers in this lawsuit. [TT at 481:21-482:11, 500:19-506:9.] The Statement of Loss revealed that Chubb paid $1,248,379.19 in connection with the Wexlers' dwelling, $1,258,023.03 in connection with the Wexlers' contents, $521,319.85 in additional living expenses ("ALE"), and an additional $10,000 in coverage for mold. [Belfor Trial Ex. 319; Trial Transcript at 529:3-11.] These payments tallied together come to $3,037,722.07. Mr. Paradis explained that these amounts[3] included both payments that Chubb made directly to Plaintiffs and payments that Chubb made to vendors on Plaintiffs' behalf. [Trial Transcript at 502:13-20; 503:10-19.] The Statement of Loss is also supported by a separate declaration made by Mr. Paradis. [Dkt. 255-2.]

At the conclusion of the jury trial in this matter, on August 4, 2025, the jury returned a verdict in favor of Plaintiffs in the total amount of $825,000—allocated as follows: HOME: $600,000; PERSONAL PROPERTY (CONTENTS): $150,000; PERSONAL PROPERTY (CONTENTS) FINE ARTS, BOOKS, AND COLLECTIBLES: $0; and ADDITIONAL LIVING EXPENSES: $75,000. [Dkt. 438 at 3].

## II.      Standard of Review

"Illinois adheres to the single recovery principle, which 'holds that there may not be more than one recovery of damages for a single, indivisible injury'" *Doctors Hosp. of Hyde Park, Inc.*, 494 B.R. 344, 358 (Bankr. N.D. Ill. 2013). "The law is clear: 'For one injury there should only be one recovery irrespective of the availability of multiple remedies and actions.'" *Federal Ins. Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277, 296 (2009) (quoting *Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 422 (2002)). Or put another way, "a plaintiff is only entitled to a single recovery for a single injury, regardless of how many defendants could be liable for that single injury, or how many

---

[3]    Obviously apart from any payments made under the Wexler/Chubb Settlement Agreement.

different theories of recovery could apply to that single injury." *Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 900 F.3d 377, 383 (7th Cir. 2018) (*citing Swanigan v. City of Chi.*, 881 F.3d 577, 582 (7th Cir. 2018)). As a result, when a plaintiff receives compensation for an injury from one party, that reduces the damages it can seek from any other party. As the Illinois Appellate Court explained:

> What [defendant] is seeking is, in essence a bare reduction of damages received by [plaintiff] from another source. In tort cases, a payment by one tortfeasor diminishes a plaintiff's claim against all other tortfeasors responsible for the same harm in order to ensure that the plaintiff receives only one satisfaction for any one injury. A similar rule applies in contract cases. The purpose of contract damages "is to place the nonbreaching party in the position he would have been in had the contract been performed, but ***not to place him in a better position or provide him with a windfall recovery***." The underlying current behind both rules is that a plaintiff's claimed damages are to be reduced by any payments he has received in compensation for the same harm or injury. The key here is same harm or injury.

*Binney*, 393 Ill. App. 3d at 295-96 (emphasis in original) (citing *Hentze* v. *Unverfehrt,* 237 Ill. App. 3d 606, 612-13 (1992) (other citations omitted by *Binney*).[4] Indeed, this Court held similarly in support of its denial of Plaintiff's motion *in limine* to bar evidence of insurance claim payments to Plaintiffs, stating:

> As this Court has already noted, [i]t is "a fundamental rule that contract damages are supposed to compensate for a loss and not provide a windfall" because "the plaintiff is not to be put in a better position than it would have been had the defendant performed the terms of the [contract]." *Bowes v. Saks & Co.*, 397 F.2d 113, 116, 119 (7th Cir. 1968).

[Dkt. 397 (July 21, 2025 Order (the "July 21 Order")).]

