## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AMY WEXLER and KENNETH A. WEXLER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| BELFOR USA GROUP INC., | ) | No. 21 CV 2543 |
| | ) | |
| Defendant. | ) | |

## BELFOR USA GROUP INC.'S
## <u>RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

DM1\301916079.1

Belfor USA Group, Inc. ("Belfor") submits this renewed motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b), to preserve, for appellate proceedings that Plaintiffs have now initiated, its arguments that Plaintiffs failed to offer the evidence required to establish the applicable measure of damages and that Plaintiffs lacked standing to pursue their claims. In support of its motion, Belfor respectfully states as follows:

## I.      STANDARD

"Under Rule 50, a court should grant judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Alexander v. Mount Sinai Hosp. Med. Ctr.*, 484 F.3d 889, 902 (7th Cir. 2007) (noting that the "standard for granting judgment as a matter of law mirrors the standard for granting summary judgment" and that the court therefore "must view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the party against whom judgment was granted") (citing *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 886-87 (7th Cir. 2001)).

A directed verdict is proper where "'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.'" *Pro Football Wkly., Inc. v. Gannett Co.*, 988 F.2d 723, 726-27 (7th Cir. 1993) (citing *Maple v. Gustafson,* 151 Ill.2d 445, 177 Ill.Dec. 438, 442, 603 N.E.2d 508, 512 (1992)). "This standard does not require a complete lack of evidence to support the nonmovant's claim. Rather, a directed verdict is still proper when there is only a mere scintilla of evidence to support the nonmovant's allegations...." *Id.* (citing *Pennsylvania Truck Lines, Inc. v. Solar Equity Corp.,* 882 F.2d 221, 225 (7th Cir. 1989)).

DM1\301916079.1

## II.     ARGUMENT

Judgment as a matter of law in Belfor's favor is warranted for two reasons. *First*, Plaintiffs did not supply the evidence required to establish the correct measure of damages, or the evidence required under any of the potentially applicable measures. *Second*, Plaintiffs failed to establish that they possess standing to pursue their claims.

### A.     Plaintiffs Failed to Supply Evidence of the Applicable Measure of Damages.

This Court ruled that "Plaintiffs bear the burden of proving they sustained damages resulting from the breach and establishing both the correct measurement of damages and the final computation of damages based on that measurement." (Dkt. 381, at 6) (citing *First Nat'l Bank of Elgin v. Dusold*, 180 Ill. App. 3d 714, 718, 536 N.E.2d 100, 103 (2d Dist. 1989) ("The burden of proof regarding the correct measure of plaintiff's damages is on the plaintiff, not the defendant…."). Further, "damages are an essential element of a breach of contract action, for without damages there can be no recovery." *Id.* "Damages may not be awarded on the basis of speculation and conjecture." *Id.*

#### 1.     Plaintiffs failed to adduce the necessary evidence regarding alleged damages to their contents.

For allegedly damaged contents, this Court established a two-step process. The Plaintiff first had to present evidence of whether each item can or cannot be repaired, as that determines which measure of damages applies. For items deemed repairable, "the proper measure of damages is the reasonable cost of repair" (subject to a cap of the market value at the time of loss). Dkt. 381, at 6; *Beasley v. Pelmore*, 631 N.E.2d 749 (Ill. App. Ct. 1994); *Wall v. Amoco Oil Co.*, 416 N.E.2d 705 (Ill. App. Ct. 1981). For items deemed non-repairable, the measure of damages is the market value at the time of loss. Dkt. 381 at 5; *Harris v. Peters*, 653 N.E.2d 1274 (Ill. App. Ct. 1995). Critically, "'[l]ack of testimony concerning the condition and fair market value of the property' at

the time of loss is fatal to any action to recover for its loss." *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 130314, ¶ 30, *quoting First Nat'l Bank of Elgin v. Dusold,* 180 Ill. App. 3d 714, 719 (1989). Because Plaintiffs did not introduce evidence to allow a jury to make a reasoned determination of repairability, and further failed to elicit any evidence of either the cost to repair or the fair value at the time of loss, the Court should direct a verdict in favor of Belfor.