Under Illinois law, "'[t]he general rule of contract damages is that the person who is injured is to be placed in the position he would have been in had the contract been performed, *but not in a better position.*'" *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 278 (7th Cir. 1996) (emphasis in

---

[4] The court also explained that "set off" technically applies only in the context where a defendant has a separate cause of action against the plaintiff that is pleaded at the outset, *e.g.*, a counterclaim. *Binney*, 393 Ill. App. 3d at 296. Where, as here, the amount recoverable is reduced on account of payments from a third party, the concept is a reduction in damages under the single recovery rule (although courts at times do refer to such a reduction in damages as a "setoff").

original) (quoting *Gaiser v. Village of Skokie,* 271 Ill.App.3d 85, 95 (1995)). Towards that end, "a plaintiff's claimed [contract] damages are to be reduced by any payments he has received in compensation for the same harm or injury." *Hentze,* 237 Ill. App. 3d at 613; *see also Creation Supply, Inc.* v. *Hahn*, 608 F. Supp. 3d 668, 688-89 (N.D. Ill. 2022) (noting that "the law in Illinois is clear that a plaintiff is not entitled to double recovery," entitling defendants "to a reduction in damages – sometimes called a 'setoff' – to offset any amounts that the plaintiff already has collected from other sources in compensation for the same injury").

**III. <u>Analysis</u>**

Key to the Court's analysis here is whether the payments Plaintiffs received from Chubb concern the "same harm or injury" for which the jury awarded damages against Belfor. Belfor argues they undoubtedly did for four reasons:

First, Plaintiffs sought recovery for the damage to their Home and collectively for 11,799 items of contents in that Home. Towards that end, throughout this litigation, Plaintiffs presented the same damages figures for both Belfor and Chubb. For example, Plaintiffs' construction cost expert Mr. Larry Schaedel presented two figures—one for the cost to repair the Home and another for the cost to rebuild the Home entirely [Dkt. 451-1 at 4-5]; Mr. Schaedel did *not* present a set of figures for damages allegedly caused by Chubb and another for damages allegedly caused by Belfor. Similarly, Plaintiffs' fine artifacts/contents expert Ms. Carrie Baker never broke out different sets of damages suggesting that Belfor and Chubb allegedly caused distinct injuries to the contents. [Dkt. 451-2 at 1.] There is no evidence that Plaintiffs sought different types or amounts of recovery from Chubb or Belfor for "different" injuries to their house and contents. That is to say, Plaintiffs have identified no distinct injury caused by Belfor.

Second, and confirming that point, Plaintiffs' now-settled claims for breach of contract and violation of Section 155 of the Illinois Insurance Code against Chubb sought damages for the same

losses and injuries as their claim for breach of contract against Belfor. To be part of the same "injury," conduct need not occur at the same time, or be of the same type; instead, it need only have "contributed to or exacerbated" the injury. *Mercola* v. *Abdou*, 223 F. Supp. 3d 720, 727 (N.D. Ill. 2016). Here, Plaintiffs' prior breach of contract and tort claims against Chubb concerned the same injuries to the Home, contents, and ALE. As the Court referenced in its July 21, 2025 Order [Dkt. 397], Plaintiffs' proposed jury instructions (which Plaintiffs submitted to the Court by email on July 11, 2025) included an instruction informing the jury that Chubb and Belfor were jointly and severally liable for the full amount of Plaintiffs' damages.[5] The Concept of joint and several liability presupposes multiple defendants are liable for a single injury. *E.g.*, *Fed. Trade Comm.* v. *Day Pacer LLC*, 125 F.4th 791, 812 (7th Cir. 2025) (joint and several liability obtains where multiple defendants cause a "single, indivisible injury"). The Court further explained in its July 21 Order:

> [W]hether Chubb payments would offset any liability of Belfor ***was an issue present from the outset of the case***, as Plaintiffs recognized by proposing a jury instruction that Belfor and Chubb had joint and several liability, which necessarily meant that amounts paid by one defendant would inure to the benefit of the other.

[Dkt. 397 (emphasis added).][6]

---

[5]     Plaintiffs' proposed instruction [Dkt. 451-3] read:

Under the law, when two parties breach separate contracts and it is not reasonably possible to segregate the damages between those parties, both parties are jointly and severally liable for the full amount of the plaintiff's damages.

Joint and several liability means that Chubb and Belfor will share responsibility for the Wexlers' damages, but you are not required to allocate the damages between Chubb and Belfor.

If you find that Chubb and Belfor both are liable to the Wexlers for damage to their home, then you are not required to divide up the damages between Chubb and Belfor. You may find that both Chubb and Belfor are liable for the cost to repair or replace the Wexlers' home. You also may find that Chubb and Belfor are both liable for the additional living expenses that the Wexlers incurred while they were unable to live in their home due to mold and water damage.

If you find that Chubb and Belfor both are liable to the Wexlers for damage to their contents, then you are not required to divide up the damages between Chubb and Belfor. You may find that both Chubb and Belfor are liable for the cost to replace the Wexlers' contents.