### a.    Plaintiffs presented no repairability evidence.

Plaintiffs lack the necessary evidence at every step. They presented no evidence of whether any of the approximately 12,000 items for which they sought recovery were repairable. Quite the contrary, their experts Mr. Kathenes (books) and Ms. Baker (all other contents) ***assumed*** all items were a total loss and made no assessment of repairability. (Trial Transcript ("TT") 844:12–845:1; 846:17–847:8, 855:14–857:4, 868:5–7). The only evidence that Plaintiffs could point to in support of that assumption was the fact that their insurer listed items on a "total loss inventory." But this description only describes how Chubb and its agents were treating the items from an insurance perspective, not what their actual condition was or whether or not repair was possible.[1]

Nor did any other witness address the repairability of any of the approximately 12,000 items. Although Enservio added items to its "total loss" inventory, there was no evidence or testimony establishing that those items were, in fact, unrepairable. Further, Plaintiffs conceded that some quantity of items from the Glencoe house were at the Lincoln Park that they later occupied and that other items were kept in storage for which Plaintiffs paid material sums. (TT 390:12-22, 391:8–14). Such evidence indicated such items plainly were not "total losses." Based on that some

---

[1] Mr. Paradis testified that if "items are either, you know, destroyed beyond—you know, they can't be repaired or cleaned, or items that just don't respond to cleaning, we add them to a total loss inventory to be replaced." (TT 437:1-4). He did not testify as to any specific determination that the items listed on a total loss inventory were in fact destroyed or beyond repair.

evidence, a jury could not reasonably find that all items were a total loss. Because Plaintiffs have not presented evidence of which items are repairable—and clearly at least some were—there was no way to ascertain which items were or were not repairable.[2]

### b. Plaintiffs presented no evidence of fair market value.

Second, even if Plaintiffs' evidence could establish certain items were non-repairable, they lacked the applicable measure of damages.

Plaintiffs presented only evidence of *replacement value*, which is the cost to buy a brand new item, and not the value on which a willing buyer and a willing seller would agree for the item at the time of the loss. *See First Nat'l Bank of Elgin v. Dusold*, 536 N.E.2d 100, 102–103 (Ill. App. Ct. 1989) (quoting *Trailmobile Div. of Pullman, Inc. v. Higgs*, 297 N.E.2d 598 (Ill. App. Ct. 1973)) ("Where, however, the property cannot be economically repaired the measure of damages is the difference between the market value of the property before the injury and the value of the wreckage"); *Williams-Bowman Rubber Co. v. Ind. Maint., Welding & Mach. Co.*, 677 F. Supp. 539 (N.D. Ill. 1987). Ms. Baker confirmed that she ascertained only the cost to replace the contents of the Glencoe house and did not consider the age or condition of any item at the time of the loss (which would have an impact on market value). (TT 851:23–852:5, 866:1–868:4). Mr. Kathenes similarly testified that his assignment was only to estimate replacement cost, not to make any determinations of value. (TT 831:3–6, 835:5–22, 844:12–845:3; 846:8–847:8). Further, Ken Wexler conceded that he did not even know whether anything in the house was brand new on

---

[2] Although certain of Plaintiffs' items were sent to the Chicago Conservation Center or B.I.G. for cleaning and restoration (TT 138:15-139:18, 157:15-20, 344:10-345:2, 346:20-347:2, 348:16-19; 480:7-21), that fact does not establish whether or not those items were repairable, and in fact Plaintiffs contend that many of the items sent to the Conservation Center or B.I.G. were a total loss even if the item was intact. (TT 205:22–206:13; 479:22–480:3; 491:15–492:2).

4

February 7, 2019, when the contract at issue was formed (TT 389:20–390:7). Plaintiffs simply did not put forth the required evidence.

In ruling on Belfor's summary judgment motion, the Court noted cases that allowed Plaintiffs to use alternate measures of damages in lieu of fair market value. (Dkt. 381, at 5-6; *see also Rajkovich v. Alfred Mossner Co.*, 199 Ill. App. 3d 655, 660 (1990) (weighing the value of a drawing intended for exhibition that lacked a commercial market).) However, those are inapposite. In those cases an alternative measure of damages was permitted because there was evidence that a fair market value *did not exist* for the item at issue. That is distinguishable from the case here, where plaintiffs introduced no evidence establishing fair market value for any of the items at issue *and* no evidence establishing that a fair market value *did not exist* for any of the items at issue.