[6]     Indeed, even the Wexler/Chubb Settlement Agreement contains a clause memorializing that the Wexlers and Chubb did not "intend[]" for the agreement to impact Belfor's liability [Settlement Agreement, p. 1]. However, it is axiomatic that Chubb and the Wexlers cannot impact the rights of Belfor in this way because Belfor was not a party to the settlement

Third, following the insurance appraisal process ordered by the Court, Plaintiffs made no objection that the award failed to cover all of the injuries suffered by Plaintiffs' Home or contents.

Fourth, and finally, when Plaintiffs moved *in limine* to exclude evidence of the payments made by Chubb from evidence at trial against Belfor, they omitted any contention that the payments were irrelevant because they concerned different injuries to their house and contents. Plaintiffs relied only on the "collateral source rule," which the Court rejected. [Dkt. 397.]

For these reasons, the Court agrees the payments Chubb made to Plaintiffs concerned the *same injuries* to the Home and contents that Plaintiffs presented to the jury in connection with their breach of contract claim against Belfor. This is borne out by the jury instructions and the jury verdict form, which asked the jury to determine if Plaintiffs were damaged "because of Belfor's failure to perform the contract" – not whether Plaintiffs sustained damages due to water or due to mold. [Dkt. 438 (verdict form); *see also* Dkt. 472 at Instruction 21 (contract required Belfor to properly repair the Home, including but not limited to mold remediation).] As such, the jury's award must be reduced by the payments made by Chubb to the Plaintiffs. *See Binney*, 393 Ill. App. 3d at 296 (remanding damages award to trial court with directions to account for amounts received by plaintiffs in settlement with insurer); *Narkiewicz-Laine* v. *Doyle*, 930 F.3d 897, 904-05 (7th Cir. 2019) (reducing damage award for common law claim by amount received pursuant to statutory claim); *Matsushita Elec. Corp. of Am.* v. *Home Indem. Co.*, 907 F. Supp. 1193, 1199-1200 (N.D. Ill. 1995) (where plaintiff "suffered only one injury," payments by insurers "serve to reduce the damages it may collect from" defendant); *Doctors Hosp.*, 494 B.R. at 358-59.

---

agreement, and under Illinois law, the principle of privity of contract dictates that a non-party cannot be bound by the terms of an agreement. *Contra Protect Our Parks, Inc. v. Buttigieg*, 97 F.4th 1077, 1089 (7th Cir. 2024) ("[i]t is a rather vanilla statement of contract law" that "a cause of action based on a contract may be brought only by a party to that contract, by someone in privity with such a party, or by an intended third-party beneficiary of the contract."). The very inclusion of this WHEREAS clause was likely because the issue of setoff arose in pretrial motion practice and the parties to the Wexler/Chubb Settlement Agreement realized that the issue of the single-recovery rule would be a problem for the Wexlers to overcome should they receive a jury award that amounted to a "windfall" recovery against Belfor.

Because "damages are not assessed by defendant or by claim but for an injury", *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 640 (7th Cir. 2011) (signals omitted), the Court must now analyze how much of a reduction is appropriate under the circumstances. As mentioned in the Material Facts section above, at trial (but outside the presence of the jury), the Court was presented with Chubb's Statement of Loss, a summary that Bob Paradis of Chubb maintained in the regular course of business that reflected the amounts that Chubb had paid in connection with the Wexlers' insurance claim for the damages sought by the Wexlers in this lawsuit. [TT at 481:21-482:11, 500:19-506:9.] The Statement of Loss revealed that Chubb paid $1,248,379.19 in connection with the Wexlers' dwelling, $1,258,023.03 in connection with the Wexlers' contents, $521,319.85 in ALE, and an additional $10,000 in coverage for mold. [Belfor Trial Ex. 319; Trial Transcript at 529:3-11.] These payments totaled $3,037,722.07. And Plaintiffs have offered nothing in their briefing to suggest the Chubb payments (particularly for contents) did not pertain to the same items for which the jury awarded damages in this case.[7] Importantly, the $3,037,722.07 in payments under the policy do *NOT* include the $1.5 million dollar settlement payment Chubb paid the Wexlers pursuant to the Settlement Agreement to settle any amounts in dispute related to the Wexler's insurance claim "for covered water damage to their home and contents resulting from the Burst Pipe Incident." [Settlement Agreement, at 1.]