This very distinction was recognized by this district court in *Macy's, Inc. v. Johnson Controls World Servs., Inc.*:

> Courts will consider "the secondary means for proving property's value only where no market has established a value for the property damaged" because "any other interpretation would allow the plaintiff to pluck the highest value from several methods of determining the property's value, thus undermining the goal of compensatory damages."

670 F. Supp. 2d 790, 801 (N.D. Ill. 2009).[3] Indeed, Illinois courts have recognized that the replacement cost of an item cannot be substituted for the fair market value of the item at the time

---

[3] The *Macy's* court ultimately awarded only nominal damages for office furniture where plaintiff failed to present evidence of the fair market value and offered only replacement cost (at an arbitrary 40% discount):

> Bloomingdale's paid $792.31 to replace office furniture destroyed by the flood. As with other replaced property, Bloomingdale's is entitled to recover the pre-flood fair market value of the replaced furniture. Bloomingdale's presented evidence that the furniture replaced was approximately one year old, but presented no evidence of the fair market value of the furniture replaced. Rather, it claims damages of $475.39, which is a forty percent depreciation of the cost of the replacement furniture. But, as explained above, this is an improper measure of the value of the furniture replaced. Therefore, the court finds that Bloomingdale's incurred damages from the flood in the destruction of this furniture, but also finds that Bloomingdale's has failed to establish a reasonable basis for the calculation of damages, and therefore awards Bloomingdale's $1 in nominal damages.

of loss because most common household goods depreciate over time such that awarding plaintiffs the cost of new items as replacement cost is a windfall that makes the plaintiff more than whole. *Benford,* 2014 IL App (1st) 130314, at ¶ 32.

Because the fair market value of Plaintiffs' contents was in fact ascertainable, and Plaintiffs presented no evidence that it was not, Plaintiffs' reliance on other values such as replacement costs to establish the measure of damages forecloses their ability to recover damages as a matter of law.

> **c.      Plaintiffs presented no evidence of the value of their contents at the legally relevant points in time.**

Plaintiffs' damages case suffered from another fatal flaw. Plaintiffs' contract with Belfor was not signed until February 7, 2019. Belfor therefore had no liability for preserving the condition of Plaintiffs' contents prior to that date. Thus, the fair market value that was operative for purposes of calculating damages was the fair market value of Plaintiffs' possessions on February 7, 2019, when the contract was signed and after multiple days of water damage had already occurred. Plaintiffs' contents experts only testified as to the replacement value of new items. They presented no expert testimony or other evidence as to the value of Plaintiffs' contents six days after the pipes had burst. Nor did they offer evidence as to the market value of the items immediately after Plaintiffs terminated Belfor from the job on May 7, 2019.

Plaintiffs' testimony about the sentimental value of certain items did not alter this analysis. Sentimental value cannot be readily monetized, and it is not foreseeable. *See, e.g. Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 288 (7th Cir. 1997) (recognizing that the jury's award in that case properly excluded sentimental or fanciful value); Restatement (Second) Torts § 911 cmt. e (1979) ("[D]amages cannot be based on sentimental value. Compensatory damages are not given for

---

670 F. Supp. 2d at 802; *see also Standard Plumbing Supply Co. v. U.S. Steel Corp.*, 703, 804–805 F.2d 802 (5th Cir. 1983).

DM1\301916079.1

emotional distress caused merely by the loss of such things."); *Carpel v. Saget Studios, Inc.*, 326 F. Supp. 1331, 1333–34 (E.D. Pa. 1971) (recognizing that sentimental value cannot be considered as a measure of damages because it is too speculative). While the Plaintiffs testified that certain objects held such value for them, their measure of damages as to those items remained the repair cost of the item,[4] the fair market value of the item if it could not be repaired, or the replacement cost if the evidence established that no market for the item existed. Plaintiffs did not meet that burden here.