Further, as Belfor correctly argues [Dkt. 469 at 2], the Settlement Agreement plainly dismisses all claims relating to the "Burst Pipe Incident" and the subsequent "Claim" Plaintiffs submitted to

---

[7]    In arguing that the Chubb payments were based on the "Enservio total loss inventory, while the inventory prepared by their expert, Carrie Baker, "was not based *entirely* on the Enservio inventory," because she "took other information" in creating her list of items, Plaintiffs imply that the damages figure Ms. Baker prepared included items to which the Chubb payments did not apply. First, Ms. Baker's testimony did *not* indicate she valued any items not on the Enservio list. [Trial Transcript at 856:3-858:3.] And to the extent Plaintiffs suggest *Belfor* needed to establish precisely which items were included in Ms. Baker's report (Plaintiff's *own* contents expert), Plaintiffs are mistaken. This is not Belfor's burden. *See*, *e.g.*, *Portalatin*, 900 F.3d at 383-84 (finding that plaintiff failed to establish that a prior settlement that contained multiple claims did not include sums related to the injury at hand, and that "a subsequent defendant should not bear the burden of proving what portion of the plaintiff's previous settlement should be set-off or be denied a set-off") (quoting *Patton v. Carbondale Clinic*, S.C., 641 N.E.2d 427, 433 (Ill. 1994)).

Chubb because of the Burst Pipe Incident. These claims all concern the same injury to the Plaintiffs' Home and resulting ALE for which the jury awarded damages. Because Plaintiffs received direct payments from Chubb in connection with the injuries to the Home and its contents that exceeded the damages awarded by the jury, they have been fully compensated for those injuries. Although Plaintiffs argue "[t]here is no possible way that the Settlement [Agreement] could include ALE payments that overlap with the jury's ALE award because Chubb stopped paying for ALE when its contractual obligation to do so ended in April 2021 pursuant to the express terms of the Chubb Policy, and the Wexlers only requested at trial ALE payments that they incurred after April 2021" [Dkt. 470 at 3], the Court finds this a disingenuous position for Plaintiffs to take in their post-trial briefs. Indeed, Plaintiffs took the exact *opposite* position before settlement—that Chubb was liable for all ALE—repeatedly: (i) in their allegations against Chubb [Dkt. 150 (Second Amended Complaint) at ¶¶ 97, 189, and 190]; (ii) in their position that delayed insurance payments by Chubb resulted in Chubb's continuing ALE liability [Dkt. 291, at 13]; (iii) in their damages itemization; and (iv) in their request for a "joint and several liability" jury instruction (which proposed that "You also may find that Chubb and Belfor are both liable for the additional living expenses that the Wexlers incurred while they were unable to live in their home due to mold and water damage." [Dkt. 451-3]).

In sum, while the jury determined Plaintiffs' Home and contents were damaged from the Polar Vortex water incursion event in the amount of $825,000 in total, Plaintiffs have already recovered or received the benefit of $4,537,722.07 from Chubb ($3,037,722.07 under the policy plus $1,500,000 under the Settlement Agreement) for this exact loss. This is more than five times the jury-assessed damages; it would certainly be a windfall to allow Plaintiffs to recover any additional monies from Belfor related to this same loss. Again, the Court must only put the Wexlers "in the position [they] would have been in had the contract been performed" *Binney*, 393 Ill. App. 3d at 295-96, which, according to the jury, required compensation in the amount of $825,000 for the entirety of their loss, an amount which has already been satisfied many times over. The Court must also take care "not to place [Plaintiffs] in a better

11

position or provide [them] with a windfall recovery." *Id*. Thus, in a decision the Court does not take lightly, it is required to grant Belfor's Motion to reduce the jury's damages award to $0 as Plaintiffs have already been compensated by Chubb up to (and well over) the amount of the jury's damage award for the same injury for which it found Belfor liable. As there can be no double recovery, there certainly can be no quintuple recovery.

## IV.    Conclusion

For all the foregoing reasons, Defendant Belfor USA Group Inc.'s Motion to reduce the damages awarded at trial to Plaintiffs [Dkt. 451] is granted.

Additionally, pursuant to the rulings herein, Plaintiffs' Motion for a New Trial Under Rule 59 [Dkt. 452], on the question of damages for "specialty contents" and additional living expenses, is denied.

**ENTERED: May 20, 2026**

Hon. Keri L. Holleb Hotaling,
United States Magistrate Judge