Plaintiffs similarly could not establish the measure of damages for repairable items. While Plaintiffs did present evidence that certain items were sent for repair, their clear testimony was that in many instances those repairs were unsuccessful. (TT 479:22–480:3; 491:15–492:2.) The only evidence of the cost to repair was invoices for the cost of those efforts—invoices which did not distinguish between items that Plaintiffs were, or were not, claiming as repairable at trial. (TT 505:24–506:6.) There was thus no evidence before the jury of damages associated with repairable items that were recoverable against Belfor.

> **2. Plaintiffs presented no evidence sufficient to establish the applicable measure of damages to the house.**

It was Plaintiffs' burden to establish both the correct measure of damages and the computation of damages based on that measurement. *Ollivier v. Alden*, 634 N.E.2d 418, 422-23 (Ill. App. Ct. 1994); *Jurkovic v. Boulder Dev., Inc.*, 2021 IL App (1st) 200940-U, ¶ 31.

As this Court has held, "the damage to real property is determined by [1] the reasonable expense of necessary repairs to the property that was damaged or [2] the difference between the

---

[4] Plaintiffs did not establish the repair costs of any items at trial except those which were repaired by Chicago Conservation Center or B.I.G., both of which, it is undisputed, were retained by, and paid for by, Chubb. Thus, there is no evidence of repair costs that could properly be assessed against Belfor as damages.

7

fair market value of the real property *immediately* before the occurrence and its fair market value *immediately* after the occurrence, *whichever is less*." (Dkt. 381 at 4 (emphasis added)); *see* IPI 30.17, 30.18 (the Illinois Pattern Jury Instructions ("IPI") contain instructions setting forth the measure of damages for damage to real property. IPI 30.17 discusses the Measure of Damages for Repairable Damage and IPI 30.18 discusses the Measure of Damages for Permanent or Continuing Damage). Further, and importantly, the Court established that "fair market value is generally considered to be 'the price a willing buyer would pay a willing seller for the subject property, there being no collusion and neither party being under any compulsion.'" (*Id.*, at 4 n.1 (citing *Bloomington Pub. Sch., Dist. No. 87, McLean Cnty., Ill. v. Illinois Prop. Tax Appeal Bd.*, 379 Ill. App. 3d 387, 389 (2008)).

In order to establish damages, therefore, Plaintiffs needed to establish the lesser of (1) the reasonable expense of repairs *and* (2) the diminution in value based on applicable instructions and the law of this case. Plaintiffs made no effort to establish either.

<blockquote>

**a.      Plaintiffs offered no evidence of fair market value immediately before or immediately after the occurrence.**

</blockquote>

The evidence clearly established that Plaintiffs' contract with Belfor was executed on February 7, 2019, and terminated on May 7, 2019. Because this is a breach of contract case, the calculation of the diminution in fair market value of the property necessarily turned on the questions of what the value of the property was "immediately before" February 7, 2019, and "immediately after" May 7, 2019. *See* Dkt. 381, P. 4 ("In other words, the damage to real property is determined by the reasonable expense of necessary repairs to the property that was damaged or

8

the difference between the fair market value of the real property *immediately before* the occurrence and its fair market value *immediately after* the occurrence, whichever is less.").

There was no evidence at trial of what the fair market value of Plaintiffs' home was on February 7, 2019, six days after burst pipes had flooded the home and during which no professional water remediation had occurred. Although Mr. Wexler testified generally about his beliefs as to the value of the house prior to the Polar Vortex based on its location and his investments in it, and introduced evidence of valuations from prior to that time, Plaintiffs presented no evidence of the value of the house after water damage had occurred but before Belfor had been retained—the time period that *had* to be considered by the jury if any damages were to be awarded.

Nor was there any evidence of the fair market value of the home on May 7, 2019, or immediately thereafter, a subject which necessarily requires expert testimony. *See generally Cunningham v. Masterwear Corp.*, 569 F.3d 673 (7th Cir. 2009) (granting summary judgment where Plaintiff had no evidence "by a real estate agent or real estate appraiser to establish the effect of the [PCE] contamination on the value of their property"). As a result of those oversights, Plaintiffs could not and did not establish the diminution in value that is causally connected to Belfor's alleged breach of contract.

> **b.     There was no evidence of fair market value generally.**

Plaintiffs may attempt to establish diminution in value by pointing to two distinct pieces of evidence, yet neither can assist them. The first piece is Chubb's 2016 appraisal (Wexler Ex. 87), which was admitted over objection. But when questioned, Chubb's Bob Paradis was clear that that appraisal was an appraisal of the *replacement value* of the house itself, not the fair market value of the property:

9

Q. So, Mr. Paradis, I want to start kind of where we ended with the appraisal report. So, when you said that the replacement cost of the home represents the fair market value, what did you mean by that?
A. That's the cost -- if the house were to burn down, that's the cost to rebuild the house like it was.
Q. So, you're not referring to the fair market value to purchase the home?
A. No, because it does not include land.
Q. You're referring just to the cost of what it would take to rebuild the home?
A. Yes.

(TT 468:7–19.)

The cost of labor and materials necessary to rebuild the house is not evidence of what a willing buyer would have paid for the Glencoe house, which, according to Ken Wexler, was built in 1957 and was "lived in." (TT 217:5–6). The appraisal is irrelevant also because, as Mr. Paradis testified, it concerns the replacement of the house itself and does not account for land values, which are inextricable from the fair market value of the property. Additionally, this 2016 appraisal cannot be considered to have occurred "just before" the 2019 contract at issue in this case: it is separated from the time of the alleged damage by years (and by six days of exposure to water damage).

The second piece of evidence to which Plaintiffs may point is Mr. Wexler's lay testimony about what he believes the house is worth.[5] The only actual number concerning market value that the jury could consider was a hearsay statement by Mr. Wexler about the price at which he believed the Redfin website had valued his property. (TT 258:7–24). Plaintiffs did not present the Redfin website to the jury, and even if they had attempted to do so the website would have been inadmissible, both as hearsay and because there was no proof of the methodology used to determine the figure offered or to establish its reliability otherwise. *See Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009) (recognizing that testifying property owners

---

[5] Plaintiffs likely resorted to this gambit because Plaintiffs' damages expert on their house admitted that he had no real estate appraisal experience and no opinions on the fair market value of the house. (TT 826:15–827:1).

10

are not allowed to "merely repeat" another person's valuation of their property). The dangers of such double-hearsay "evidence" came into sharp relief when Mr. Wexler (after a break) stated that he had checked Redfin during the break and offered a new number that was $700,000 to $1,500,000 lower than the original range he stated. (TT 307:5–10). Valuation evidence requires specialized knowledge and, under the circumstances here, should be offered through experts with specialized knowledge who are properly disclosed as such under Rule 26. *See Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560–61 (7th Cir. 2008) (characterizing valuation testimony as expert testimony when it involves specialized knowledge, such as estimating the value of goods based on market experience, and excluding such testimony when witness was not properly disclosed as an expert under Rule 26(a)(2)).[6]

Finally, all the other issues with this testimony aside, it remains the case that Redfin's supposed valuation of the Glencoe house on July 28, 2025, *was not* the fair market value of the property "immediately before" or "immediately after" the alleged breach of contract.

The evidence presented by Plaintiffs thus fell short of establishing the required measure of damages because it demands that they establish the diminution in fair market value caused by Belfor's breach of contract in order to compare it to the cost to repair. As such, based on this Court's previous rulings of the law in this case, Plaintiffs failed to supply the evidence required to permit a jury to make a determination of damages to the Glencoe house.

For these reasons, a directed verdict in favor of Belfor is warranted on Plaintiffs' breach of contract claim to the extent it is based on alleged damage to the Glencoe house.

---

[6] Moreover, Plaintiffs did not even establish that the values reflected on the Redfin website constitute a "valuation" under the Federal Rules of Evidence or that they could properly substantiate damages for a breach of contract claim. Plaintiffs offered nothing to suggest that an actual person engaged by Redfin undertook a valuation of the Plaintiffs' home, as opposed to Redfin simply setting forth the results generated by an algorithm or other computer-based tool.

11

### B.    Plaintiffs Have Not Established Standing to Maintain Their Claims.

Standing is a threshold requirement imposed by Article III of the Constitution, which limits federal subject matter jurisdiction to claims that present an actual case or controversy in whose outcome a plaintiff has a "personal stake." *Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000). Even where the parties agree that a plaintiff has constitutional standing, courts must satisfy themselves that the jurisdictional requirement is met. *Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998); *see also* Fed. R. Civ. P. 12(h)(3). Standing, moreover, "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof," meaning that at trial Plaintiff must adduce competent evidence establishing its standing. *County of Cook v. Wells Fargo & Co.*, 544 F. Supp. 3d 833, 835 (N.D. Ill. 2021). "If standing is challenged as a factual matter, the plaintiff must come forward with 'competent proof'—that is a showing by the preponderance of the evidence—that standing exists." *Lee v. City of Chi.*, 330 F.3d 456, 468 (7th Cir. 2003).

At trial, Plaintiffs introduced into evidence Exhibit 1, a copy of their insurance policy with Chubb. Pursuant to that Policy, Plaintiffs and Chubb agreed that:

> If we make a payment under this policy, we will assume any recovery rights a covered person has in connection with that loss, to the extent we have paid for the loss. All of your rights of recovery will become our rights to the extent of any payment we make under this policy.

Although the Court excluded evidence about payments made by Chubb from the jury trial, Belfor's offer of proof by Mr. Paradis established that Chubb made payments under the Policy of at least $3,037,722.07, including payments for repairs to the Wexlers' dwelling and for the replacement of the Wexlers' contents. Additionally, it is now a matter of public record that Chubb settled Plaintiffs' claims brought under the policy for an additional payment in the amount of $1.5 million. Based on Mr. Paradis's testimony and, separately, the facts Belfor would have been able to put into evidence had its motion to compel production of the settlement agreement been granted,

12

DM1\301916079.1

it is clear that under the insurance policy Plaintiffs assigned at least some portion of their "recovery rights" to Chubb, thereby surrendering their own standing to pursue such claims. *See In re Wolf*, 644 B.R. 725, 757 (N.D. Ill. 2022), aff'd, No. 23-1045, 2023 WL 6564882 (7th Cir. Oct. 10, 2023) (noting that with regards to standing, "[a]n unequivocal and complete assignment [of claims] extinguishes the assignor's rights ... and leaves the assignor without standing") (citing *Matter of Motors Liquidation Co.*, 689 F. App'x 95, 96 (2d Cir. 2017)); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1131 (C.D. Cal. 2015) ("Once a claim has been assigned  the assignee is the owner and the assignor generally lacks standing to sue on it") (citing *WellPoint II*, 903 F. Supp. 2d 880, 897 (C.D. Cal. 2012)); *In re K-Ram, Inc.*, 451 B.R. 154, 168 (Bankr. D.N.M. 2011) (stating that "[i]f one makes an absolute assignment of a cause of action, that person loses standing to pursue, continue, or settle it because they are no longer the real party in interest") (citing Wright, Miller, Kane and Marcus, 6A Federal Practice & Procedure § 1545 (3d ed.) ("Under present law an assignment passes the title to the assignee so that the assignee is the owner of any claim arising from the chose and should be treated as the real party in interest under Rule 17(a).")).

While Belfor remained in the dark about the extent of such an assignment, because the evidence was not ordered turned over until after trial, it was Plaintiffs' burden to establish their standing and, thus, it was their burden to demonstrate to this Court, by a preponderance of the evidence, that their insurance policy did not assign or extinguish their claims against Belfor. There is no evidence to that effect, and a directed verdict on the question of standing is therefore warranted.

13

## III.    CONCLUSION

Belfor respectfully requests that this renewed directed verdict motion be granted Belfor's favor based on Plaintiffs' failure to meet their burden to establish the measure of damages as to their damages claims for real property or personal property, as well as on the issue of standing.

Dated: June 15, 2026                                    Respectfully submitted,

                                                        /s/ *John D. Cooke*

                                                        Brian A. McAleenan
                                                        John D. Cooke
                                                        Chris J. Chasin
                                                        Duane Morris LLP
                                                        190 South LaSalle Street, Suite 3700
                                                        Chicago, IL  60603-3433
                                                        Telephone: 312-499-6700
                                                        Email: bamcaleenan@duanemorris.com
                                                        jdcooke@duanemorris.com
                                                        cjchasin@duanemorris.com

14